# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., | |
| Plaintiff, | Civil Action No: |
| vs. | |
| ACTAVIS HOLDCO U.S., INC., ACTAVIS PHARMA, INC., ACTAVIS ELIZABETH LLC, AKORN, INC., AKORN SALES, INC., APOTEX CORP.,  ASCEND LABORATORIES, LLC, AUROBINDO PHARMA USA, INC., BARR PHARMACEUTICALS, LLC, BRECKENRIDGE PHARMACEUTICAL, INC., CITRON PHARMA, LLC, DAVA PHARMACEUTICALS, LLC, DR. REDDY'S LABORATORIES, INC., EMCURE PHARMACEUTICALS, LTD., ENDO INTERNATIONAL PLC, EPIC PHARMA, LLC, FOUGERA  PHARMACEUTICALS INC., GENERICS BIDCO I, LLC, GLENMARK PHARMACEUTICALS INC., USA, HERITAGE PHARMACEUTICALS INC., HI-TECH PHARMACAL CO., INC., IMPAX LABORATORIES, INC., LANNETT COMPANY, INC., LUPIN PHARMACEUTICALS, INC., MAYNE PHARMA INC., MORTON GROVE PHARMACEUTICALS, INC., MUTUAL PHARMACEUTICAL COMPANY, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN N.V., PAR PHARMACEUTICAL, INC., PERRIGO NEW YORK, INC., PLIVA, INC., SANDOZ, INC.,  SUN PHARMACEUTICAL INDUSTRIES, INC., TARO PHARMACEUTICALS U.S.A., INC., TELIGENT, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES, INC., UPSHER-SMITH LABORATORIES, LLC, WEST-WARD PHARMACEUTICALS CORP., WOCKHARDT USA LLC, AND ZYDUS PHARMACEUTICALS (USA) INC. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   AT LEAST THE FOLLOWING DRUGS WERE THE SUBJECT OF THE CONSPIRACY ........................................................................................ 13

III.  VENUE AND JURISDICTION ...................................................... 18

IV.  PARTIES ...................................................................................... 20

A.  Plaintiff.............................................................................................. 20

B.  Defendants......................................................................................... 23

C.  Co-Conspirators and Agents ............................................................ 40

V.  TRADE AND COMMERCE ............................................................... 41

VI. GENERIC DRUGS, THE FDCA & THE HATCH-WAXMAN AMENDMENTS ................................................................................. 42

VII.  THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS ........ 47

A.  The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers..................................... 47

B.  At Least 45 State Attorneys General Are Also Investigating the Anticompetitive Conduct in The Generic Drug Industry .................................. 52

VIII.  THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS ........................... 56

A.  The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions. ...................................................................... 57

B.  Defendants Used Sales Employees and Trade Association Meetings to Facilitate Their Collusion...................................................... 59

C.  Defendants Communicated in Secret Through Email, Telephone, and Text Messages.......................................................................................... 85

IX.  THE CONSPIRATORIAL PRICE-FIXING AGREEMENTS ........................... 86

A.  Acetazolamide ................................................................................. 87

B.  Albuterol.......................................................................................... 94

C.  Amitriptyline ................................................................................... 97

D.  Baclofen......................................................................................... 100

E.  Benazepril HCTZ .......................................................................... 103

F.  Clobetasol ...................................................................................... 105

G. Clomipramine ......................................................................................... 107

H. Desonide ................................................................................................. 110

I. Digoxin ................................................................................................... 113

J. Divalproex ER ........................................................................................ 117

K. Doxycycline ........................................................................................... 121

L. Econazole ............................................................................................... 141

M. Fluocinonide .......................................................................................... 148

N. Fosinopril HCTZ .................................................................................... 151

O. Glipizide-Metformin .............................................................................. 158

P. Glyburide ................................................................................................ 162

Q. Glyburide-Metformin ............................................................................. 167

R. Leflunomide ........................................................................................... 170

S. Levothyroxine ........................................................................................ 173

T. Lidocaine-Prilocaine .............................................................................. 178

U. Meprobamate .......................................................................................... 179

V. Nimodipine ............................................................................................. 183

W. Nystatin .................................................................................................. 190

X. Paromomycin .......................................................................................... 203

Y. Pravastatin .............................................................................................. 205

Z. Propranolol ............................................................................................. 208

AA. Theophylline ER ..................................................................................... 212

BB. Ursodiol .................................................................................................. 214

CC. Verapamil ............................................................................................... 217

DD. Zoledronic Acid ..................................................................................... 221

X. THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION ............................................................................................. 226

XI. DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING ............................................................................................... 228

XII. DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY ........................................................................................ 230

XIII. ANTITRUST INJURY ........................................................................... 230

XIV. TOLLING AND FRAUDULENT CONCEALMENT ............................ 232

XV. ANTITRUST VIOLATIONS, BY CONSPIRACY ............................... 241

A.   Overarching Conspiracy on All Price-Fixed Generic Drugs (All Defendants) .... 241

B.   Individual Conspiracies by Drug ......................................................................... 252

   1.   Acetazolamide Conspiracy (Heritage, Lannett, Taro, Teva, and Zydus) .......... 255

   2.   Albuterol Conspiracy (Mylan and Sun) ............................................................. 258

   3.   Amitriptyline Conspiracy (Mylan, Par, and Sandoz) ........................................ 260

   4.   Baclofen Conspiracy (Lannett, Par, Teva, and Upsher-Smith) ......................... 263

   5.   Benazepril HCTZ (Mylan and Sandoz) ............................................................. 265

   6.   Clobetasol Conspiracy (Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt) .............................................................. 268

   7.   Clomipramine Conspiracy ( Mylan, Sandoz, and Taro) ..................................... 271

   8.   Desonide Conspiracy (Actavis, Fougera, Perrigo, Sandoz, and Taro) .............. 274

   9.   Digoxin Conspiracy (Impax, Lannett, Mylan, Par, Sun, and West-Ward) ........ 276

  10.   Divalproex ER Conspiracy (Dr. Reddy's, Mylan, Par, and Zydus) ............... 279

  11.   Doxycycline Conspiracy (Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward) ................................................................................ 282

  12.   Econazole Conspiracy (Fougera, Perrigo, Taro, and Teligent) ..................... 285

  13.   Fluocinonide Conspiracy (Actavis, Taro, and Teva) ..................................... 287

  14.   Fosinopril HCTZ Conspiracy (Aurobindo, Citron, Glenmark, Heritage, and Sandoz) ............................................................................................................ 290

  15.   Glipizide-Metformin Conspiracy (Heritage, Mylan, and Teva) .................... 293

  16.   Glyburide Conspiracy (Aurobindo, Citron, Heritage, and Teva) .................. 296

  17.   Glyburide-Metformin Conspiracy (Actavis, Aurobindo, Citron, Heritage, and Teva) ......................................................................................................... 298

  18.   Leflunomide Conspiracy (Apotex, Heritage, and Teva) ............................... 301

  19.   Levothyroxine Conspiracy (Lannett, Mylan, and Sandoz) ........................... 304

  20.   Lidocaine-Prilocaine Conspiracy (Akorn, Fougera, Hi-Tech, Impax, and Sandoz) ............................................................................................................ 307

  21.   Meprobamate Conspiracy (Dr. Reddy's and Heritage) .................................. 309

  22.   Nimodipine Conspiracy (Ascend, Heritage, and Sun) ................................... 312

  23.   Nystatin Conspiracy (Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva) ......................................................................................................... 315

  24.   Paromomycin Conspiracy (Heritage and Sun) .............................................. 318

  25.   Pravastatin Conspiracy (Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Sandoz, Teva, and Zydus) ............................................................................... 320

26.   Propranolol Conspiracy (Actavis, Breckenridge, Heritage, Mylan, Par, PLIVA, Teva, UDL, and Upsher-Smith) ..........................................................323

27.   Theophylline ER Conspiracy (Heritage and Teva) ........................................326

28.   Ursodiol Conspiracy (Actavis, Epic Pharma, and Lanett) ............................329

29.   Verapamil Conspiracy (Actavis, Heritage, and Mylan) ................................331

30.   Zoledronic Acid Conspiracy (Dr. Reddy's, Heritage, and Par) ....................334

XVI.  LEGAL CLAIMS FOR RELIEF AND CAUSES OF ACTION......................337

FIRST CLAIM FOR RELIEF ................................................................337

SECOND CLAIM FOR RELIEF ...........................................................338

THIRD CLAIM FOR RELIEF ...............................................................341

FOURTH CLAIM FOR RELIEF ...........................................................346

XVII. PRAYER FOR RELIEF ...................................................................................349

JURY DEMAND .........................................................................................................350

United HealthCare Services, Inc. ("Plaintiff" or "UHS") files this Complaint under the antitrust laws of the United States and the State laws as alleged in this Complaint against each of the above-captioned Defendants (collectively "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    This is a civil action against Defendants for violating federal and state antitrust laws by conspiring to fix, increase, stabilize, or maintain prices of generic pharmaceutical drugs in a case that continues to grow.  As recently as December 9, 2018, reports indicated that the ongoing investigation led by state and federal regulators had ballooned to encompass 300 generic drugs and at least 16 companies and certain aspects of the unlawful conduct can be traced back to at least 2006.[1]  According to reports, over steak dinners, cocktails, and rounds of golf, executives at the Defendant companies developed a term—"sandbox"—as a shorthand way to describe how they unlawfully conducted business.  The conspirators were expected to "play nice" in the sandbox.  This was code for participation in an ongoing anticompetitive conspiracy:  The companies agreed to fix prices and allocate a "fair share" in markets for generic pharmaceuticals to ensure profitability and undermine competition.  As noted by the States at a July 11,

---

[1] Christopher Rowland, *Investigation of generic 'cartel' expands to 300 drugs*, Washington Post (Dec. 9, 2018).

2018 court conference, "this could be the largest cartel case in the history of the United States."[2]

2.      Plaintiff UHS, together with its subsidiaries and affiliates, is the single largest health insurance carrier and services provider in the United States, administers pharmaceutical drug benefits on behalf of millions of Americans, and through its mail-order and specialty retail pharmacies is also a direct purchaser of the generic pharmaceuticals at issue.  Plaintiff seeks damages against Defendants, jointly and severally, injunctive relief to prevent and restrain Defendants' continuing violations of the antitrust laws, and all such other relief as provided by federal law and the State laws asserted in this Complaint.

3.      The existence of collusion in the generic pharmaceutical industry is well established at this point:  the former President and the former CEO of Defendant Heritage have pleaded guilty to federal criminal charges of anticompetitive collusion relating to multiple generic drugs, and the States, which include the attorneys general from 49 jurisdictions, have unearthed compelling evidence of widespread anticompetitive conduct spanning numerous manufacturers and drugs.[3]

---

[2] July 11, 2018 Hrg. Tr. at 36:1-4; 48:10-16, *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL 2724 (E.D. Pa.).

[3] The allegations set forth below are based on publicly available information.  UHS has not yet been permitted access to millions of documents, including emails and cellphone records, that investigators have gathered.  UHS reserves the right to amend this Complaint based on discovery or further proceedings in this case.

4.      The unlawful and collusive conduct sweeps far broader than the guilty pleas, which merely define the minimum parameters of the generic drug price-fixing conspiracy.  A widespread conspiracy is detailed in the Consolidated Amended Complaint in a civil enforcement action brought by the Attorneys General of 45 States. *See* State Attorneys' General Consolidated Amended Complaint, ECF No. 3, Case No. 17-cv-3768-CMR (E.D. Pa.) ("State AG Complaint") (incorporated by reference).  The State AG Complaint is a result of information gathered in response to Civil Investigative Demands ("CIDs").

5.      The State AG Complaint reveals that the companies with whom Heritage's executives conspired regarding glyburide and doxycycline included at least Aurobindo, Citron, Mayne, Mylan, and Teva.  All seven of these companies manufactured a number of generic drugs other than glyburide and doxycycline, and also conspired with each other (and with other Defendants) to fix the prices of these drugs as well.  Glazer and Malek, as the CEO and the President of Heritage, respectively, had pricing authority for generic drugs other than doxycycline and glyburide, including, for example, propranolol. Thus, as alleged in this Complaint, Heritage, through Messrs. Glazer and Malek, conspired to fix prices of not just glyburide and doxycycline, but also propranolol— which Teva and Mylan also manufactured.

6.      In a Memorandum Opinion issued on June 5, 2018, the federal District Court for the Eastern District of Pennsylvania held that, based on "the facts alleged in the [State AG Complaint] – which resulted in part from an investigation commenced in 2014 by the State of Connecticut – it is plausible to infer that there was a broader

conspiracy." ECF No. 603, Case No. 16-MD-2724 (E.D. Pa. June 5, 2018), at 7. The court thus granted the State AGs leave to file their Consolidated Amended Complaint and rejected Defendants' arguments that such claims of an overarching conspiracy were "futile." *Id.*

7.     According to the State AG Complaint, the conspiracy included specific agreements to fix prices of at least 12 additional drugs in addition to glyburide and doxycycline, including acetazolamide, fosinopril-hydrochlorothiazide, glipizide-metformin, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline (extended release), verapamil, and zoledronic acid. In addition to the seven Defendants that colluded to fix prices of doxycycline and glyburide, the State AGs plead facts establishing that Defendants Actavis, Apotex, Ascend, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, Sun, and Zydus all reached an agreement not to compete on the pricing and sale of at least one of these 12 additional generic drugs. The State AG Complaint also explains that Mylan's CEO participated in the conspiracy in both his individual and official capacity.

8.     The State AGs explain clearly that the conspiracy was not limited to just the 15 drugs or 17 corporate Defendants identified in the State AG Complaint. To the contrary, the State AG Complaint also reveals substantial evidence of a broader, overarching conspiracy to cartelize the entire generic drug market. Specifically, the State AGs allege that there was a longstanding agreement or understanding in the generic drug industry that each competitor was entitled to a certain percentage of the market for each

generic drug that it manufactured, depending on the timing of its entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

9.      Through this industry-wide market allocation agreement, Defendants were also able to implement substantial price increases on a number of additional generic drugs.   For example, as detailed below, during the conspiracy, Defendants' price increases included increases on:  (1) acetazolamide of approximately 75%; (2) albuterol of more than 3,400%; (3) amitriptyline of more than 900%; (4) baclofen of more than 400%; (5) benazepril HCTZ of more than 300%; (6) clobetasol of more than 800%; (7) clomipramine of more than 2,700%; (8) desonide of more than 140%; (9) digoxin of more than 630%; (10) divalproex ER by as much as 361%; (11) econazole of more than 600%; (12) fluocinonide of more than 200%; (13) fosinopril HCTZ of approximately 200%; (14) levothyroxine of as much as 120%; (15) nystatin of approximately 100%; (16) paromomycin of approximately 100%; (17) pravastatin of more than 100%; (18) propranolol of more than 1,700%; (19) theophylline ER of approximately 150%; and (20) ursodiol of more than 560%.  All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that are the subject of the pending state and federal enforcement actions.

10.      Indeed, the United States Department of Justice ("DOJ") has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the 16 drugs that are not yet the subject of government enforcement actions

were nonetheless subject to collusion.[4]  Specifically, the DOJ informed the Court that "[e]vidence uncovered during the criminal investigation implicates other companies (including a significant number of the Defendants here) and individual employees in collusion with respect to . . . a significant number of the [16 additional drugs]."  The DOJ further noted that the lack of complete overlap between its criminal investigation and the 16 drugs that are not yet subject to enforcement actions should not be read as an indication that any of these drugs was not the subject of collusion by Defendants, explaining that:  "[s]till more companies and individuals, and additional drugs, may be implicated as the investigation continues to develop."

11.    Moreover, for the 16 (or more) drugs that are not yet known to be the subject of pending government enforcement actions, the collusive nature of Defendants' price increases on these drugs is supported by the facts from those enforcement actions that have been made publicly available.  Take digoxin, for example.  Digoxin is an essential heart medication that was widely used in the U.S. prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act.  Between 2010 and 2013, the price for digoxin was remarkably stable, with one tablet costing as little as 12 cents.  Beginning in October 2013, however, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward successfully raised prices from 12 cents per tablet to more than a dollar per tablet, an increase of 750%.  We know for certain (from Glazer's and Malek's guilty pleas) that

---

[4] United States' Cross Motion to Stay Discovery, at 2, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 561-1 (E.D. Pa. Oct. 27, 2017).

Heritage conspired to fix prices of doxycycline, and the State AG Complaint reflects that Mylan and Mayne were the unidentified co-conspirators with which Malek and Glazer pleaded guilty to conspiring.  Additionally, the State AG Complaint further reflects that Mylan, Lannett, Par, and Sun adhered to the generic drug industry's overarching market allocation agreement.  Accordingly, under the circumstances alleged here, the unprecedented 750% price increase on digoxin is also shown to be the result of collusion. (Or put differently, this enormous price increase was <u>not</u> the result of competitive and independent decision-making by documented conspirators participating in an industry rife with collusion).

12.    Further, each of the price increases that are the subject of this Complaint was against each Defendant's self-interest at the time in the absence of collusion.  This is because, among other reasons, based on fundamental economic theory and the nature of price competition in the generic drug industry, in the absence of collusion, each Defendant that raised prices would lose substantial market share to rivals that continued to price competitively.  This is particularly so where, as here, the price increases were so stunningly large.  Thousands of generic drugs have been sold in the U.S. since the passage of the Hatch-Waxman Act in 1984.  Prior to approximately 2007, nearly all of the pricing behavior of generic drugs was consistent with economic theory, *i.e.*, when generic entry occurred, generic drug prices declined.  Not so for the 30 generic drugs that are the subject of this Complaint; their pricing pattern—considered alone or in comparison with glyburide and doxycycline—is so unusual and extraordinary as to demonstrate the existence of a conspiracy.

13.     Still other economic evidence confirms the broader scope of the conspiracy alleged in this Complaint.  As alleged below, each of the generic drug price increases covered by this Complaint is not explained by changes in supply, the costs of production, or demand.  Indeed, there are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion.  Moreover, as alleged below, each of the generic drugs at issue (or, "Price-Fixed Generic Drugs") has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated. These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization.

14.     The existence of a broader generic drug price-fixing conspiracy is further revealed or supported by other activities of U.S. law enforcement.  The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint.  As explained in detail in Section VII, to empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.  Upon information and belief, nearly all the Defendants identified in this Complaint were served with grand jury subpoenas.  (The following companies have publicly acknowledged receiving the grand jury subpoenas: Mylan, Teva, Actavis, the Sandoz Defendants, Endo, Par, Sun, Impax, Lannett, Mayne, Dr. Reddy's, Sandoz, Aurobindo, and Taro.  Privately-held companies are under no obligation to make this disclosure.)  The DOJ also executed search warrants at the corporate offices of Perrigo, Mylan, and ACETO (which purchased Citron in 2016).  *See infra* § VII.  For this to

occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and ACETO. *See* U.S. CONST. amend. IV. Finally, upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in this case. This company has not yet publicly acknowledged its amnesty status, but it has been reported that "Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under the DOJ's leniency program[.]"[5] Under the DOJ Guidelines, for DOJ to grant a company conditional amnesty, the amnesty applicant had to confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant. *See id.* Press reports indicate that "[t]he Department of Justice (DOJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[6]

15.     As noted above, the State AGs' and DOJ's investigations are ongoing and likely involve additional conspirators and additional drugs beyond those named in this Complaint. For example, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic

---

[5] Richard Vanderford, Generic Pharma Investigation Still Broad, Prosecutor Says, mLex (Feb. 21, 2017).

[6] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

pharmaceutical industry. The government has been obtaining information from Greenstone.

16.    In addition to the information made public from these government investigations, the allegations in this Complaint are further supported by the fact that Defendants engaged in an extremely high level of interfirm communications. These communications included a large number of in-person meetings facilitated by an almost constant stream of industry trade events, such as the trade association meetings sponsored by the Generic Pharmaceutical Association. *See infra* § VIII. In addition to these in-person meetings, Defendants frequently communicated by telephone, email, and text message. *See id.* As demonstrated in this Complaint, these interfirm communications involved high-level executives with pricing authority and directly affected Defendants' pricing decisions on the generic drugs identified in this Complaint.

17.    Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic drug prices and allocate markets and customers. As alleged in greater detail below, the sheer volume of industry meetings provided the perfect opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations described below confirms that Defendants availed themselves of this opportunity. Defendants implemented their conspiracy through numerous meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the

Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

18.     Considered collectively—(1) the guilty pleas; (2) the State AGs' civil enforcement action and allegations; (3) the unprecedented price increases with respect to the generic drugs covered in this Complaint (particularly given the economic and market conditions in the generic drug industry); (4) the absence of any reasonable economic or market explanation for these price increases other than collusion; (5) the correlation between the unprecedented and indisputably collusive pricing on glyburide and doxycycline and the other generic drugs covered in this Complaint; (6) the economic and structural factors rendering the market for the manufacture and sale of generic drugs conducive to cartelization; (7) the extremely high level of interfirm communications by senior executives with pricing authority that occurred in-person through trade association meetings as well as by telephone, email, and text message; and (8) the other U.S. law enforcement activities, including the search warrants and criminal subpoenas—all support the existence of the conspiracy alleged in this Complaint.

19.     Defendants and their co-conspirators carried out their continuing conspiracy regarding generic drugs through in-person meetings and communications, including emails, text messages, and telephone calls.  During these meetings and communications, they conspired on the terms alleged in this Complaint, and coordinated price increase announcements or pricing terms, allocated markets and customers, rigged bids, secretly and collusively exchanged pricing information and prospective pricing

announcements and business plans, and collectively reduced quantity and restrained output of generic drugs throughout the United States.

20.     Upon information and belief, a single group of core conspirators consisting of Actavis, Heritage, Mylan/UDL, Par/Endo, Sun, Taro, Teva/PLIVA, and the Sandoz Defendants (collectively the "Core Conspirators") engaged in the conduct alleged in this Complaint and directed the implementation of an overarching conspiracy.  Each of the Price-Fixed Generic Drugs alleged in this Complaint were manufactured by at least one of the Core Conspirators.  A second group of conspirators, consisting of Akorn/Hi-Tech, Apotex, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, Fougera, Glenmark, Impax, Lannett, Lupin, Mayne, Morton Grove/Wockhardt, Perrigo, Teligent, Upsher-Smith, West-Ward, and Zydus (collectively the "Additional Conspirators") joined the Core Conspirators and were active participants in the overarching conspiracy. In some cases, these Additional Conspirators only manufactured one or two of the Price-Fixed Generic Drugs, but their participation in the overarching conspiracy was useful to raise the price of the Price-Fixed Generic Drugs that they manufactured because it would have been in their independent interests not to follow the price increases of the other conspirators and thereby increase their market share.  The existence of the overarching conspiracy permitted the Core Conspirators to induce the Additional Conspirators to increase prices on each of the Price-Fixed Generic Drugs to implement and maintain the overarching conspiracy.

21.     The allegations in this Complaint are pleaded in the alternative if necessary to avoid inconsistency.  As set forth in Sections XV and XVI, Plaintiff alleges an

overarching conspiracy among all Defendants regarding all of the Price-Fixed Generic Drugs, as well as individual conspiracies among the specified Defendants regarding each individual Price-Fixed Generic Drug.  Defendants' conduct violated Section 1 of the Sherman Act, as well as the laws of all States alleged below.

## II.     AT LEAST THE FOLLOWING DRUGS WERE THE SUBJECT OF THE CONSPIRACY

22.     "Acetazolamide" is a carbonic anhydrase inhibitor used to treat a wide range of conditions including epilepsy, glaucoma, temporary paralysis, hypertension, heart failure, and altitude sickness.

23.     "Albuterol" is a bronchodilator that specifically targets the β-2 receptor of the lungs to relax muscles in the airways and increase airflow to the lungs.  It was first discovered in the 1960s and is commonly prescribed to treat wheezing and shortness of breath caused by, among other things, asthma and chronic obstructive pulmonary disease.

24.     "Amitriptyline" is an antidepressant also used to treat other conditions such as migraines and nerve pain.

25.     "Baclofen" is a commonly prescribed muscle relaxant and anti-spastic medication used primarily to alleviate the signs and symptoms of spasticity resulting from multiple sclerosis ("MS"), particularly for the relief of flexor spasm and concomitant pain, clonus, and muscular rigidity.

26.     Benazepril hydrochlorothiazide ("benazepril HCTZ") is a commonly prescribed drug for the treatment of high blood pressure and kidney disease.  Benazepril

HCTZ combines an angiotensin converting enzyme ("ACE") inhibition, benazepril, and hydrochlorothiazide, a diuretic.

27.     "Clobetasol" means clobetasol proprionate topical ointment 0.05%, topical solution 0.05%, topical gel 0.05%, topical cream 0.05%, and emollient 0.05%. Clobetasol is a highly potent topical corticosteroid used to treat skin disorders such as eczema, psoriasis, and dermatitis.  Clobetasol is available in topical ointment, solution, emollient-cream, or gel form.

28.     "Clomipramine" is a prescription oral tricyclic antidepressant used to treat obsessive compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

29.     "Desonide"—which includes topical ointment 0.05% and topical cream 0.05%—is a topical corticosteroid used to treat skin disorders such as eczema, psoriasis, and dermatitis.  Because it is less potent than clobetasol, it is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids.  Desonide is available in cream or ointment form.

30.     "Digoxin" is a purified cardiac glycoside used to treat atrial fibrillation and mild to moderate heart failure.

31.     "Divalproex ER" refers to divalproex sodium extended release.  It derives from valproate, a compound that has been in use for more than 100 years and is a commonly prescribed anticonvulsant indicated for the treatment of migraines and seizures.

32.    "Doxycycline" is a tetracycline antibiotic that is used to treat bacterial infections ranging from malaria to Lyme disease to various STDs.  Doxycycline hyclate ("doxy hyclate") is a water-soluble form of doxycycline that absorbs quickly into the bloodstream.  A delayed release version of doxy hyclate ("doxy DR") is used to treat acne.  Doxy hyclate is available in regular release capsules and tablets, and delayed release tablets.  Doxycycline monohydrate ("doxy mono") is a significantly less water-soluble form of doxycycline that absorbs more slowly than doxy hyclate.

33.    "Econazole" refers to econazole nitrate cream 1%.  Econazole is a topical antifungal agent used to treat skin infections such as ringworm, tinea versicolor, and yeast infections.  Econazole is available in topical cream, ointment, emollient-cream, or gel form.

34.    "Fluocinonide"—which includes topical cream 0.05%, topical ointment 0.05%, and topical gel 0.05%—is a topical corticosteroid used to treat conditions such as psoriasis and eczema.  Among other things, fluocinonide reduces the swelling, itching, and redness that can occur in these types of conditions.

35.    Fosinopril-hydrochlorothiazide ("fosinopril HCTZ") refers to the combination of fosinopril (an angiotensin converting enzyme) and hydrochlorothiazide (a diuretic) used to treat hypertension and heart failure.

36.    "Glipizide-metformin" combines glipizide (a sulfonylurea that stimulates the body's natural insulin production) with metformin (a biguanide that reduces the body's absorption of sugar) in order to reduce blood sugar in patients with type-2 diabetes.

37.     "Glyburide" is an oral diabetes medication that is used to control blood sugar levels caused by Type 2 diabetes.

38.     "Glyburide-metformin" is also taken orally to control blood sugar for patients with type-2 diabetes that combines glyburide with metformin.

39.     "Leflunomide" is a pyrimidine synthesis inhibitor used to treat arthritis.

40.     "Levothyroxine" refers to levothyroxine sodium.  It is a synthetic thyroid hormone replacement used to treat hypothyroidism and other thyroid ailments such as goiters.

41.     "Lidocaine-prilocaine" is a combination anesthetic indicated for dermal anesthesia, meaning it is a combination of two topical anesthetics that is applied to the skin or genital area to cause numbness or loss of feeling before a medical procedure.

42.     "Meprobamate" is an oral tranquilizer used to treat various anxiety disorders.

43.     "Nimodipine" is a dihydropyridine calcium channel blocker used to manage and reduce the risk of certain brain hemorrhages.

44.     "Nystatin" is an antifungal medication used to treat Candida infections and yeast infections.

45.     "Paromomycin" is an antibiotic used to treat a wide range of infections, including amebiasis, giardiasis, leishmaniasis, and tapeworm infection.

46.     "Pravastatin" is a HMG CoA reductase inhibitor used to lower triglycerides and LDL cholesterol, lowering the risk of stroke, heart attack, and other heart complications.

47.     "Propranolol" is a beta-blocker used to prevent heart attack and to treat heart or circulatory conditions such as hypertension and angina.  Propranolol is available in capsule and tablet form.

48.     "Theophylline ER" is an extended release form of theophylline used to treat asthma and other lung conditions such as emphysema and chronic bronchitis.

49.     "Ursodiol" is a widely-prescribed drug used to treat gallstones.  A bile acid, it works by decreasing the production of cholesterol and by dissolving the cholesterol in bile so that it cannot form stones.

50.     "Verapamil," including verapamil hydrochloride, is a calcium channel blocker used to treat hypertension (high blood pressure), angina, and certain heart rhythm disorders.

51.     "Zoledronic acid" is a bisphosphonate used primarily by cancer patients to prevent skeletal fractures and treat bone disease.  It is also used to treat osteoporosis.

52.     As it is used in this Complaint, the term "Price-Fixed Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations of generic acetazolamide, albuterol, amitriptyline, baclofen, benazepril HCTZ, clobetasol, clomipramine, desonide, digoxin, divalproex ER, doxycycline (including doxy hyclate, doxy DR, and doxy mono), econazole, fosinopril HCTZ, fluocinonide, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, levothyroxine, lidocaine-prilocaine, meprobamate, nimodipine, nystatin, paromomycin, pravastatin, propranolol, theophylline ER, ursodiol, verapamil, and zoledronic acid.

III.     **VENUE AND JURISDICTION**

53.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Plaintiff asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

54.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391.  During the relevant time period (at least March 2011 to the present), Defendants resided, transacted business, and/or were found or had agents in the United States, including this District.  During the alleged time period, Defendants sold and shipped the generic drugs at issue in a continuous and uninterrupted flow of interstate commerce in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.  Defendants engaged in an unlawful conspiracy to artificially increase prices for the generic drugs at issue that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and each Defendant is otherwise subject to the service of process provisions of 15 U.S.C. § 22.  Throughout the time period alleged herein, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of the generic drugs at issue

transmitted interstate between and among offices of Defendants and their customers throughout the United States.

55.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District. Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in or from this District including, without limitation, selling one or more generic drugs at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because, *inter alia*, and as alleged in this Complaint, each Defendant has transacted business in this District, each Defendant has contracted to

supply services or things in this District, and because the District's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the District to satisfy due process; and/or

(e)     Based on the allegations in this Complaint, Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum District) and have purposefully availed themselves of the laws of the United States.  As alleged in this Complaint, each Defendant, either directly, or indirectly through their subsidiaries, engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce throughout the United States, including this District.

## IV.   PARTIES

### A.   Plaintiff

56.     Plaintiff UHS is a corporation organized and existing under the laws of Minnesota with its principal place of business in Hennepin County, Minnesota.  It is a wholly owned subsidiary of UnitedHealth Group, Incorporated, which is also headquartered in Minnetonka, Minnesota.

57.     UHS is engaged in servicing prescription drug managed care programs provided to members and beneficiaries under insurance plans offered by UHS's subsidiaries and affiliates, which, together, constitute the largest single health insurance carrier and services provider in the United States, and serve some 70 million individual

insureds ("UnitedHealthcare Insureds").[7]   UHS is the centralized and primary contracting entity responsible for payments made for pharmaceutical drugs dispensed to UnitedHealthcare Insureds throughout the country.  From its headquarters in Hennepin County, Minnesota, UHS negotiated and executed contracts with Pharmacy Benefit Managers ("PBMs") on behalf of itself and its health plan subsidiaries and affiliates ("UnitedHealthcare Plans"), and during the relevant time period, was (and is) contractually responsible for the payments made under those contracts, including for the Price-Fixed Generic Drugs dispensed to UnitedHealthcare Insureds during the relevant time period.

58.     UHS is the parent company of, or otherwise an affiliate/related company to, each of the UnitedHealthcare Plans, which issue health insurance to UnitedHealthcare Insureds, including for coverage of prescription drug costs.  The UnitedHealthcare Plans issue insurance to UnitedHealthcare Insureds covering prescription drugs in the form of (1) fully insured commercial ("Commercial") plans; (2) Medicare plans; and (3) Medicaid plans.  The UnitedHealthcare Plans provide these prescription drug insurance benefits to UnitedHealthcare Insureds in all 50 states, the District of Columbia, and Puerto Rico.  These UnitedHealthcare Plans are listed in the attached Exhibit A.

59.     UHS is also an affiliate and the assignee of OptumRx Group Holdings, Inc., OptumRx, Inc., and their wholly owned pharmacy subsidiaries as pertaining strictly

---

[7] For purposes of this Complaint, UnitedHealthcare Insureds do not include those members of self-insured health plans, also known as self-funded or Administrative Services Only ("ASO") customers.

to the purchases made for or arising out of the business of their wholly owned pharmacy subsidiaries (collectively, "Pharmacy Assignors").   Pharmacy Assignors buy prescription drugs and dispense them to prescribed consumers, on a mail-order or specialty retail pharmacy basis.   Pharmacy Assignors have purchased substantial quantities of the Price-Fixed Generic Drugs directly from drug manufacturers, including Defendants and/or their co-conspirators, and have assigned to UHS their claims and the rights to obtain all recoveries arising out of such direct purchases and the matters alleged in this Complaint.

60.   By this Complaint, UHS seeks recovery for all unlawful overcharges incurred in connection with paying for Price-Fixed Generic Drugs dispensed to UnitedHealthcare Insureds, including all those receiving insurance or health benefits from any of the UnitedHealthcare Plans (or their predecessors or successors), as well as in connection with direct purchases made by Pharmacy Assignors.

61.   UHS is the proper entity to pursue all forms of relief, including damages, for all injury and losses incurred as alleged in this Complaint.  In a separate and unrelated antitrust case, defendants, some of which are Defendants in this case, have suggested that the UnitedHealthcare Plans were the proper entities to seek indirect purchaser/payor damages recovery for overcharges for drugs dispensed to UnitedHealthcare Insureds. That position is incorrect.  Nonetheless, out of an abundance of caution, and to further assure the Court that there is no potential for any duplicative recovery, UHS has obtained assignments from the UnitedHealthcare Plans, conveying to UHS any claims and rights to recoveries they may have in connection with the matters alleged in this Complaint.

UHS hereby asserts those assigned claims in the alternative to the claims of UHS, to the extent that the UnitedHealthcare Plans are found to be sole owners of any claims that are non-duplicative to those of UHS.  Accordingly, to the extent that the Court were to find such assignments from the UnitedHealthcare Plans are required for any claims, all subsequent references to "UHS" include both itself and its assignor UnitedHealthcare Plans, unless expressly indicated otherwise.

B.    **Defendants**

62.    Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In March 2015, Actavis plc, the parent company of Defendant Actavis, merged with Allergan plc ("Allergan") and adopted Allergan's name.  In August 2016, Defendant Teva USA purchased Actavis' generics business, which included Actavis Inc., Actavis Elizabeth Inc., and Defendant Actavis Pharma Inc., from Allergan plc.  All the assets of the entities were then transferred to the newly formed Actavis Holdco.  The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities. During the time period relevant to Plaintiff's claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint.

63.    Defendant Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey.  It is a wholly

owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis' generic operations.  During the time period relevant to Plaintiff's claims, Actavis Elizabeth directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint.

64.    Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  During the time period relevant to Plaintiff's claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.  Actavis Holdco (and its predecessors), Actavis Pharma, and Actavis Elizabeth are collectively defined as "Actavis."  Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

65.    Defendant Akorn, Inc. is a Louisiana corporation with its principal place of business located in Lake Forest, Illinois.  It is the parent company of Defendant Hi-Tech (defined below).  Akorn, Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Akorn Inc. directly participated in the conspiracy alleged in this Complaint,

produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

66.     Defendant Akorn Sales, Inc. is a Delaware corporation with its principal place of business in Lake Forest, Illinois.  It is a wholly owned subsidiary of Akorn, Inc. Akorn Sales, Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Akorn Sales, Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.  Defendants Akorn, Inc. and Akorn Sales, Inc. are defined collectively as "Akorn."

67.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Apotex directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint.

68.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation with its principal place of business in Parsippany, New Jersey.  During the time period relevant to Plaintiff's claims, Ascend directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs

throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint.

69.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business located in Dayton, New Jersey. Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Aurobindo directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

70.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware company with its principal place of business in North Wales, Pennsylvania.  Barr is a wholly owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.  Barr directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

71.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business located in Fairfield, New Jersey.  Breckenridge is wholly owned by Pensa Pharma S.A.  Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Breckenridge directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed

Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

72.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business located in East Brunswick, New Jersey.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims Citron directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

73.     Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.  DAVA is a wholly owned subsidiary of Defendant Endo (defined below), and affiliate of Defendant Par (defined below).  During the time period relevant to Plaintiff's claims, DAVA directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

74.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business located in Princeton, New Jersey.  Dr. Reddy's is a wholly owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company.  Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint,

produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

75. Defendant Endo International plc ("Endo"), is an Irish company with its principal place of business in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania. Endo is the parent company of Defendant Par (defined below). In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par, from a private investment firm for about $8 billion in cash and stock. At that time, Endo created a combined U.S. Generics segment that included Par, and Endo's subsidiary co-conspirator, Defendant Generics Bidco/Qualitest, naming the segment Par Pharmaceutical, Inc. Further, in August 2014, Endo acquired Defendant DAVA and folded it into Par. During the time period relevant to Plaintiff's claims, Endo manufactured and sold in the United States generic doxycycline, and as alleged below, took affirmative steps to reduce the supply of doxycycline in the U.S. market, including the forum state. Defendant Endo is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Endo directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint. During the time period relevant to this Complaint, Endo purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

76.     Defendant Emcure Pharmaceuticals Ltd. ("Emcure") is an Indian corporation.  Emcure is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Emcure directly participated in the conspiracy and engaged in the unlawful conduct alleged in this Complaint.  Through its wholly owned subsidiary Heritage Pharmaceuticals Holdings Inc., Emcure is the also sole owner of Defendant Heritage Pharmaceuticals Inc. Emcure further purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

77.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York.  Epic is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Epic directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

78.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera.  Fougera is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Fougera directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United

States and its territories, and engaged in the unlawful conduct alleged in this Complaint. The term "Sandoz Defendants" refers to Fougera and Sandoz, collectively.

79.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama, and formerly conducted business as Qualitest Pharmaceuticals ("Qualitest"). Generics Bidco is a wholly owned subsidiary of Defendant Endo, and affiliate of Defendant Par (defined below). During the time period relevant to Plaintiff's claims, Generics Bidco/Qualitest directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

80.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey. Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

81.    Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey. In April 2011, Emcure, an Indian company headquartered in Pune, India, acquired Heritage. Heritage is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Heritage directly

participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

82.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business located in Amityville, New York.  Hi-Tech is a wholly owned subsidiary of Defendant Akorn, which purchased Hi-Tech in April 2014, for $640 million.  Hi-Tech is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Hi-Tech directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

83.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  Defendant Impax is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Impax directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

84.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  Defendant Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Lannett directly participated

in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

85.    Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business located in Baltimore, Maryland.  Lupin is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Lupin directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

86.    Defendant Mayne Pharma Inc. ("Mayne") is a Delaware corporation with its principal place of business located in Paramus, New Jersey.  In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories, and has also operated under the name Midlothian since that time.  In 2013, Mayne also acquired Libertas Pharma.  Mayne is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Mayne directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

87.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois.  Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove.

Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Morton Grove directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

88.    Defendant Mutual Pharmaceutical Company, Inc. ("Mutual") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  It is a wholly owned subsidiary of SPII (defined below).  Many of the pharmaceutical products sold and distributed throughout the United States during the relevant period by SPII, URL (defined below), and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.  Mutual is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims Mutual directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

89.    Defendant Mylan N.V. is a Dutch corporation with its principal place of business and global headquarters in Canonsburg, Pennsylvania.  Mylan N.V. is the direct parent corporation of Defendant Mylan Inc. and the ultimate parent and owner of Defendants Mylan Pharma and UDL (both defined below).  During the time period relevant to Plaintiff's claims, Mylan N.V. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs

throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint.

90.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. is the parent company of Defendant UDL (defined below) and Defendant Mylan Pharma (defined below).  Mylan Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint.

91.     Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  Mylan Pharma is a subsidiary of Defendant Mylan Inc.  Mylan Pharma is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims Mylan Pharma directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.  Mylan N.V., Mylan Inc., Mylan Pharma, and UDL (defined below) are collectively defined as "Mylan."

92.     Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business located in Chestnut Ridge, New York.  Defendant

Endo is the parent company and owner of Defendant Par.  As alleged above, in September 2015, Endo purchased Par from a private investment firm.  PPI, Generics Bidco/Qualitest and DAVA collectively do business as Par Pharmaceutical, and are collectively referred to as "Par."  Defendant Par is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Par directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

93.    Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Allegan, Michigan.  Perrigo is a subsidiary of Perrigo Company plc, an Irish company.  Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

94.    Defendant PLIVA, Inc. ("PLIVA") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  PLIVA is a wholly owned subsidiary of Defendant Teva (defined below).  PLIVA is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims PLIVA directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout

the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

95.     Defendant   Sun   Pharmaceutical   Industries,   Inc.   (f/k/a   Caraco Pharmaceutical Laboratories, Ltd.) ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.   Co-conspirator Sun Pharmaceutical Industries Ltd. ("Sun Ltd."), based in Mumbai, India, along with certain of its wholly owned subsidiaries, owns 100% of SPII.   Sun Ltd. also owns approximately 70% of Defendant Taro (defined below) and Taro's parent, Taro Pharmaceutical Industries, Ltd. Beginning in 1997, Sun Ltd. began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Ltd.'s US operations for generic pharmaceutical products.   In late 2012, SPII acquired URL Pharma, Inc. ("URL"), and its subsidiary, Defendant Mutual, both of which have their principal place of business in Philadelphia, Pennsylvania.   Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia.   SPII is defined to include its managers, officers, employees, and agents acting on its behalf.   During the time period relevant to Plaintiff's claims SPII directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.   SPII, URL, Mutual, and Caraco are collectively defined as "Sun."

96.     Defendant Sandoz, Inc. ("Sandoz USA") is a Colorado corporation with its principal place of business located in Princeton, New Jersey.   Sandoz USA distributes

the drugs that its parent, Sandoz Germany, develops and manufacturers. Sandoz USA and Sandoz Germany are both owned by Novartis International AG. Defendant Sandoz USA is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Sandoz USA directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint. Sandoz USA is referred to as "Sandoz."

97.     Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli corporation. Taro is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Taro directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

98.     Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business located in Buena, New Jersey. Teligent is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims Teligent directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-

Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

99.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation. Teva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Teva directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

100.    Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois.  UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc.  UDL is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, UDL directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

101.    Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business located in Maple Grove, Minnesota.  Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Upsher-Smith directly participated in the

conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

102.    Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey.  West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company.   West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

103.    Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt is a wholly-owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc.   Wockhardt is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Wockhardt directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint.

104.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business located in Pennington, New Jersey.

Zydus is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Zydus directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint.

### C.   Co-Conspirators and Agents

105.   Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

106.   The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiff. Plaintiff reserves the right to amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

107.   At all relevant times, other persons, firms, and corporations, referred to in this Complaint as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described in this Complaint.

108.   The acts alleged in this Complaint that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

109.    The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.    TRADE AND COMMERCE

110.    During the time period relevant to the claims asserted in this Complaint, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)    Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic drugs;

(b)    Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)    Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States;

(d)    Defendants and their co-conspirators imported substantial quantities of raw materials for generic drugs from outside the United States; and/or

(e)     Prices for the generic drugs at issue have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels as paid in interstate transactions throughout the United States.

111.     The substantial effect of Defendants and/or their co-conspirators' anticompetitive conduct on commerce throughout the United States and in each individual State and territory gives rise to the claims asserted in this Complaint.

## VI.     GENERIC DRUGS, THE FDCA & THE HATCH-WAXMAN AMENDMENTS

112.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain Food and Drug Administration ("FDA") approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).  Congress enacted the Drug Price Competition and Patent Term Restoration Act (often referred to as the "Hatch-Waxman Act") in 1984 to promote competition and lower drug prices.[8]  Under the Hatch-Waxman Act, a manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA by showing that the

---

[8] *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

113.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

114.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

115.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic

43

alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

116.    Generic versions of brand name drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective as their brand name counterparts.  The only material difference between generic and brand name drugs is their price:  generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers and payors.  The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiator and the basis for competition among manufacturers.

117.    Generic competition usually enables market participants to acquire or pay for generic versions of the brand drug at a substantially lower price than the brand drug.  Generic competition to a single blockbuster brand drug (*i.e.*, a drug that generates annual sales of $1 billion or more) can result in billions of dollars in savings to health insurance

entities, and others. Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[9]

118. Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Amendments, every State has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

119. There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and pharmacy retailers (such as Pharmacy Assignors) pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug, and particularly where there is legitimate generic competition. Health insurance third-party payors such as UHS, which pays for prescription drugs dispensed to insureds, also benefit from the lower prices charged as a result of generic competition.

120. Further, the more generic manufacturers that enter a market, the more the price for the drug decreases. As an FDA study reflects, "generic competition is

---

[9] GPhA, Generic Drug Savings in the U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction," as average prices fall to roughly half the price of the branded drug.   Further, with the entry of each additional generic manufacturer up to the ninth manufacturer, the price continues to fall.   In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version.   This phenomenon is demonstrated in the following chart prepared by the FDA:



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

121.   Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.   WAC prices represent the manufacturer's benchmark or reported list price.   The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.   Manufacturers generally provide

their WACs to purchasers or report them to publishers that compile that information for the market.[10]

## VII.   THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS

122.   As set forth in this Complaint, the fact of a conspiracy to manipulate the price of generic drugs is not legitimately in dispute.   What remains unknown is the complete scope of the vast conspiracy.

### A.   The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers

123.   As noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas to several generic drug manufacturers, including nearly all Defendants and/or their affiliates.   Grand jury proceedings are conducted in secret and news of the investigation was not publicly reported until months later.

124.   In 2016, BLOOMBERG NEWS reported that the investigation encompassed more than a dozen companies and at least two dozen generic drugs.   The source quoted by the BLOOMBERG article correctly predicted in November 2016 that the DOJ would file criminal charges against at least one member of the generic drug price-fixing conspiracy by the end of 2016.[11]

---

[10] At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.

[11] *See* D. McLaughlin & C. Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG NEWS (Nov.  3, 2016), *available at*

125.    On December 12, 2016, DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage).  Both Glazer and Malek later pleaded guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for glyburide and doxycycline.  The Hon. Barclay Surrick of the U.S. District Court for the Eastern District of Pennsylvania determined that there was a factual basis for both Glazer's and Malek's pleas and convicted each individual of a felony violation of the Sherman Act.

126.    Following the plea agreements of Malek and Glazer, the DOJ has obtained and executed search warrants against at least ACETO Corporation (which purchased Citron's generic drugs business in December 2016), Perrigo, and Mylan in connection with the generic drug price-fixing probe.  Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was probable that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

127.    In addition to the raid of Perrigo's, Mylan's, and ACETO's corporate offices, the grand jury empaneled by DOJ as part of its investigation has issued subpoenas to numerous Defendants and/or their employees.  Mylan, Teva, Actavis, the Sandoz Defendants, Endo, Par, Sun, Impax, Lannett, Mayne, Dr. Reddy's, Aurobindo,

---

https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

and Taro have all acknowledged receiving criminal grand jury subpoenas from DOJ. Upon information and belief, additional companies have also received subpoenas but have not publicly acknowledged this fact.

128. The fact that most Defendants and/or their employees received criminal subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, *available at* https://www.justice.gov/atr/division-manual.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  *Id*. at III-82.  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83.  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which Price-Fixed sales were made or where conspiratorial communications occurred." *Id*.  Thus, the fact that one or more of the Defendants and certain of their employees received federal grand jury subpoenas is an indication that antitrust offenses have occurred involving these companies.

129.     Additionally, public sources have reported that at least one Defendant or

co-conspirator has applied for conditional amnesty under ACPERA.  That a target has

applied for leniency is significant.     As the DOJ notes on its website

(https://www.justice.gov/atr/page/file/ 926521/download):

> 5.     Does a leniency applicant have to admit to a criminal violation
> of the antitrust laws before receiving a conditional leniency letter?
>
> Yes.    The Division's leniency policies were established for
> corporations and individuals "reporting their illegal antitrust
> activity," and the policies protect leniency recipients from criminal
> conviction.   Thus, the applicant must admit its participation in a
> criminal antitrust violation involving price fixing, bid rigging,
> capacity restriction, or allocation of markets, customers, or sales or
> production volumes before it will receive a conditional leniency
> letter.  Applicants that have not engaged in criminal violations of
> the antitrust laws have no need to receive leniency protection from
> a criminal violation and will receive no benefit from the leniency
> program.
>
> The DOJ further provides that the leniency applicant must also
> satisfy the following condition, among others, to avail itself of the
> government's leniency: "[t]he confession of wrongdoing is truly a
> corporate act, as opposed to isolated confessions of individual
> executives or officials.[12]

*Id.*

130.     The DOJ has intervened in MDL 2724 as well as numerous civil antitrust

actions alleging price-fixing, bid rigging, and market and customer allocation of generic

pharmaceuticals, stating that these cases overlap with the DOJ's ongoing criminal

investigation.     For example, in a civil antitrust action related to the generic

---

[12] https://www.justice.gov/atr/page/file/926521/download.

pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that:  "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."  As noted above, the DOJ also filed a motion to stay discovery in MDL 2724, stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxy hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[13]

131.   The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.  The Division's investigation into the generics market, however, has revealed that some

---

[13] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.,* MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

executives have sought to collude on prices and enrich themselves at the expense of American consumers.[14]

**B.** **At Least 45 State Attorneys General Are Also Investigating the Anticompetitive Conduct in The Generic Drug Industry**

132.     In addition to the DOJ's criminal enforcement action, at least 45 States' Attorneys General, led by the State of Connecticut, also filed a civil enforcement action on December 15, 2016, based on their investigation to date into generic drug pricing. The State Attorneys General ("State AGs") have identified as co-conspirators at least 17 generic drug manufacturers[15] that conspired to fix prices of at least 15 different generic drugs.[16]   Additionally, the State AGs allege that Rajiv Malik (President and Executive Director of Mylan N.V.) participated in the conspiracy in his individual capacity.

133.     The State AGs allege—and document with detail based on records obtained from Defendants through Civil Investigative Demands—that the identified Defendants and their co-conspirators participated in an overarching conspiracy to unlawfully increase prices, allocate markets, and rig bids of numerous generic drugs. Although the State AGs identify 15 drugs as part of the conspiracy, the State AGs make

---

[14] DOJ Website, Division Update Spring 2017 (Mar.  28,  2017),  *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[15] The Defendants identified by the State AGs include: Actavis (multiple entities), Ascend, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Mylan,  Par, Sandoz, Sun, Teva, and Zydus.

[16] The State AGs have  identified  specific  unlawful  agreements  to  fix  prices  of: acetazolamide, doxycycline, fosinopril HCTZ, glipizide-metformin, glyburide, glyburide-metformin,   leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline ER, verapamil, and  zoledronic acid.

clear that the "overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in [the State AG Complaint]."

134.    In essence, the State AGs allege that these generic drugs (along with many others) were cartelized based on an agreement or understanding between or among Defendants and their co-conspirators to refrain from competing with each other on the pricing and sale of the generic drugs in the United States.   This agreement or understanding that the Defendants and their co-conspirators adhered to provides that each generic manufacturer "is entitled to its [fair share][17] of the market, whether the market is a particular drug, or a number of generic drugs.   [The fair share] is an approximation of how much market share each competitor is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry . . . .   The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price."   State AG Complaint, ¶¶ 90, 97.   In other words, generic drug manufacturers followed an express agreement to apply a negotiated formula that allocated the market share for the manufacturers of numerous generic drugs.

---

[17] The State AG Complaint redacts from public view the term used in the industry to refer to each conspirator's predetermined share, but other plaintiffs in the MDL have since publicly referred to the "'fair share' agreement spanning all Defendants and all Drugs at Issue in which Defendants shared a common code of conduct and understanding about how to price their products and allocate market share."  *See, e.g.,* ECF No. 714-3, Case No. 2:16-md-02724-CMR, at 12.

135.    The State AGs establish that this formula was developed and agreed to as the result of "an almost constant ability for Defendants to meet in person and discuss their business plans."   State AG Complaint, ¶ 91.   For example, anticompetitive agreements are reached at:

> [o]rganized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions . . . use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively sensitive information.

> These trade shows and customer conferences provide generic drug manufacturers, including but not limited to [the identified Defendants], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

State AG Complaint, ¶¶ 79-80.

136.    In furtherance of the conspiracy, the State AGs' Complaint establishes that Defendants would frequently rig bids by increasing pricing to existing customers in order to allow another conspirator to win the business of that customer and obtain the market share to which it was entitled by the conspiracy's formula.  This process of purposefully abandoning existing customers would occur most frequently when a new conspirator enters the market for a generic drug.  Whereas fundamental economic principles dictate that the price of the drug should decrease as the number of suppliers of that drug increases, the opposite typically occurred as a direct result of the conspiracy, because the

existing competitors would walk away from their customers in order to allow the new entrant a portion of the market.  State AG Complaint, ¶ 100.

137.    These market allocation and price-fixing agreements were often negotiated across more than one generic drug.  In order to maintain supracompetitive prices, "customers in one drug market might be traded for customers in another drug market . . . . Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs."  State AG Complaint, ¶ 101.

138.    For example, Rajiv Malik of Mylan, N.V., spoke with Jeffrey Glazer of Heritage, and Malik agreed that Mylan would walk away from two large accounts for doxycycline DR so that Heritage could win this business.  Malik noted that Mylan's consideration for abandoning this business had been provided previously, when Heritage intentionally forfeited accounts to Mylan on a different drug.  State AG Complaint, ¶ 103.  During this exchange, as with all collusive communications involving Mylan alleged in this Complaint, the senior executive from Mylan (in this case Mr. Malik) acted on behalf of and reached an agreement that bound all of the Mylan entities identified in this Complaint.

139.    By adhering to the common understanding regarding the market share that each conspirator was entitled to, the Defendants also facilitated substantial price increases.  "As long as everyone in the 'sandbox' is playing fair, and the manufacturers believe that they have their [predetermined market share], the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price

increase by bidding a lower price to take that business.  Doing so is viewed as 'punishing'

a competitor for raising prices—which is against the rules."  State AG Complaint, ¶ 106.

## VIII.  THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS

140.    All Defendants are competitors or potential competitors with each other

for each and every Price-Fixed Generic Drug at issue in this Complaint.  The collusion

alleged in this Complaint infected the generic drug industry, and at a minimum it

contaminated the pricing and sale of the Price-Fixed Generic Drugs.

141.    As Connecticut's Attorney General George C. Jepsen commented, there is

"a culture of cronyism [in the generic drugs industry] where, whether it's over a game of

golf or a dinner or drinks, there's just systematic cooperation."[18]

142.    As alleged in this Complaint, these numerous competitor contacts resulted

in express agreements between Defendants and their co-conspirators to fix prices,

allocate markets, and rig bids on the pricing and sale of generic drugs sold throughout

the United States, including the Price-Fixed Generic Drugs.  In other words, the

Defendants got together and exchanged assurances of common action and also adopted

a common plan to cartelize the pricing and sale of the Price-Fixed Generic Drugs.

---

[18] K. Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, NY TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?mcubz=3.

A.     **The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions**

143.    In an unrestrained generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.  As a result, each subsequent entry into a generic market should decrease the market prices as manufacturers compete for market share.  As discussed in detail below, this did not happen for the generic drugs at issue because Defendants used their "fair play" and "fair share" agreement to coordinate market share and pricing.

144.    The practice of contacting competitors to determine their market intentions—whether through in-person meetings, telephone communications, or other interactions—is a longstanding industry practice and dates back to at least 2006.  Indeed, when Glazer began working at Heritage in early 2006, the then-head of sales, Konstantine Ostaficiuk, taught him the importance of speaking to competitors in order to figure out pricing and how to secure adequate customer volume without depressing prices market wide.

145.    Defendants understood and engaged in the practice of contacting their competitors when they were preparing to enter a particular generic market so that they could allocate the market according to their "fair share" agreement.  Reaching out to competitors was part of the "tool kit" used in the ordinary course of business.

146.    "Fair shares" were allocated to Defendants within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market.  Traditionally, the first entrant to the market received the largest share of the

market, and each subsequent entrant received a progressively smaller share. This system aimed to allocate to each Defendant a "fair share" of the market without depressing prices. As detailed below, through this overarching conspiracy, Defendants often were able to raise prices or enter the market at elevated prices.

147.    The "fair share" agreement was so ingrained that some Defendant account managers and sales teams viewed contacting their counterparts at other companies—even to discuss market allocation and/or price increases—as part of the normal course of business.

148.    Defendants understood the "rules of the road" and that they needed to "play nice in the sandbox." This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

149.    The concept of a "fair share" was not limited to a specific drug. Rather, the concept of "fair share" extended across generic drugs, and at least to the Price-Fixed Generic Drugs. Defendants that "played fair" and maintained a "fair share" would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally "lose out" on one specific drug. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair shares could be allocated across the larger market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. Defendants who

undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the "fair share" agreement.

150.   The "fair share" agreement was utilized repeatedly throughout the relevant period.  Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs.  Additionally, when customers requested new bids in response to price increases instituted from other Defendants, the Defendant-competitors spoke to each other and devised strategies for responding without undermining pricing.  Consequently, consistent with their understanding of fair share, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed.

**B.**     **Defendants Used Sales Employees and Trade Association Meetings to Facilitate Their Collusion**

151.   As the civil and criminal enforcement actions indicate, Defendants were also members of numerous trade associations and used the meetings of those associations to facilitate their collusion.  The frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold throughout the United States.

152.   Upon information and belief, Defendants' anticompetitive conduct was a result of an agreement (or series of agreements) to fix, maintain, and stabilize prices, rig bids, and allocate customers for the sale of the Price-Fixed Generic Drugs.  The agreement was furthered by discussions held at industry meetings and events hosted by

various trade associations, including GPhA, HDMA, ECRM, and MMCAP (all defined below) as well as other meetings and communications.

153.   In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other acts:

(a)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Price-Fixed Generic Drugs in the United States;

(b)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(c)   Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(d)   Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Price-Fixed Generic Drugs sold in the United States;

(e)   Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)   Selling Price-Fixed Generic Drugs in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Price-Fixed Generic Drugs sold in the United States at collusive and noncompetitive prices.

154.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily in and around: (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

155.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

156.    The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.  The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry

trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."[19]

157.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning Price-Fixed Generic Drugs, including but not limited to GPhA and HDMA.  In addition, Defendants regularly attended industry events hosted by the MMCAP.

158.    The GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The trade association was the result of a 2000 merger between the GPhA and two rival trade associations (the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance).  According to GPhA's website, its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."   The GPhA's website touts the "business networking opportunities" and the "peer-to-peer connections" as the primary reasons to join the trade association.  *See* http://www.gphaonline.org/about/ membership.  GPhA members during the relevant time period have included Defendants Actavis, Apotex, Aurobindo,

---

[19] http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus.

159.    Several of Defendants' high-ranking officers have served on GPhA's Board of Directors, including Mylan's Heather Bresch, Impax's Marcy MacDonald, Par's Tony Pera, and Sun's Jim Kedrowski.   Ms. Bresch served as the GPhA's Chairperson.   Apotex's Jeff Watson, Aurobindo's Paul Krauthauser, Dr. Reddy's Vanessa Brill, Glenmark's Robert Matsuk, Lupin's Alok Sonig, Mayne's Scott Richards, Sandoz's Carol Lynch, Sun's Stephen Manzano, Teva's Brendan O'Grady, and Zydus's Joe Renner all currently serve on GphA's Board of Directors.

160.    Throughout the period relevant to Plaintiff's claims, the GPhA held three conferences each year.   The GPhA's Fall Technical Conference was held each year in late October in Bethesda, Maryland.   The GPhA's Annual Meeting was held each year in mid-February in Orlando, Florida.   The GPhA's CMC Workshop was held each year in early June in Bethesda, Maryland.   The following table lists the date of each conference between October 2012 and June 2015, including the members of the conspiracy that attended each conference and, if available, their respective individuals as well:

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| 2012 Technical Conference | October 1-3, 2012<br><br>Bethesda, MD | **Actavis**<br>-   Joyce DelGaudio, Executive Director, Regulatory Affairs<br>**Akorn** |

| Meeting | Date and Location | Attendees by Defendant |
|---|---|---|
| | Bethesda North Marriott Hotel and Conference Center | **Apotex**<br>- Bruce Clark, Senior Vice President, Scientific and Regulatory Affairs<br>**Aurobindo**<br>**Breckenridge**<br>**Dr. Reddy's**<br>- Nick Cappuccino, Vice-President and Head of Global Quality<br>**Fougera**<br>**Glenmark**<br>**Heritage**<br>**Impax**<br>- Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Lupin**<br>**Mylan**<br>- Marcie McClintic, Vice President and General Counsel<br>**Par**<br>**Perrigo**<br>- Richard Stec, Vice President, Global Regulatory Affairs<br>**Sandoz**<br>**Sun**<br>**Taro**<br>**Teva**<br>- Debbie Jaskot, Vice President, US Generic Regulatory Affairs & North American Policy<br>- Jonathan Kafer, VP Sales & Marketing<br>**UDL (Mylan Institutional)**<br>**Upsher-Smith**<br>**Wockhardt**<br>**Zydus** |
| 2013 Annual Meeting | February 20-22, 2013<br><br>Orlando, FL | **Actavis**<br>- Sigurdur Olafsson, President<br>**Akorn**<br>**Apotex** |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| | JW Marriott Orlando Grande Lakes | **Aurobindo**<br>**Breckenridge**<br>**Dr. Reddy's**<br>**Glenmark**<br>**Heritage**<br>**Impax**<br>**Lupin**<br>**Mylan**<br>   -  Tony Mauro, President<br>**Par**<br>**Perrigo**<br>**Sandoz**<br>   -  Donald DeGolyer, President<br>**Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>   -  Allan Oberman, President & CEO<br>**Wockhardt**<br>**Zydus** |
| 2013 CMC Conference | June 4-5, 2013<br><br>Bethesda, MD<br><br>Bethesda North Marriott Hotel & Conference Center | **Actavis**<br>**Apotex**<br>   -  Kiran Krishnan Vice President, Regulatory Affairs<br>**Breckenridge**<br>**Dr. Reddy's**<br>   -  Nick Cappuccino, Vice-President and Head of Global Quality<br>**Fougera**<br>**Glenmark**<br>**Heritage**<br>**Hi-Tech**<br>**Impax**<br>   -  Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Morton-Grove**<br>**Mylan**<br>**Par**<br>**Perrigo**<br>   -  Richard Stec, Vice President, Global Regulatory Affairs |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| | | **Sandoz**<br>- Alison Sherwood, Associate Director, Regulatory Affairs<br>**Sun**<br>**Taro**<br>**Teva**<br>**UDL (Mylan Institutional)**<br>**Upsher-Smith**<br>**Zydus** |
| 2013 Fall Technical Conference | October 28-30, 2013<br><br>Bethesda, MD<br><br>Bethesda North Marriott Hotel & Conference Center | **Actavis**<br>**Akorn**<br>**Apotex**<br>- Kiran Krishnan Vice President, Regulatory Affairs<br>**Aurobindo**<br>**Breckenridge**<br>**Dr. Reddy's**<br>- Nick Cappuccino, Vice-President and Head of Global Quality<br>**Fougera**<br>**Glenmark**<br>**Heritage**<br>**Hi-Tech**<br>**Impax**<br>- Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Lupin**<br>**Mylan**<br>- Dan Snider, Vice President Morgantown RD<br>- Marcie McClintic, Vice President and Chief of Staff<br>- Carmen Shepard, Senior VP, Global Policy and Regulatory<br>**Par**<br>**Perrigo**<br>- Richard Stec, Vice President, Global Regulatory Affairs<br>**Sandoz**<br>**Sun** |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| | | **Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>**UDL (Mylan Institutional)**<br>**Upsher-Smith**<br>**Wockhardt**<br>**Zydus** |
| 2014 Annual Meeting | February 19-21, 2014<br><br>Orlando, FL<br><br>JW Marriott Orlando Grande Lakes | **Actavis**<br>**Apotex**<br>  - Jeff Watson, President<br>**Aurobindo**<br>**Breckenridge**<br>**Dr. Reddy's**<br>**Epic**<br>**Heritage**<br>**Hi-Tech**<br>**Impax**<br>**Lupin**<br>**Mylan**<br>  - Marcie McClintic Coates, VP and Head of Global Regulatory Affairs<br>  - Andrea Miller, Senior Vice President, Head, Global Complex Products Operations<br>  - Tony Mauro, President<br>**Par**<br>**Perrigo**<br>**Sandoz**<br>  - Carlos Sattler, M.D. Vice President, Clinical Development & Medical Affairs<br>**Sun**<br>**Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>  - Allan Oberman, President and CEO<br>**Upsher-Smith**<br>**Wockhardt**<br>**Zydus** |
| 2014 CMC Conference | June 3-4, 2014 | **Actavis** |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
|  | Bethesda, MD<br><br>Bethesda North Marriott Hotel & Conference Center | **Apotex**<br>- Pradeep Sanghvi, Executive Vice President, Global R&D<br>- Kiran Krishnan, Vice President, Regulatory Affairs<br>- Chetan Doshi, Director of Formulation Development - Solid Dose<br>**Dr. Reddy's**<br>**Fougera**<br>**Glenmark**<br>**Heritage**<br>**Hi-Tech**<br>**Impax**<br>- Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Lupin**<br>**Morton-Grove**<br>**Mylan**<br>- Dan Snider, Vice President Morgantown RD<br>**Par**<br>**Perrigo**<br>- Richard Stec, Vice President, Global Regulatory Affairs<br>**Sandoz**<br>**Sun**<br>**Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>- Scott Tomsky, Generic Regulatory Affairs, North America<br>- Siva Vaithiyalingam, Director, Regulatory Affairs<br>**Upsher-Smith**<br>**Zydus** |
| 2014 Fall Technical Conference | October 27-29, 2014<br><br>Bethesda, MD | **Actavis**<br>- Michael Kimball, Executive Director, Transdermal Development |

| Meeting | Date and Location | Attendees by Defendant |
|---|---|---|
| | Bethesda North Marriott Hotel & Conference Center | **Apotex**<br>- Kiran Krishnan, Vice President, Regulatory Affairs<br>**Aurobindo**<br>**Breckenridge**<br>**Citron**<br>**Dr. Reddy's**<br>**Fougera**<br>**Glenmark**<br>**Heritage**<br>**Impax**<br>- Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Lupin**<br>**Mylan**<br>- Marcie McClintic Coates, Vice President and Head of Global Regulatory Affairs<br>**Par**<br>**Perrigo**<br>- Richard Stec, Vice President, Global Regulatory Affairs<br>**Sandoz**<br>**Sun**<br>**Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>- Scott Tomsky, Generic Regulatory Affairs, North America<br>**Upsher-Smith**<br>**UDL (Mylan Institutional)**<br>**West-Ward**<br>**Wockhardt**<br>**Zydus** |
| 2015 Annual Meeting | February 9-11, 2015<br><br>Miami, FL | **Actavis**<br>**Akorn**<br>**Apotex**<br>- Jeff Watson, President<br>**Aurobindo**<br>**Breckenridge** |

| Meeting | Date and Location | Attendees by Defendant |
|---|---|---|
| | Fontainebleau Miami Beach | **Dr. Reddy's**<br>**Epic**<br>**Glenmark**<br>**Heritage**<br>**Impax**<br>**Lupin**<br>**Mylan**<br>  - Rajiv Malik, President<br>  - Deborah Autor, Senior Vice President, Strategic Global Quality & Regulatory Policy<br>**Par**<br>**Perrigo**<br>  - Joseph Papa, President, Chief Executive Officer and Chairman<br>**Sandoz**<br>**Taro**<br>**Teligent (IGI Laboratories)**<br>**Teva**<br>  - Sigurdur Olafsson, President and Chief Executive Officer, Global Generic Medicines Group<br>  - Brian Rubenstein, Executive Counsel<br>**Upsher-Smith**<br>**West-Ward**<br>**Wockhardt**<br>**Zydus** |
| 2015 CMC Conference | June 9-10, 2015<br><br>Bethesda, MD<br><br>Bethesda North Marriott Hotel & Conference Center | **Actavis**<br>  - Joyce Anne DelGaudio Executive Director, Regulatory Affairs<br>**Apotex**<br>  - Kiran Krishnan, Vice President, Regulatory Affairs<br>**Citron**<br>**Dr. Reddy's**<br>**Fougera**<br>**Glenmark**<br>**Heritage** |

| Meeting | Date and Location | Attendees by Defendant |
|---|---|---|
| | | **Impax**<br>- Marcy Macdonald, Vice President Regulatory Affairs<br>**Lannett**<br>**Lupin**<br>**Mylan**<br>- Bryan Winship, Senior Director, Quality Management, Strategic Global Quality and Regulatory Policy<br>- Daniel Snider, Vice President, Research and Development<br>- Timothy Ames, Vice President, Global Strategic Regulatory Affairs<br>- Dawn Culp, Vice President, Global Regulatory Affairs Policy<br>**Par**<br>**Perrigo**<br>- Richard Stec, Vice President, Global Regulatory Affairs<br>**Sandoz**<br>- Nicholas Tantillo, Head, Policy and Regulatory Strategy<br>**Sun**<br>**Taro**<br>**Teva**<br>- Scott Tomsky, Generic Regulatory Affairs, North America<br>- Siva Vaithiyalingam, Director, Regulatory Affairs<br>**UDL (Mylan Institutional)**<br>**Upsher-Smith**<br>**West-Ward**<br>**Wockhardt**<br>**Zydus** |

161.   Upon information and belief, each of the conspiratorial price increases alleged in this Complaint was discussed, at least in part, at the GPhA's three annual

meetings (including the numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners). In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the Price-Fixed Generic Drugs. Indeed, the State AGs allege that the GPhA meetings and other events "provide generic drug manufacturers, including but not limited to [the 17 corporate Defendants named in the State AG Complaint], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

162. In addition to the GPhA meetings, other industry events provided Defendants with opportunities to collude, and Defendants did in fact use these opportunities to discuss their unlawful agreements.

163. The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics. HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members, during the relevant time period, have included Defendants Apotex, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus. The following table lists the dates of the HDMA meetings between 2013 and 2015, including members of the conspiracy that attended each conference:

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| 2013 HDMA Business and Leadership Conference | June 2-5, 2013<br><br>Orlando, FL<br><br>JW Marriott | **Dr. Reddy's**<br>- Mike Burton<br>**Lannett**<br>- Lauren Carotenuto<br>- Justin McManus<br>- Kevin Smith, Sr. VP Sales & Marketing<br>**Mylan**<br>- Richard Isaac, Senior Manager, Strategic Accounts<br>- Rob O'Neill, Head of Sales Generic, NA<br>- Edgar Escoto, Director National Accounts<br>- Kevin McElfresh, Director National Accounts<br>- Jim Nesta, National Account Manager<br>- Gary Tighe<br>**Upsher-Smith**<br>- JoAnn Gaio, Sr. National Account Manager, Trade<br>- Brad Leonard, Senior Director, National Accounts<br>- Mike Muzetras, Senior National Accounts Manager<br>- David (Dave) Zitnak, National Accounts Senior Director - Trade<br>- Doug Zitnak, National Accounts Senior Director – Trade |
| 2014 HDMA Business and Leadership Conference | June 1-4, 2014<br><br>Phoenix, AZ<br><br>JW Marriott Desert Ridge | **Actavis**<br>- Anthony Giannone, Exec. Director Sales<br>**Mylan**<br>- Lance Wyatt, Director, National Accounts<br>- Richard Isaac, Senior Manager, Strategic Accounts<br>**Upsher-Smith**<br>- JoAnn Gaio, Sr. National Account Manager, Trade<br>- Scott Hussey, Senior Vice President, Global Sales<br>- Jim Maahs, Sr. Director<br>- Michael (Mike) McBride, Associate Vice President, Partner Relations |

| Meeting | Date and Location | Attendees by Defendant |
|---|---|---|
| | | - Mike Muzetras, Senior National Accounts Manager<br>- Doug Zitnak, National Accounts Senior Director – Trade |
| 2015 HDMA Business and Leadership Conference | June 7-10, 2015<br><br>San Antonio, TX<br><br>JW Marriott San Antonio Hill Country | **Actavis**<br>- Andrew Boyer, Sr. VP Generic Sales and Marketing<br>- Marc Falkin, VP Marketing, Pricing and Contracts<br>- Anthony Giannone, Exec. Director Sales<br>- Brandon Miller, Exec. Director, Trade Relations<br>- Michael Reed, Director, National Trade Accounts<br>**Apotex**<br>- Sam Boulton, Director National Account<br>- John Crawford, Director National Account<br>- Beth Hamilton, VP Sales & Marketing<br>- Jeff Hampton, Sr. VP, Commercial Operations<br>- Tina Kaus, Director National Account<br>- Erin Organ, Director, Commercial Operations<br>- Jim Van Lieshout, VP Market Access and Pharm. Strategy<br>- Debbie Veira, Manager, National Accounts<br>**Aurobindo**<br>- Julia Faria, Sr. Manager, Sales Operations and Contract Admin.<br>- Charles Rath, National Trade Relations Manager<br>**Breckenridge**<br>- Scott Cohon, Director of Sales<br>- David Giering, Manager, Marketing & Trade Relations<br>- Philip Goldstein, Director of National Accounts<br>**Citron**<br>- Susan Knoblauch, Director National Accounts |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
|         |                   | - Laura Short, Vice President of Sales<br>- Karen Strelau, EVP of Sales and Marketing<br>**Dr. Reddy's**<br>- Jake Austin, Director, National Accounts Rx Generics<br>- Victor Borelli, Sr. Director, head of National Accounts Rx Generics<br>- Sherice Koonce, Director, Rx Pricing<br>- Katherine Neely, Director, National Accounts<br>- Patricia Wetzel, Sr. Director, National Accounts<br>**Heritage**<br>- Matthew Edelson, Associate Director, National Accounts<br>- Jeff Glazer, CEO & Vice Chairman<br>- Jason Malek, Senior VP Commercial Operations<br>- Neal O'Mara, Director, National Accounts<br>- Anne Sather, Director, National Accounts<br>**Impax**<br>- William Ball, Senior National Sales Manager<br>- Danny Darnell, Senior National Accounts Manager<br>- Todd Engle, VP, Sales and Marketing<br>- Michael Grigsby, Senior National Accounts Manager<br>- Italo Pennella, Trade Account Manager<br>- Thomas Sammler, Director, Sales Operations<br>- Gary Skalski, Senior Director Sales<br>**Lannett**<br>- Kevin Smith, Sr. VP of Sales & Marketing<br>- Breanna Stillman, Sales Analyst<br>- Tracy Sullivan, Director of National Accounts |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
| | |    -  Grace Wilks, Director of National Accounts<br>**Lupin**<br>   -  David Berthold, VP of Sales, US Generics<br>   -  William Chase, Director, Managed Markets & Trade (Brand)<br>   -  Jason Gensburger, Director, Financial Services<br>   -  Kevin Walker, National Account Manager<br>   -  Lauren Walten, Regional Sales Associate<br>**Mylan**<br>   -  Todd Bebout, VP of Sales, Vice President – NA Supply Chain Management<br>   -  Janet Bell, Director National Accounts<br>   -  Richard Isaac, Senior Manager, Strategic Accounts<br>   -  Stephen Krinke, National Account Manager<br>   -  Rob O'Neill, Head of Sales Generic, NA<br>   -  Sean Reilly, National Account Manager<br>   -  Erik Williams, VP NA Pricing<br>   -  Lance Wyatt, Director, National Accounts<br>**Par**<br>   -  Karen O'Connor, Vice President, National Accounts<br>**Sandoz**<br>   -  Ken Baker, Director, Managed Markets<br>   -  Christopher Bihari, Director of National Accounts (Sales)<br>   -  Seth Coombs, Executive Director, Oncology Injectables<br>   -  Steven Greenstein, Director of National Accounts (Sales)<br>   -  Anuj Hasija, Executive Director Key Customers<br>   -  Jason Jones, Director of Key Customers<br>   -  Kirko Kirkov, Executive Director Key Customers |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
|         |                   | - Marco Polizzi, Head, Institutional Sales and Marketing<br>- Arun Varma, Executive Director Marketing<br>- Sean Walsh, Key Account Manager<br>**Sun**<br>  - Daniel Schober, VP Trade Sales<br>  - Steve Smith, Sr. Director Sales<br>**Teva**<br>- Christine Bader, Vice President, Commercial Operations<br>- Brad Bradford, Director National Accounts<br>- Theresa (Teri) Coward, Senior Director of National Sales<br>- Christopher (Chris) Doerr, Senior Director, Trade Operations<br>- Cassie Dunrud, Associate Director<br>- Nick Gerebi, Director National Accounts<br>- Jeff Herberholt, Senior Manager, Regional Accounts<br>- Jeff McClard, Senior Director National Accounts<br>- Jason Nagel, Associate Director, Trade Relations<br>- Michelle Osmian, Director, Customer Operations<br>- Nisha Patel, Director, National Accounts<br>- Jessica Peters, Director, National Accounts<br>**Upsher-Smith**<br>- JoAnn Gaio, Senior National Account Manager, Trade<br>- Scott Hussey, Senior Vice President, Global Sales<br>- Brad Leonard, Senior Director, National Accounts<br>- Michael (Mike) McBride, Associate Vice President, Partner Relations<br>- Mike Muzetras, Senior National Accounts Manager |

| Meeting | Date and Location | Attendees by Defendant |
|---------|-------------------|------------------------|
|         |                   | - David (Dave) Zitnak, National Accounts Senior Director – Trade<br>- Doug Zitnak, National Accounts Senior Director – Trade<br>**Wockhardt**<br>- Karen Andrus, Director of Sales<br>- Scott Koenig, Vice President, Retail Generics<br>**Zydus**<br>- Maria Bianco-Falcone, Director of Offer Development and Trade Operations<br>- Scott Goldy, Sales Director<br>- Kevin Green, Senior Director of Sales<br>- Maria McManus, Corporate Account Manager<br>- Louis Pastor, Senior Director, Trade Operations<br>- Kristy Ronco, Vice President, Sales<br>- Jodi Weber, Corporate Account Manager |

164.    Other events at which Defendants may have conspired included meetings held by the National Association of Chain Drug Stores (NACDS), the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP), and the Efficient Collaborative Retail Marketing (ECRM).

165.    According to its website, NACDS "advances a pro-patient and pro-pharmacy agenda.  For the ultimate benefit of the consumers served by NACDS members, the mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

166.    NACDS hosts an Annual Meeting every year that it claims is "the industry's most prestigious gathering of its most influential leaders.  It is the classic 'Top-

to-Top' business conference, attended by industry decision makers."  Its website promises that it will give companies "a unique opportunity to gain new insights into today's changing marketplace and set your course for the future."  It provides companies with the "opportunity to meet and discuss strategic issues with key trading partners" to "set[] the stage for profitable business."  Participation is restricted to executives from NACDS member companies.

167.    NACDS also hosts an annual Total Store Expo.  Its website claims it is "the industry's largest gathering of its most influential leaders.  It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

168.    NACDS members include Defendants Akorn, Apotex, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, Glenmark, Heritage, Impax, Lannett, Lupin, Mayne, Mylan, Perrigo, Sandoz, Sun, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

169.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

170.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program....   In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy ... and currently provide healthcare-related contracting to state and local government members located across the United States of America."   Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually.

171.    MMCAP held its National Member Conference in Bloomington, Minnesota on May 12-15, 2014.   At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."   At the MMCAP conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of one or more Price-Fixed Generic Drugs.

172.    MMCAP's May 12-15, 2014 National Member Conference was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    Actavis: Mark Blitman, Executive Director of Sales for Government Markets;

(b)    Mylan: Jan Bell, Director, National Accounts; and

(c)    Heritage: Anne Sather, Director, National Accounts.

173.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one -on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

174.    At these various conferences and trade shows, representatives from at least some Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

175.    In conjunction with meetings at these conferences and trade shows, representatives of generic drug manufacturers got together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers got together periodically for what at least some of them referred to as industry dinners.

176.    A large number of generic drug manufacturers, including many Defendants here, are headquartered in close proximity to one another in New York, New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

177.    Generic drug manufacturer employees also got together regularly for what they referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discussed competitively sensitive information.   For example, several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving sales executives from Citron, Dr. Reddy's, Heritage, Lannett, and Teva, among others); (2) in Baltimore, Maryland in May (involving sales executives from Citron, Dr. Reddy's, Heritage, Teva, and Zydus, among others); and (3) upon information and belief, in August in Denver, Colorado (involving sales executives from Citron, Dr. Reddy's, and Heritage, among others).

178.    Many "Women in the Industry" dinners were organized by a salesperson from Defendant Heritage who resides in the State of Minnesota.   Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area.   However, out-of-town sales representatives were also aware of these dinners and were included when in the area.

179.    Through these various interactions, Defendants' employees were often acutely aware of their competition and, more importantly, each other's current and future business plans.   This familiarity and opportunity often led to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

180.    Defendants also routinely communicated and shared information with each other about bids and pricing strategy.   This included forwarding bid packages received

from a customer *(e.g.,* a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information. Upon information and belief, these information exchanges were made by individuals with pricing and bidding authority and impacted the prices charged by Defendants for the Price-Fixed Generic Drugs.

181. Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate higher prices or superior terms with their customers, which was to the ultimate detriment of consumers. Again, this information sharing was undertaken for the purpose of impacting (and increasing) Defendants and their conspirators' prices for the Price-Fixed Generic Drugs.

182. In sum, during meetings of the GPhA, HDMA, ECRM, and MMCAP, and the other meetings described above, Defendants and co-conspirators exchanged confidential, commercial sensitive information in furtherance of the conspiracy, or agreed to fix prices, or both, of Price-Fixed Generic Drugs.

183. In addition, National Account Managers ("NAMs") are the sales force within the pharmaceutical industry. Although NAMs at the various Defendants compete for the same customers, they also have developed close relationships. NAMs frequently met with each other in various social settings, which made it easy to exchange competitive information.

184.    Many of the NAMs and other marketing and sales personnel employed by Defendants have worked at multiple companies—including other Defendants—during their careers.  These employees maintained contact with people at their prior employers. In turn, this facilitated the ease with which conspiratorial agreements could be reached.

185.    For example, Susan Knoblauch worked at Sun for nearly 10 years before moving to a different sales position at Citron.  Beth Hamilton worked at Apotex before moving to Mayne.  Heritage's Daniel Lukasiewicz began his career at Aurobindo, moved to Zydus and currently works at Defendant Heritage.

186.    Among Defendants, this familiarity spawned collusion.  For example, as discussed below, in the spring and summer of 2014, Heritage's Lukasiewicz—at the direction of CEO Glazer—reached out to Aurobindo, his former place of employment, to coordinate pricing on glyburide, glyburide-metformin, and fosinopril HCTZ.

187.    Similarly, Teva's Director of Strategic Customer Marketing Nisha Patel met Heritage's then-Sr. Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed.  When Patel moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could coordinate pricing.  As detailed below, Malek and Patel used their relationship to orchestrate a number of price increases throughout the relevant period—some led by Teva, others led by Heritage.

188.    Malek and Patel's relationship was valued and accepted by Malek's supervisors.  For example, in April 2014, Malek and Glazer met with the CEO (Satish

Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent, to discuss potential price increases for several drugs.  During that meeting, Heritage's Malek told Emcure's Mehta and Thapar about his contact at Teva, Nisha Patel.  Malek, who already had been discussing price increases for nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation.  Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

189.    Defendants' geographic proximity to each other—at least 41 different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas—facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events.  These events provided Defendants with additional opportunities to collude.

### C.    Defendants Communicated in Secret Through Email, Telephone, and Text Messages

190.    In addition to the in-person meetings, Defendants also communicated regularly in furtherance of the conspiracy via email, telephone, and text.

191.    Telephone records produced to the State AGs establish that, during just a one-year period between July 2013 and July 2014, senior sales executives and other individuals with responsibility for pricing at Heritage had at least 513 contacts with executives from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.  State AG Complaint, ¶ 94 (as the State AG Complaint further notes, the 513 figure likely underrepresents the actual

number of phone contacts during this period, "because it is based on phone and text message records from only some of the executives and salespeople at issue.").

192.    Similarly, during that same period, senior sales executives and other individuals responsible for pricing at Teva had at least 1,501 contacts with executives from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

193.    It is clear from the limited information adduced to date, that there was a widespread pattern of communications occurring simultaneously between and among Defendants that marketed and sold the generic drugs at issue.  This extraordinary level of inter-firm contacts is consistent with collusion and inconsistent with independent action.  Upon information and belief, Defendants used these contacts to discuss the unlawful agreements alleged in this Complaint.

## IX.    THE CONSPIRATORIAL PRICE-FIXING AGREEMENTS

194.    As part of their overarching conspiracy, and as a result of their frequent in-person meetings and the collusive communications that ensued as a result of these meetings via email, telephone, and text messages, Defendants and their co-conspirators were able to implement, and did implement unlawful price increases on Price-Fixed Generic Drugs identified in this Complaint.

195.    There were no market-based justifications for any of the abrupt price increases described below.  The increases in price were not necessitated by increased manufacturing costs, or research and development costs.  Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption

was reported during the duration of the alleged conspiracy as to any of the Price-Fixed Generic Drugs (except where expressly alleged below). Similarly, during the time frame relevant to these allegations, there were no known raw material shortages affecting the manufacture of any of the Price-Fixed Generic Drugs in the United States, nor did demand for any of these drugs suddenly increase.

196. In the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales, and the price increases of the Price-Fixed Generic Drugs described in this Complaint were against each Defendant's individual self-interest.

197. While the direct evidence currently known or available to Plaintiff focuses predominantly on Heritage's communications within the industry, these communications are just one window into Defendants' overarching conspiracy, which cuts across all of the generic drugs at issue in this Complaint and inculpates all Defendants. Upon information and belief, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the Price-Fixed Drugs. The purpose and effect of these agreements was to lessen competition in the markets for each drug.

A.    **Acetazolamide**

198. The market for acetazolamide is mature, as the drug has been available in the United States since 1952. The World Health Organization ("WHO") includes

acetazolamide on its list of essential medicines.  During the relevant time period, Taro, Lannett, Heritage, Teva, and Zydus sold generic acetazolamide throughout the United States.  Acetazolamide is sold in two formulations—tablets (manufactured by Taro and Lannett) and sustained-release capsules (manufactured by Heritage, Teva, and Zydus).

199.    Taro and Lannett dominate sales for acetazolamide tablets.  Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share.

200.    Prior to the spring of 2012, Taro and Lannett priced their acetazolamide tablets similarly, but not identically.  Small price increases in 2009 and 2010 were implemented by both manufacturers, but were not identical, nor were they simultaneous. For example, when Taro implemented a price increase at the end of 2009, Lannett kept its prices unchanged thereafter before implementing an increase.  Market share between Taro and Lannett also shifted during this period.  Things changed, however, in April and May of 2012.

201.    In April and May of 2012, Taro and Lannett imposed 40% to 50% list price increases, and brought their list prices for acetazolamide 250 mg tablets to identical levels.  Taro also increased the list price of 125 mg tablets around this time.

202.    In early 2013, Taro made slight price increases to both of its tablets.  By the middle of 2013, Taro and Lannett appear to have worked out a remarkably stable split of the market, accounting for both 125 mg and 250 mg tablets.

203.    By the end of 2013, Taro and Lannett were ready to impose a large price increase.  Within weeks of each other, in November and December, Taro and Lannett imposed identical list prices for acetazolamide 250 mg tablets.  The increases were well

over 200%.  Taro imposed a similarly large list price increase on 125 mg tablets around this time.  AWP prices for both products also increased significantly.

204.    The graph below shows Taro and Lannett's lockstep pricing behavior on list prices.



205.    The list and AWP prices for acetazolamide tablets remained elevated above competitive levels thereafter.

206.    The graph below shows combined market share (total dollar sales) for acetazolamide 125 mg and 250 mg tablets:



207.   The lockstep price increases and nearly perfect market share split across multiple dosages by Taro and Lannett is consistent with Defendants' "fair share" agreement.

208.   The pricing conduct of Taro and Lannett is not consistent with competition.   Manufacturers would not impose a large price increase absent some assurance that their competitor would do the same, lest they lose market share.

209.   The ability of Taro and Lannett to reach agreement on market share and price increases was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  For example, in August 2013, not long before large price increases, both Defendants (including Tracy Sullivan) attended the NACDS Total Store Expo.  In October 2013, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda,

Maryland, which provided another opportunity to discuss price increases for acetazolamide.

210.    Heritage, Teva, and Zydus have sold the vast majority of acetazolamide capsules, with Heritage and Teva combining for approximately 78% of sales.[20]

211.    During the week of April 14, 2014, Heritage's Malek met with two employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including acetazolamide.

212.    Before introducing the market-wide price increases to the rest of his sales team, Malek began communication with Patel at Teva, who was a competitor for multiple (at least seven) drugs on Malek's initial list.  On April 15, 2014, Heritage's Malek spoke with Patel of Teva for more than seventeen minutes.  During that phone call, Patel agreed to support Heritage's price increase for acetazolamide and a series of other drugs.  Patel already had secured Heritage's agreement to support Teva's price increases for nystatin and theophylline.

213.    Malek and Patel spoke several more times over the next several months to confirm their agreement to raise prices and to keep abreast of the progress of Heritage's price increases.

214.    On April 16, 2014, the day after Malek spoke to Patel, a Teva employee— believed to be Patel—then called an employee at Zydus to discuss the pricing of at least

---

[20] Teva marketed and sold acetazolamide capsules during the relevant period at least in part through its subsidiary, Barr.

acetazolamide.  The two spoke for nearly twenty minutes, and spoke again the next day for nearly twelve minutes.  Over the next several months, the two communicated frequently.

215.    As noted above, on April 22, 2014, Heritage's Malek held a telephone conference with the sales team and dictated a pricing strategy that targeted numerous drugs for a price increase.  This list included acetazolamide.

216.    As with the other drugs he targeted, Malek believed it was important to "socialize" the idea of an acetazolamide price increase with competitors before implementing it.  To that end, he and the Heritage NAMs contacted Teva and Zydus to discuss pricing and customers either via phone, text or email, or in person, often through industry trade association meetings and conferences.

217.    Malek personally took responsibility to communicate with Defendants Teva and Zydus.  Anne Sather was responsible for Lannett as well as two other Defendants.  Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

218.    Four days after this phone call, on April 26-29, CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from numerous Defendants, including the other manufacturers of acetazolamide capsules, Teva and Zydus.

219.    While Teva's Patel and Heritage's Malek were discussing increasing prices for multiple generic drugs, on April 24, 2014, Malek contacted a Zydus employee

through the website LinkedIn to discuss at least acetazolamide. The Zydus employee responded later that day.

220. In a May 6 and 7 email exchange, Malek explained that he had obtained agreements to raise the price of acetazolamide. Malek had previously told an unidentified Heritage sales person to hold off on responding to a large customer's request for a price reduction. After confirming his agreement with Teva and Zydus to raise the price of acetazolamide, he informed his sales person that Heritage would not agree to reduce its price.

221. Malek also confirmed an agreement with another competitor—most likely Zydus—on acetazolamide pricing on May 7.

222. During this time Heritage avoided bidding on any potential customers where Zydus was already supplying acetazolamide. Heritage did this in furtherance of Defendants' agreement not to compete.

223. During this time, employees at Teva and Zydus were also in close contact with each other about acetazolamide. On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

224. All Defendants had plentiful opportunities to speak in person about these agreements. Between April and October 2014, all U.S. Defendants attended at least one of the many trade events organized during this time period, by NACDS, MMCAP, HDMA, or GPhA, in addition to several customer conferences.

225. Defendants used these meetings as an opportunity to confirm agreements on pricing and otherwise engage in anticompetitive conduct related to the generic drugs

at issue.  For example, on June 3, at the HDMA Business and Leadership Conference, Heritage's Sather had dinner and drinks with sales people from Sandoz, Par, and Lannett.

226.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on the identified drugs and their strategy for doing so.  The proposed increase for acetazolamide capsules was 75%.

227.    On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including acetazolamide.  By July 9, 2014, Heritage had raised the price of acetazolamide to at least seventeen different customers nationwide.

### B.    **Albuterol**

228.    The market for albuterol is mature, as albuterol has been available in the United States for over twenty-five years.  The World Health Organization includes albuterol on its list of essential medicines.  During the relevant time period, Mylan sold albuterol pursuant to an ANDA approved by the FDA in or around January 1991.  Sun (either directly or through its subsidiary Mutual) sold albuterol pursuant to ANDAs that were approved by the FDA in or around December 1989.

229.    At all times relevant to this lawsuit there has been more than one manufacturer of albuterol on the market.  Defendants Mylan and Sun dominate the market for albuterol.

230.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for albuterol was remarkably stable.  Beginning in March 2013, the prices rose abruptly and, for the most part, in unison.

231.   By way of example, available WAC data demonstrates that beginning in March 2013, Defendants selling generic albuterol took substantial price increases on the 2 mg strength that exceeded 3,400%:[21]

| Product 2 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3674% |

232.   NADAC data too shows a sharp increase in price following a period of extremely stable prices:

---

[21] WAC prices referenced throughout this Complaint are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.





233.   Upon information and belief, the price increases on albuterol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of albuterol in the United States.

234.   These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).  For example, price increases closely followed Defendants' participation in the October 2012 GPhA meeting in Bethesda, Maryland.

### C.   **Amitriptyline**

235.   The market for amitriptyline is mature, as amitriptyline has been available in the United States for over sixty years.  Amitriptyline is on the WHO's List of Essential Medicines.  During the relevant time period, Defendants Mylan, Par, and Sandoz sold amitriptyline throughout the United States.

236.   At all times relevant to this lawsuit there has been more than one manufacturer of amitriptyline on the market.  Defendants Mylan, Par, and Sandoz dominate the market for amitriptyline.

237.   In the years prior to the conspiracy period, Defendants' average price in the U.S. for amitriptyline was remarkably stable.  Beginning in May 2014, Defendants increased their prices abruptly and, for the most part, in unison.  Average prices for amitriptyline increased 300% to nearly 2,000% across dosage strengths.  The Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill

cost just 4 cents."[22]  The Boston Globe similarly reported: "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 10-milligram pill in 2014 to $1.03 in 2015."[23]

238.   Defendants' WAC prices further illustrate these substantial price increases.  By way of example, beginning in May 2014, Defendants Sandoz, Mylan, and Par set their WACs for their 50 mg product in lockstep, increasing from previous WACs that exceeded 900%:

| Product 50 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1157% |
| 100 ct | Par | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Par | 00603221432 | * | $0.48 | 26-Sep-14 | * |

239.   National  Average  Drug  Acquisition  Cost  ("NADAC")  data  for amitriptyline likewise show the low and stable prices of amitriptyline characteristic of the market prior to the Defendants' price hikes, and the huge spike in price that occurred

---

[22] David Crow, Teva bids for Mylan amid pressure on copycat drugmakers, The Financial Times (May 12, 2015), *available at* https://wvv\:v.ft.com/content/8ff2fc5a-f5 l 3-l l e4-8a42-00l44feab7de.

[23] Priyanka Dayal McCluskey, As competition wanes, prices for generics skyrocket, The Boston Globe (Nov. 6, 2015), *available at* https://www.bostonglobe.com/business /2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/l-13 iA9CSxA UylnCdGjLNKVN/story.html.

abruptly in May 2014. Since that time, Defendants have continued to charge supracompetitive prices.





240.    Upon information and belief, the price increases on amitriptyline were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of amitriptyline in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA, ECRM, and HDMA as well as other meetings and communications (as identified throughout this Complaint).

241.    The price increases above closely followed, for example, Defendants' participation in the 2014 Annual Meeting of the NACDS in Scottsdale, Arizona.  In the months prior to implementing their agreement, Defendants also attended the annual meetings of GPhA and ECRM in February 2014.

**D.    Baclofen**

242.    The market for baclofen is mature, as baclofen has been available in the United States for nearly 50 years.  During the relevant time period and continuing today, Defendant Lannett sells baclofen pursuant to an ANDA that was approved by the FDA in or around July 2007, and Defendant Par sells baclofen pursuant to ANDAs approved by the FDA in or around August 2005.  Teva sells baclofen pursuant to ANDAs approved in February 1992, and Upsher-Smith sells baclofen pursuant to ANDAs approved in May 1988 and August 1996.  Lannett, Par, Teva, and Upsher-Smith each sold baclofen throughout the United States.

243.    At all times relevant to this lawsuit, there has been more than one manufacturer of baclofen on the market.  Defendants Lannett, Par, Teva, and Upsher-Smith dominate the market for baclofen.  In the years prior to the conspiracy period,

Defendants' average price in the U.S. for baclofen was remarkably stable.  Beginning in February 2014, Defendants increased their prices abruptly and in unison.

244.    By way of example, beginning in February 2014, Upsher-Smith, Teva, Par, and Lannett matched their WAC prices on their 20 mg product within less than two months of each other and by more than 400%:

| Product 20 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 1000 ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 100 ct | Teva | 00172409760 | $0.10 | $0.49 | 15-Apr-14 | 420% |
| 1000 ct | Teva | 00172409780 | $0.09 | $0.49 | 15-Apr-14 | 447% |

245.    Although WAC data is not available, upon information and belief, Par and Lannett implemented the same price increases as Upsher-Smith and Teva, such that all price increases were in unison.

246.    NADAC data for baclofen likewise reveals a pattern of massive price increases beginning in early 2014, after which prices remained elevated well above their previous competitive levels.





247.   Upon information and belief, the price increases on baclofen were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of baclofen in the United States.   These collusive agreements were furthered, at least in part, through in-person discussions conducted at

meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

### E.   **Benazepril HCTZ**

248.   The market for benazepril HCTZ is mature, as benazepril HCTZ has been available in the United States for over 25 years.   During the relevant time period, Defendants Mylan and Sandoz sold benazepril HCTZ throughout the United States.

249.   At all times relevant to this lawsuit there has been more than one manufacturer of benazepril HCTZ on the market.   Defendants Mylan and Sandoz dominate the market for benazepril HCTZ.

250.   In the years prior to the conspiracy period, Defendants' average price in the U.S. for benazepril HCTZ was remarkably stable.   Beginning in August 2013, Defendants increased their prices abruptly and in unison.

251.   By way of example, in August 2013, Mylan and Sandoz set nearly identical WAC prices on their 25 mg product for benazepril HCTZ, reflecting increases of more than 300%:

| Product 25 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 00378477501 | $0.38 | $1.65 | 9-Aug-13 | 334% |
| 20 ct | Sandoz | 00185027701 | $0.32 | $1.62 | 20-Aug-13 | 407% |

252.   The Benazepril HCTZ NADAC pricing data in the graphs below also show staggering price increases following a period of extremely stable prices for Benazepril HCTZ:





253.    Upon information and belief, the price increases on benazepril HCTZ were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of benazepril HCTZ in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

### F.    Clobetasol

254.    The market for clobetasol is mature, as clobetasol has been available in the United States for decades.  During the relevant time period, Defendants Actavis, Akorn, Hi-Tech, Sandoz, Fougera, Perrigo, Taro, Wockhardt, and Morton Grove sold clobetasol throughout the United States.

255.    For more than two years prior to June 2014, Defendants' average price in the U.S. for clobetasol was remarkably stable.

256.    Beginning in approximately June 2014, Defendants abruptly increased their prices for clobetasol on multiple formulations and sizes.  By way of example, Taro, Sandoz, Hi-Tech, Actavis, and Wockhardt all took price increases on their 0.05% cream product in near lockstep reflecting increases of more than 800%:

| Product crm | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672125801 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | 00168016315 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | 50383026715 | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | 00472040015 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672125802 | $0.33 | $6.84 | 3-Jun-14 | 1993% |

| 30gm | Sandoz | 00168016330 | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | 50383026730 | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | 00472040030 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672125806 | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | 00168016346 | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | 50383026745 | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | 00472040045 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672125803 | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | 00168016360 | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | 50383026760 | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | 00472040060 | * | $6.12 | 10-Mar-15 | * |

257.   Upon information and belief, between June and August 2014, Akorn, Morton Grove, Fougera, and Perrigo all increased their list prices for clobetasol by similar amounts, even though these prices were not publicly reported.

258.   NADAC data for clobetasol likewise show the low and stable prices of clobetasol that were characteristic of the market prior to the Defendants' price hikes, as well as the huge spike in price that occurred abruptly in June 2014. Since that time, Defendants have continued to charge supracompetitive prices. Starting in June of 2014, the average price of clobetasol increased by approximately 1,144%, with certain formulations increasing as much as 1,738%.

259.   Upon information and belief, the price increases on clobetasol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of clobetasol in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at

106

meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

260.   For example, the price increases closely followed Defendants' participation in the workshop hosted by GPhA in North Bethesda, Maryland on June 3 and June 4, 2014.  In the months prior to implementing their agreement, Defendants also attended the annual meetings of the GPhA in February 2014 and NACDS in April 2014. Prior to entering the market and selling their clobetasol products, Actavis and Perrigo attended trade association meetings with the other Defendants, including GPhA meetings in February 2015, June 2015, and February 2016, and joined the conspiracy and agreed to sell their products at the same elevated levels as their co-conspirators.

G.   **Clomipramine**

261.   The market for clomipramine is mature, as clomipramine has been available in the United States for over 20 years.  The World Health Organization includes clomipramine on its list of essential medicines.  During the relevant time period, Mylan sold clomipramine pursuant to ANDAs approved by the FDA in or around January 1998. Sandoz sells clomipramine pursuant to ANDAs that were approved by the FDA in or around June 1997 and March 1998.  Taro sells clomipramine pursuant to ANDAs approved by the FDA in December 1996.

262.   At all times relevant to this lawsuit there has been more than one manufacturer of clomipramine on the market.  Defendants Mylan, Sandoz, and Taro sold clomipramine throughout the United States.

263. For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for clomipramine was remarkably stable. Beginning in approximately May 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

264. By way of example, beginning in May 2013, Mylan, Sandoz, and Taro set their WACs in lockstep on their 25 mg product, reflecting increases from previous WACs of more than 2,700%:

| Product 25 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 ct | Taro | 51672401106 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 90 ct | Taro | 51672401105 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 100 ct | Mylan | 378302501 | $0.30 | $8.99 | 16-May-13 | 2853% |
| 100 ct | Sandoz | 781202701 | $0.31 | $8.99 | 22-Jul-13 | 2778% |

265. As the following chart based on NADAC also indicates, prices for generic clomipramine increased significantly:



Source: CMS NADAC Data

266.    These prices show the dramatic and sustained price increases for generic clomipramine starting in mid-2013.  The prices also reflect a "one-way ratchet"—prices never decreased substantially, as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

267.    Upon information and belief, the price increases on clomipramine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of clomipramine in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

H.   **Desonide**

268.    The market for desonide is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic desonide has been available in the United States since 1994.

269.    During the relevant time period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro sold desonide throughout the United States.

270.    At all times relevant to this lawsuit there has been more than one manufacturer of desonide on the market.  Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominate the market for desonide.

271.    For at least five years prior to May 2013, Defendants' prices for desonide in the United States remained stable.  In May 2013, however, Defendants abruptly began implementing substantial price increases.

272.    By way of example, Defendants all set the same WACs for their ointment products beginning in May 2013, reflecting increases from previous WACs of more than 140%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60 GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15 GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60 GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15 GM | Sandoz | 00168030915 | * | $3.21 | 17-Jan-14 | * |
| 60 GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

273.   In August 2013, Actavis entered the market for desonide and implemented the supracompetitive prices as well.  Upon information and belief, just as the Defendants did with glyburide and doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entry, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers.  This agreement on desonide was facilitated by the overarching market allocation agreement that was followed by all Defendants and conspirators and it prevented Actavis' entry into the market from eroding the conspiratorial pricing on desonide.

274.   The below charts plot the NADAC data for desonide products, and show the low and stable prices of desonide that were characteristic of the market prior to Defendants' price hikes, as well as the huge spike in price that occurred abruptly in May 2013.  The charts also show that since that time, Defendants have continued to charge supracompetitive prices.





275.   Upon information and belief, the price increases on desonide were the

result of collusive agreements between and among Defendants to increase pricing and

restrain competition for the sale of desonide in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

276.   For example, price increases closely followed Defendants' participation in the annual meetings of the GPhA in February 2013 and the NACDS in April 2013.  Prior to selling their desonide products at elevated prices along with Taro and Perrigo, Actavis and Sandoz attended other trade association meetings with Taro and Perrigo, including GPhA meetings in October 2013 and February 2014.

## I.   **Digoxin**

277.   The market for digoxin is mature, as digoxin has been available in the United States for more than a decade.  Generic digoxin is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization.  Variants of the drug have been in existence since the 18th century.  Because digoxin was in existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process.

278.   In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of digoxin.  Because digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

279.   During the relevant time period, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward sold digoxin throughout the United States.

280.   At all times relevant to this lawsuit there has been more than one manufacturer of digoxin on the market.  Defendants Impax, Lannett, Mylan, Par, and West-Ward dominate the market for digoxin.

281.   Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic digoxin.  Despite the existence of a duopoly, until October 2013, the price of digoxin charged by Lannett and Impax remained stable.

282.   Beginning in October 2013, however, Defendants issued abrupt and substantial price increases.

283.   Defendants continued to increase the prices they charged for digoxin during the first six months of 2014, despite Par's entry into the digoxin market in early 2014 and West-Ward's re-entry soon after.  Mylan also re-entered in early 2015 and followed the pricing agreed to by the conspirators.  Upon information and belief, Par, West-Ward, and Mylan each communicated their entry into the generic digoxin market to their co-conspirators well in advance of the date each entrant began marketing the drug, so that agreements could be reached on price without any disruption to the prevailing supracompetitive prices.

284.   By way of example, with respect to WAC pricing, in October 2013, Lannett and Impax implemented lockstep WAC prices on their 0.125 mg products, reflecting increases of more than 630%.  Instead of competing on price, Par, West-Ward,

and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered

the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

285.   The below charts of NADAC data on generic digoxin show the substantial

and sustained price increases for generic digoxin products starting in the fall of 2013:





286. Defendants' pricing of digoxin is the exact opposite of what one would

expect to see in a competitive market, where the entry of new manufacturers brings the

116

price down.  Instead, as a result of their collusion, Defendants' pricing for digoxin in the United States increased as the number of "competitors" in the market grew.  Thus, the pricing of digoxin mirrors Defendants' collusion on glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on the diabetes drug in advance of the entry into the market by Heritage and Mayne.

287.    In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing, which continue to persist in the market even as of the filing of this Complaint.

288.    Upon information and belief, the price increases on digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of digoxin in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

### J.    Divalproex ER

289.    The market for divalproex ER is mature, as generic versions of the drug have been available in the United States for almost a decade.  Valproate, the base compound in divalproex ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

290.    In 1999, Abbot Laboratories received FDA approval to market Depakote ER, a branded version of the drug.  Depakote ER was a blockbuster drug that achieved nearly $1,000,000,000 in sales for Abbot.

291.   Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs authorizing them to market divalproex ER as generic versions of Depakote ER.  Defendant Dr. Reddy's sells divalproex ER pursuant to ANDAs approved by the FDA in March 2012.

292.   During the relevant time period, Defendants Mylan, Zydus, Dr. Reddy's, and Par sold divalproex ER throughout the United States.

293.   At all times relevant to this lawsuit there has been more than one manufacturer of divalproex ER on the market.  Defendants Mylan, Zydus, Dr. Reddy's, and Par dominate the market for divalproex ER.

294.   Between 2009 and June 2013, Defendants' prices for divalproex ER remained relatively stable.  However, in early July 2013, Defendants implemented in unison abrupt and substantial price increases on divalproex ER.  For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle.  Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1,600 per bottle, an increase of more than 1,100%.

295.   By way of example, with respect to WAC pricing, Mylan and Par set identical WAC prices within a couple of weeks of each other in June 2013; and Dr. Reddy's and Zydus matched those WACs in August 2013, around the time they each entered the market.  As noted below, the new WACs for 100 and 500 count bottles of 500 mg pills reflected increases of more than 300%.

296.    NADAC data, too, shows a sharp price increase for divalproex ER

following an extended period of extremely stable prices:

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |





297.    As  alleged  throughout  this  Complaint,  employees  from  Defendants including at least Mylan and Par spoke directly numerous times between June and July 2013.  For example, Mylan and Par had several calls on June 7, 2013 and June 13, 2013. Mylan and Par both increased their prices of divalproex shortly after these calls, on June 14 and June 26, respectively.  Dr. Reddy's and Zydus followed suit when they entered the market shortly thereafter.

298.    Upon information and belief, the price increases on divalproex ER were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of divalproex ER in the United States.  These collusive  agreements  were  furthered,  at  least  in  part,  through  in-person  discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

K.   **Doxycycline**

299.   The doxycycline market is mature, as generic doxycycline—which includes generic versions of branded doxycycline such as Vibramycin, Vibra-Tabs, and Monodox—has been available in the United States since the mid-1980s in tablet and capsule form.  Doxycycline has been designated by the WHO as an essential medicine. Doxy DR (the delayed release version of doxy hyclate) is the generic version of the branded acne medication Doryx, for which Warner Chilcott received an NDA in May 2005.  Although doxy hyclate and doxy mono are not bioequivalent drugs, doctors will often simply write a prescription for doxycycline, which allows pharmacists to supply consumers with either doxy hyclate or doxy mono.

300.   Although there were, at one point, approximately 20 manufacturers of doxycycline, by early 2012, the primary manufacturers became Actavis, Mylan, Par, Sun (including its subsidiaries Mutual and Caraco), and West-Ward (for doxy hyclate) and Heritage, Lannett, Mylan, and Par (for doxy mono).   In 2012, Mylan received authorization to market both doxy hyclate and doxy DR.  Because Mylan was the first generic manufacturer to receive an ANDA for doxy DR, it received 180 days of exclusivity as the sole authorized generic manufacturer, which expired in early 2013. Mylan remained the only generic manufacturer of doxy DR until Heritage and Mayne entered the market in 2013.  Historically, doxy mono cost more than doxy hyclate, and for that reason, doxy hyclate was the most commonly used version of doxycycline.

301.   Defendants Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun (including Mutual and Caraco), and West-Ward each sold at least one variation of doxycycline throughout the United States.

### 1.   *The Doxy Hyclate Collusive Price Increases*

302.   Although prices of doxycycline had remained low and stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price increase across all doses of doxy hyclate.   Throughout 2012, Defendants attended a number of trade events where they met and discussed the pricing of doxycycline hyclate.   By May 2013, Defendants' prices for doxy hyclate increased on certain strengths by as much as 8,000%.   For example, in mid-January 2013, West-Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength doxy hyclate pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

303.   Upon information and belief, the agreement to increase prices on doxy hyclate was discussed at the GPhA meetings in October 2012 in Bethesda and February 2013 in Orlando.   The October 2012 meeting was attended by Defendants Actavis, Teva, Sun, and Mylan, in addition to other conspiring Defendants as alleged above.   The February 2013 meeting was attended by Defendants Actavis, Mylan, and Teva, in addition to other conspiring Defendants as alleged above.

304.   By way of example, Defendants raised doxycycline WACs on the 100 mg capsules to identical benchmark prices over a two-week period reflecting increases of more than 2,500%:

| Product 100 mg **cap** | **Defendant** | **NDC** | Old **WAC** | New **WAC** | **Date of Increase** | **Percentage Increase** |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7844% |

305.     In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500%:

| Product 100 mg **tab** | **Defendant** | **NDC** | Old **WAC** | New **WAC** | **Date of Increase** | **Percentage Increase** |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5631% |
| 500 ct | Sun | 53489012005 | $0.08 | $4.92 | 5-Feb-13 | 6268% |

306.     NADAC data for doxy manufactured and/or distributed by Defendants Actavis, West-Ward, Sun, Mylan, and Par (via Qualitest and/or DAVA) reveals a similar pattern:



307.   In May 2013, after the price increases had been implemented, Teva discontinued production of doxy hyclate—a product that it had manufactured for three decades.  This act was against Teva's individual self-interest (given that pricing for doxy hyclate had been raised by orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

308.   When Defendants Par (through DAVA) and Mylan entered the market, rather than undercut pricing of the incumbent manufacturers, they priced at similarly elevated prices, consistent with Defendants' "fair share" agreement.  Even today their prices are far above competitive, pre-conspiracy prices.

309.   By April 2014, DAVA launched doxy hyclate pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell  Pharmaceuticals,  LLC  ("Chartwell").    Around  this  time,  Endo  was  in discussions with DAVA to acquire it, which it did in August 2014.

310.    Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement for doxycycline.[24]   Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take delivery of doxycycline shipments from Chartwell despite the fact that there was demand for doxycycline in the market.  Because Endo (through its generics subsidiaries including DAVA) refused to accept the available doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

311.    Chartwell recognized that its supply of doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits."  But Endo (and, subsequently, Par) withheld doxycycline supply from the U.S. market and priced its doxycycline at the supracompetitive price of its co-conspirators.  Chartwell suggested a reason for Endo's economically irrational decision to withhold additional doxycycline supply when there was ample demand in the market.  It accused Endo and its generic subsidiaries of engaging in an illegal price-fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold- and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' doxycycline, and, in collusion with its alleged 'competitors,' set doxycycline's price at the *exact same* level

---

[24] *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

its competitors were charging for the drug." (Emphasis in original). Chartwell further alleged that "DAVA and Moezinia dedicated efforts to *withhold* [doxycycline] from the marketplace..., to keep the overall price of Doxy high." (Emphasis in original). For example, Chartwell cites to an email dated on or about July 11, 2014 where Moezinia emailed Chartwell and stated that DAVA's plan was to sell doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

312. Chartwell sought discovery of the materials that Par and Endo have produced to DOJ and the State AGs. Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: doxy hyclate, doxazosin mesylate, and methotrexate sodium. Chartwell and Endo settled their claims in November 2016.

## 2. *Collusion on Doxy DR*

313. With respect to doxy DR, Mylan and Heritage were the dominant manufacturers, with Mayne entering in 2014. Mylan, as the sole generic manufacturer of the drug for a period of time in 2012, was able to charge a supracompetitive price during the period of generic exclusivity. (As explained above, the FDA estimates that, in a market with one generic manufacturer, the generic drug will typically sell at 94% of the branded drug).

314. Beginning in 2013, Heritage reached out to Mylan for the purpose of colluding to allocate the doxy DR market without disturbing the supracompetitive price.

Heritage was to begin selling Doxy DR in July 2013, and before entering the market, Heritage contacted Mylan about refraining from price competition. Heritage did not want Doxy DR prices to erode when it entered the market. Mylan also wanted to maintain its prices. Consistent with their overarching "fair share" agreement, both Heritage and Mylan understood that cooperation and coordination was required to keep Doxy DR prices high.

315.    In April 2013, Heritage's Glazer and Malek traveled to India to meet with two Emcure executives, CEO Mehta and President Thapar. The purpose of the trip was to discuss Heritage's plans to enter the Doxy DR market. These meetings included discussions about how to coordinate with Mylan so as to minimize the competition between the two companies for Doxy DR.

316.    During these discussions, it was decided that in order to work out an agreement between Heritage and Mylan relating to (at least) Doxy DR, Mehta would reach out to Rajiv Malik, a high-level counterpart at Mylan, in order to facilitate communication between Glazer and Malek and their Mylan counterparts.

317.    After returning to the U.S., on or about May 3, 2013, Heritage's Malek tried to set up a call with the Vice-President of Sales at Mylan. Malek learned, however, that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts. On information and belief, that person was Jan Bell, who was a Senior Key Account Manager at Mylan from September 2010 to January 2013 and has served as Director of National Accounts at Mylan since January of 2013. Malek promptly contacted Bell

through LinkedIn.  Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

318.    While Malek was in contact with Bell, other Heritage employees began reaching out to their counterparts at Mylan to discuss Doxy DR and other drugs.  For instance, beginning on or about May 7, 2013, Glazer emailed Mylan's President and Executive Director, Rajiv Malik.  He copied both Mehta and Thapar at Emcure on the email.  Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

319.    During their May 8 telephone conversation, Heritage CEO Glazer and Mylan President Malik reached an agreement to refrain from competing in the Doxy DR market.  Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively made up 30% of the market.  Glazer further told Malik that Heritage wanted to gain market share without lowering the pricing of Doxy DR.  After numerous discussions, Malik reached an agreement with Glazer in which Mylan agreed to give up its accounts with McKesson and CVS based upon Mylan's understanding that Heritage would work with Mylan to keep the prices of Doxy DR elevated.

320.    In the course of his communications with Glazer, Malik made clear that Mylan was willing to enter into this agreement relating to Doxy DR because Heritage had, in the past, abided by its "fair share" agreements with Mylan on other drugs.

321.   Malik told Glazer that he would inform others at Mylan about their agreement.  Glazer also kept Heritage's Malek informed about his conversations with Mylan.

322.   In the months following Malik and Glazer's agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

323.   By allocating the McKesson and CVS accounts in the Doxy DR market, Mylan and Heritage were able to stabilize Doxy DR prices across the market.  In a competitive market, Heritage's entry would have spurred price competition across all customers, which would have lowered market prices.  By foregoing this competition, Mylan and Heritage kept Doxy DR prices higher than they otherwise would have been.

324.   As discussed above, beginning in July 2013 and continuing through July 2014, Heritage had at least 513 different contacts with various generic drug manufacturers about the pricing of generic drugs, including doxycycline hyclate. Defendants also had the opportunity to discuss Doxy DR and other drugs while attending a number of industry meetings.

325.   Following a number of spring and summer trade meetings in 2013, a series of inter-competitor communications led to anticompetitive agreements relating to multiple drugs.  For example, on June 11, 2013, an employee from Mylan (possibly Aigner or Nesta) called an employee at Heritage (possibly O'Mara).  They spoke for ten minutes.  Immediately after the telephone call, the Heritage employee called Malek and left a voicemail providing a report.  Malek called the employee back fifteen minutes later and they spoke for seven minutes.  That same day, Heritage also was in contact with

other generic drug manufacturers, who in turn communicated with other Defendants, including Par and Mylan.  The next day, while Defendants were also discussing pricing for at least Doxy DR, Lannett, consistent with the conspiratorial agreement discussed below, increased the prices for doxy mono.

326.    On June 18, 2013, a senior manager at Wholesaler A (believed to be McKesson) contacted a Mylan employee to inform him that Wholesaler A received an unsolicited bid for Doxy DR from a new entrant (Heritage).  Mylan was asked to submit a bid by the close of business on June 21, 2013 to retain the business with the wholesaler. Consistent with its agreement to cede its Doxy DR business to Heritage, Mylan failed to submit a counterbid.

327.    On June 27, 2013, following Mylan's failure to bid, Heritage entered into a distribution agreement with Wholesaler A for Doxy DR.

328.    The conversations among Defendants continued throughout 2013.  In July 2013, when Heritage began selling Doxy DR, Heritage contacted Mylan three times and Sun once.  Heritage spoke with Mylan once and Sun twice in August; spoke with Sun once in October; and with Mylan once in November.

329.    On July 8, 2013, Heritage submitted a proposal to a pharmacy (believed to be CVS) to obtain Doxy DR business.  The next day, the pharmacy rejected the proposal as too high.  Heritage submitted a revised bid to the pharmacy on July 11, 2013.  During this time, Heritage and its parent, Emcure, continued to communicate with Mylan to make sure Mylan was committed to their Doxy DR agreement.

330.    As part of this effort, Emcure's Mehta spoke to Mylan's Malik on July 18, 2013.  Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

331.    In response, Glazer emailed Malik trying to schedule a phone call that day. Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voicemail.  Fifteen minutes later, Glazer returned Malik's call and they spoke for four minutes.  During the call, Glazer informed Malik of Heritage's strategy with respect to at least Doxy DR and its bid to the pharmacy.

332.    In response to their conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan would walk away from the pharmacy customer in order to avoid price erosion.

333.    In August 2013, Mylan was contacted by an executive at the pharmacy and was told that the pharmacy had received an unsolicited bid for Doxy DR.  Mylan was given a chance to submit a counterbid.  In response, Mylan submitted a bid that it knew would not be low enough to retain the business.  When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage.  In September 2013, the pharmacy awarded its Doxy DR business to Heritage.

334.    The business obtained from Wholesaler A and the pharmacy accounts for more than 80% of Heritage's Doxy DR business.  Heritage maintains that business to this day.

335.   After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other Mylan customers in order to maintain the agreement with Mylan.  For example, in November 2013, Heritage did not pursue a large account, believed to be Walmart, because it was Mylan's customer and was not allocated to Heritage.

336.   When Mayne prepared to enter the Doxy DR market, anticompetitive conversations continued.  On January 7, 2014, about a month before Mayne's entry into the Doxy DR market, an employee at Mayne and Heritage's Sather had a twelve-minute telephone conversation about agreeing not to compete in the market for Doxy DR.  These conversations continued throughout early 2014, with the Heritage employee, believed to be Sather, continuing to communicate with the Mayne employee, believed to be Gloria Peluso-Schmid, via text messages, email, and including telephone conversations on March 13 and 17.  The Heritage employee emailed and texted Malek, providing him with the information on Mayne's market share and strategy that she had obtained.  The shared goal of Heritage and Mayne was to maintain pricing within the Doxy DR market.

337.   After Mayne entered the market, it initially avoided competing with Heritage and instead targeted customers of Mylan.  In one such instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid.  Heritage declined, honoring its ongoing agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler.  Malek knew Heritage had sufficient supply of Doxy DR to fulfill the bid,

132

but instructed Heritage not to submit a bid in order to honor Heritage's agreement with Mylan.

338.    In March 2014, Sather continued to communicate with her contact at Mayne about Doxy DR, speaking briefly via telephone on March 13 and again on March 17 for seventeen minutes.

339.    At the end of March, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts.  This led to telephonic, email and text discussions between Mayne and Heritage over the next several months, including on April 1, 2014, when Heritage's Sather and a Mayne employee spoke for twenty-seven minutes.  After the call, Sather and Malek exchanged text messages, likely about the substance of the conversation.

340.    Sather and a Mayne employee spoke again the next day for eleven minutes. The same day, Malek emailed CEO Glazer to provide an update on negotiations with Mayne.  Sather and a Mayne employee spoke for three minutes on April 9, 2014 and the next day they exchanged multiple text messages.  Sather reported these conversations to employees of Heritage, including at least Malek.

341.    Ultimately, because of the agreement between Heritage and Mayne not to compete in the market for Doxy DR, Heritage was able to retain the pharmacy customer at prices higher than they would have been in a competitive market.

342.    In May 2014, it was Mayne's turn.  Instead of competing on price, Heritage walked away from a customer being pursued by Mayne.

343.    Similarly, in August 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

344.    In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu).  Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson.  Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed.  Follow-up communications occurred in December 2014 by text message and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

345.    The agreement resulted in elimination of price competition and higher prices for Doxy DR.  When Econdisc put its business out for bid again in January 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business.  Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September of 2015, it declined to do so after learning that Mayne was the incumbent supplier.

3.    *The Doxy Mono Collusive Price Increases*

346.    During the relevant time period, Defendants Heritage, Lannett, Mylan, and Par were the dominant players selling doxy mono.

347.    In February 2013, Heritage believed that demand for some doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of doxy mono.  Accordingly, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for doxy mono.  These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for zoledronic acid and meprobamate, as discussed below.

348.    Starting in March 2013, Heritage's Sather began communicating with Lannett about pricing for at least doxy mono.  On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for fourteen minutes about an opportunity Heritage had at Cardinal (a large purchaser).

349.    Six days later, on March 13, 2013, Sather sent an email to Lannett's Sullivan about pricing for at least doxy mono.  They spoke for five minutes later the same day, again about pricing.

350.    On March 21, 2013—the same day that Malek instructed O'Mara and Edelson to seek a price increase on Meprobamate from Dr. Reddy's (discussed below)—Malek decided he also wanted to increase the price of doxy mono by four times the current price.  He consulted with Glazer about the price increase.

351.    On March 25, 2013, a Lannett employee—likely Tracy Sullivan—sent an email to her boss at Lannett to provide an update on her conversations with Heritage about price increases for certain drugs, including doxy mono.  Lannett's Sullivan and Heritage's Sather communicated about doxy mono by phone, text message, and in-person meetings over the next several months.

135

352. That same day, Malek sent an email to his sales team discussing Heritage's price increases for at least doxy mono and another drug—likely meprobamate or zoledronic acid.

353. Heritage's Sather continued to "socialize" the idea of a doxy mono price increase, and called Lannett's Sullivan and left a message on April 25, 2013. Sullivan returned her call the next day and they spoke for more than eight minutes.

354. As discussed above, while Heritage's NAMs were speaking with competitors about doxy mono, in April 2013 Heritage's Malek and Glazer were in India meeting with Emcure's Mehta and Thapar discussing, among other things, how Heritage and Mylan could minimize competition and avoid price erosion when Heritage entered the Doxy DR market. Mehta decided to reach out to Mylan's Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

355. Consistent with how the overarching conspiracy operated, throughout the rest of 2013, Heritage spoke with its competitors about pricing for a number of drugs, including doxy mono. These communications often overlapped with trade association meetings. For example, on May 14, 2013, the day after Lannett's Sullivan and Heritage's Sather spoke for almost six minutes, the two attended a conference together where they spoke in person and exchanged text messages discussing at least doxy mono.

356. On June 4, 2013, Sather called and texted an employee at Lannett—likely Sullivan. While Sather was exchanging text messages with this Lannett employee, she was attending the HDMA's June 2-5, 2013 Business and Leadership Conference in Orlando, Florida. That conference was attended by key executives for generic sales and

pricing from at least Actavis, Apotex (including Hamilton), Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage (including O'Mara and Sather), Lannett (including Sullivan), Mylan (including Bell, Nesta and Aigner), Par, Sandoz, Sun, Teva, West-Ward and Zydus.

357.    Defendants agreed to implement price increases for doxy mono in the late spring and summer of 2013.

358.    In the lead-up to the price increases, the four competitors selling doxy mono—Par, Lannett, Heritage, and Mylan—were in frequent communication.  For example, on June 11, 2013, the day before Lannett's price increase, a Heritage employee (likely O'Mara) spoke with a Mylan employee (believed to be either Aigner or Nesta) for nearly ten minutes.  During this same time period, a Lannett employee was communicating with an employee at Par.  In turn, this Par employee frequently communicated with a Mylan employee.  The Lannett and Par employees were friends and frequently spoke in person at trade association conferences, including about competitive information.

359.    In fact, these employees from Mylan and Par spoke numerous times between June and July 2013.  The two had several calls on June 7, 2013 and June 13, 2013—the day after Lannett confirmed that it would increase its prices for doxy mono.[25]

---

[25] Mylan and Par both increased their prices of divalproex shortly after these calls, on June 14 and June 26, respectively.

Further, an unidentified employee at Lannett exchanged nine text messages with an unidentified competitor on June 11 and June 12, 2013.

360.    Heritage was concerned about supply issues for doxy mono in 2013, and thus was cautious about the doxy mono price increases.  In a competitive market, supply challenges for one supplier would typically create competitive opportunities for other suppliers.  But Defendants' "fair share" agreement aimed to mitigate these risks of competition.  Accordingly, Sather kept in frequent communication with Lannett during this period to stay abreast of any developments, and to reaffirm Heritage's commitment to their agreement.  She also met with a Par employee while at a conference in Arizona on August 1 and 2.  Following Sather's meeting with Par in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage about at least the pricing of doxy mono.

361.    The NACDS Total Store Expo in Las Vegas, Nevada on August 10-13, 2013 was attended by numerous Defendants, including those known to have exchanged pricing and customer information throughout the relevant period, including: Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Par, Perrigo, Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward, and Zydus (Lukasiewicz).  Just as their convergence at the HDMA trade show in June led to numerous anticompetitive inter-competitor communications, Defendants' attendance at the Total Store Expo facilitated discussions about market allocation and pricing for generic drugs at issue.

362.   For example, when Malek asked Sather to obtain specific information about Lannett's price increase for doxy mono, Sather used the Total Store Expo as an opportunity to meet in person with Lannett's Sullivan.   On August 12, 2013, after meeting in person at the conference, and in response to a directive from Malek, Heritage's Sather sent a text message to Lannett's Sullivan.

363.   The next day, while still at the Total Store Expo, Sather and Sullivan texted again.   Sather also exchanged several text messages and phone calls with another employee at Lannett.   In addition, a Lannett employee also sent a text message to an employee at Par.

364.   Later in the evening of August 13, an employee at Par sent an internal email, which was subsequently circulated at Par internally.   The email included information about pricing agreements related to the prices of doxy mono and other drugs.

365.   On August 20, 2013, a week after Par's internal discussion, Heritage's Sather emailed Malek and confirmed Lannett's agreement related to the pricing of doxy mono.

366.   By March 2014, Heritage increased its doxy mono price to at least one customer and was working on a much larger across-the-board price increase on doxy mono, as well as price increases on several other drugs.

367.   As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for obtaining price increases for numerous drugs, including doxy mono.

368.    Malek and the Heritage NAMs took responsibility for communicating with specific Defendants about specific drugs, including Sather, who, among her other assignments, was responsible for communicating with Lannett about doxy mono.

369.    Right after the Heritage conference call on April 22, Sather communicated with three different competitors—including a twenty-nine-minute phone conversation with Lannett's Sullivan about pricing for doxy mono.  Through these conversations, Sather reached a number of pricing agreements covering doxy mono and four other drugs (glyburide-metformin, verapamil, nystatin, and paromomycin).

370.    Similarly, on April 23, O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted his counterpart at Mylan (either Aigner or Nesta) and obtained an agreement to raise prices on doxy mono (as well as glipizide-metformin and verapamil).  Immediately after speaking with Mylan, O'Mara sent an email to Malek advising him of his discussions with Mylan.

371.    On May 8, 2014, Malek requested an update on discussions with competitors.   Sather responded to Malek's email, providing an update on her communications with three Defendants about five drugs, including her conversations with Sullivan at Lannett about doxy mono.

372.    Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements,

an agreement with Lannett on doxy mono pricing.[26]

373.    The market allocation and price-fixing agreements on doxycycline (including doxy hyclate, doxy DR, and doxy mono) remain in force or effect (or both) as of the date of the filing of this Complaint, and UHS and Pharmacy Assignors have been and continue to be injured by this unlawful conduct.

**L.    Econazole**

374.    The market for econazole is mature, as econazole has been available in the United States for almost 20 years.  Defendants Taro and Fougera sell generic econazole pursuant to ANDAs approved by the FDA in November 2002.  Defendants Perrigo and Teligent sell econazole pursuant to ANDAs approved in 2004.

375.    During the relevant time period, Defendants Fougera, Perrigo, Taro, and Teligent sold econazole throughout the United States.

376.    At all times relevant to this lawsuit there has been more than one manufacturer of econazole on the market.  Defendants Fougera, Perrigo, Taro, and Teligent sold econazole throughout the United States.

377.    Between 2009 and June 2014, Defendants' prices for econazole remained relatively stable.   However, beginning in July 2014 and continuing thereafter, Defendants began implementing abrupt and substantial price increases on econazole.

---

[26] Sather also secured agreements with at least Aurobindo on glyburide, glyburide-metformin, and fosinopril HCTZ, and Sandoz (fosinopril HCTZ).

378.    On February 1, 2013, Teligent acquired an ANDA for econazole from Prasco LLC.  Twice during that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the primary sellers of econazole had opportunities to discuss Teligent's entry to the market.  Of particular note, the CEOs of Perrigo and Taro joined the Teligent CEO at the GPhA Annual Meeting on February 20-22.  Jason Malek and Jeffrey Glazer of Heritage, and Rajiv Malik of Mylan, each of whom is directly implicated in the Defendants' overarching "fair share" conspiracy, also attended this meeting.  In addition, on February 24-27, 2013, ECRM held its annual Retail Pharmacy Efficient Program Planning Session at the Sheraton Hotel, Dallas, Texas, and representatives from Defendant Perrigo, Taro, and Teligent attended, as did Heritage.

379.    During this period, Teligent—which had in the past focused on contract manufacturing and product development for other companies—announced its intent to become a generic pharmaceutical manufacturer.[27]  Its ambitions were not limited to econazole.  Teligent touted its strategic plan to enter the market for numerous topical generic drugs.  It launched its first topical generic drug in December 2012, followed by its acquisition of the econazole assets and ANDA from Prasco in February 2013.  By September 2013, Teligent had 12 ANDAs pending at the FDA.[28]  By June 20, 2014 that

---

[27] *See, e.g.*, IGI Laboratories Inc. 2014 Annual Report (SEC 10-K) at 3, *available at*: https://www.sec.gov/Archives/edgar/data/352998/000114420415016338/v404166_10k.htm.

[28] Teligent Press Release (Sept. 18, 2013), *available at*: http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces- twelfth-anda-submission.

number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.[29]  When Teligent acquired the right to sell econazole, it was the start of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs.   This scenario—where a drug manufacturer plans to enter a market with established, incumbent manufacturers, and where those manufacturers are competitors or potential competitors across multiple drugs—is particularly ripe for a "fair share" agreement.  Rather than allow competition to drive the price of drugs even lower, manufacturers can instead agree to "play nice in the sandbox" and keep prices higher.

380.    Teligent finally launched econazole under its own label in September 2013.  In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.  Rather than competing for market share by lowering prices (or merely seeking to preserve market share by maintaining existing prices), Teligent made the economically irrational decision to *raise* prices.  In a competitive market, this would have provided an opportunity for Perrigo and Taro to punish Teligent and gain market share by capitalizing on lower pricing.  But that did not happen.  On October 28-30, right before Teligent's higher prices took effect in the marketplace, representatives from Fougera, Perrigo, Taro, and Teligent

---

[29] Teligent Press Release (June 20, 2014), *available at*:
http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces- 18th-and-19th-anda-submissions.

had met at a GPhA conference and again had an opportunity to discuss Econazole market shares and pricing.

381.    Representatives from Fougera, Perrigo, Taro, and Teligent also all attended the GPhA conference on June 3 and 4, 2014 in North Bethesda, Maryland. Shortly thereafter, beginning at least as early as July 2014, these Defendants raised prices on all of their generic econazole products.   Upon information and belief, senior executives had reached agreement and monitored compliance.  In accordance with their price-fixing agreement, Defendants caused econazole prices to skyrocket.  Within a short period after the June 2014 industry meeting, each econazole manufacturer dramatically raised its respective list (WAC) and effective econazole prices.

382.    In July 2014, Teligent, Perrigo, Taro, and Fougera each implemented abrupt and substantial price increases on the econazole products they sold throughout the United States in lockstep.

383.    With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WACs to identical prices, reflecting increases of more than 600%:

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30 gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30 gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30 gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |

| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |







384.    Upon information and belief, by November 2014, Fougera increased its WAC prices to the same levels as Perrigo, Teligent, and Taro.

385.    Defendants' price increases coincide with increases reflected in NADAC data:



Source: NADAC Price Data

386.    Although the conspirators have not been able to maintain their full conspiracy price increase, Defendants continue to charge significantly more per dose for econazole than the prevailing market price before their anticompetitive and conspiratorial pricing.

387.    Upon information and belief, the price increases on econazole were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of econazole in the United States.   These collusive agreements were furthered, at least in part, through in-person discussions continually conducted at meetings and industry events hosted by GPhA and ECRM as well as other meetings and communications (as identified in throughout this Complaint).

**M.      Fluocinonide**

388.     The market for fluocinonide is mature.  Fluocinonide is the generic version of Lidex, a topical corticosteroid that has been available in the United States for more than 40 years.   Generic fluocinonide has been available for more than 20 years. Fluocinonide is sold in cream, gel, and ointment versions.

389.     During the relevant time period, Defendants Taro, Teva, and Actavis sold fluocinonide throughout the United States.

390.     At all times relevant to this lawsuit there has been more than one manufacturer of fluocinonide on the market.  Defendants Taro, Teva, and Actavis dominate the market for fluocinonide.

391.     As an established generic drug that had been on the market for a long period of time, in early 2014, the price of generic fluocinonide was fairly stable.

392.     Beginning in June 2014, however, Actavis planned to enter the market for fluocinonide, and sell the drug in cream form.  Upon information and belief, Actavis discussed its planned entry with at least Defendants Taro and Teva in advance of its entry into the market and coordinated a collusive price increase between all three Defendants for fluocinonide cream.

393.     Spurred by the collusive agreement on fluocinonide cream, Taro and Teva also agreed to increase prices on fluocinonide gel and ointment.  During the last week of July 2014, Taro, Actavis, and Teva were able to roughly triple the prices that each charged for fluocinonide cream, gel, and ointment in the United States, with the collusive price increase implemented before Actavis entered the market (Actavis followed the

collusive price increase that it had agreed to upon its entry). These abrupt prices were in lockstep, or virtual lockstep, across fluocinonide cream, gel, and ointment.

394. By way of example, with respect to WAC pricing, Taro and Teva set identical WAC prices within a month of each other in the Summer of 2014, reflecting increases of more than 200%:

| Product CRM .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Taro | 51672125301 | $0.79 | $2.43 | 3-Jun-14 | 206% |
| 30 gm | Taro | 51672125302 | $0.56 | $2.43 | 3-Jun-14 | 337% |
| 60 gm | Taro | 51672125303 | $0.39 | $2.43 | 3-Jun-14 | 524% |
| 15 gm | Teva | 00093026215 | $0.79 | $2.43 | 1-Jul-14 | 206% |
| 30 gm | Teva | 00093026230 | $0.56 | $2.43 | 1-Jul-14 | 337% |
| 60 gm | Teva | 00093026292 | $0.39 | $2.43 | 1-Jul-14 | 524% |

395. The charts below plot the NADAC data for Fluocinonide, and show the low and stable prices that were characteristic prior to Defendants' price hikes, as well as the huge spike in price that occurred starting in June 2014, and the maintenance and continuation of supracompetitive prices:

149







396.    Upon information and belief, the price increases on fluocinonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of fluocinonide in the United States.  As with other drugs identified in the Complaint, this collusion was spurred in part by Actavis' planned entry into the market, with Taro, Teva, and Actavis reaching agreements on pricing in advance of Actavis' entry.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

**N.      Fosinopril HCTZ**

397.    Fosinopril HCTZ is the generic version of Monopril HCT, a drug developed by Bristol Meyers Squibb in 1994 to treat hypertension.  The market for

fosinopril HCTZ is mature.  The primary sellers of fosinopril HCTZ during the relevant period are Aurobindo, Citron, Glenmark, Heritage, and Sandoz, and each sold fosinopril HCTZ throughout the United States.

398.    In early 2012, the incumbent manufacturers of fosinopril HCTZ were Aurobindo, Glenmark, and Sandoz.  In the spring of 2012, Heritage entered the market. (Citron did not enter the market until 2014).  Instead of entering with a lower-priced product in order to gain market share, Heritage announced a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark.

399.    Even though it was not offering better pricing, Heritage quickly captured market share for fosinopril HCTZ, consistent with the "fair share" agreement between Defendants.

400.    During this period, all the fosinopril HCTZ manufacturers at the time— Aurobindo, Glenmark, Heritage, and Sandoz—met on numerous occasions at trade events.

401.    Prices remained stable in the fosinopril HCTZ market from 2012 into 2014, at which time Heritage included fosinopril HCTZ on its target list for price increases.

402.    During the week of April 14, 2014, Heritage's Malek asked two employees to analyze the impact of price increases for numerous generic drugs, including fosinopril HCTZ, and during an April 22, 2014 Heritage conference call, Malek informed the sales team that fosinopril HCTZ was targeted for a price increase.

403.    As with Heritage's other targeted price increases, Malek aimed to "socialize" the idea of price increases with the other fosinopril HCTZ manufacturers by direct outreach and communication about Heritage's intentions.  Both Malek and Glazer pushed Heritage employees to communicate with their competitors and to obtain agreement to raise prices.

404.    Between the time of the sales team call in April and Heritage's price increase in July, Heritage communicated by phone call or text with every other manufacturer of fosinopril HCTZ, totaling at least 100 contacts.

405.    On April 26, representatives from Aurobindo, Citron, Glenmark, Heritage, and Sandoz met at the NACDS 2014 Annual Meeting in Scottsdale, Arizona.

406.    On April 28, 2014, Malek emailed Lukasiewicz directing him to contact Aurobindo about pricing for fosinopril HCTZ, glyburide, and glyburide-metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing.  Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014.

407.    In May 2014, Heritage's Lukasiewicz began speaking with employees at Aurobindo and Glenmark—both via phone and through LinkedIn—about price increases for fosinopril HCTZ.  On May 2, 2014, a Heritage employee—likely Lukasiewicz—contacted an employee at Glenmark via LinkedIn to discuss pricing for at least fosinopril HCTZ.

408.    A Heritage employee—likely Lukasiewicz—spoke by phone with his Aurobindo contact for sixteen minutes on May 8, 2014.  During this call, they reached

an agreement to raise the price of at least fosinopril HCTZ, glyburide-metformin, and glyburide.

409.    On May 8, 2014—the same day Lukasiewicz spoke with Aurobindo—Lukasiewicz called an employee at Glenmark, and they spoke for more than fourteen minutes.  The next day, on May 9, the Aurobindo employee spoke with an employee at Glenmark for over nine minutes.

410.    On May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases.  Fosinopril HCTZ, verapamil, theophylline, paromomycin, nystatin, nimodipine, leflunomide, glyburide-metformin, and glyburide were all on the May 9 price increase list.  During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

411.    Lukasiewicz was not the only Heritage employee communicating with other manufacturers of fosinopril HCTZ.  On May 14, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota.  She used this conference as an opportunity to speak in person with a number of different competitors about pricing.   Sather confirmed agreements on pricing with at least Aurobindo (fosinopril HCTZ, glyburide, and glyburide-metformin), Sandoz (fosinopril HCTZ), and Lannett (doxy mono).  Sather emailed Malek on May 15, telling him of the agreements with Aurobindo, Sandoz, and Lannett.

412.    Also on May 15, the day after speaking with Heritage's Sather and while the MMCAP National Member Conference was still ongoing, the same Aurobindo and

Sandoz employees spoke by phone and texted each other multiple times.  A week later, a competitor—likely an employee from Aurobindo or Heritage—exchanged text messages with the same employee at Sandoz to confirm she had his correct cell phone number.

413.    During this time, an employee at Aurobindo also spoke with employees at Glenmark and Sandoz about price increases for fosinopril HCTZ.

414.    On May 15, 2014, a large pharmacy customer informed Heritage that Aurobindo had recently provided a lower bid for fosinopril HCTZ.  Sather recommended that Heritage not reduce its price to retain business, because she was confident that Aurobindo would stick to the pricing strategy she and Aurobindo had reached the day prior.

415.    Heritage's Sather continued her pricing discussions on fosinopril HCTZ in person while at the June 2014 HDMA Business and Leadership Conference.  On June 3, Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including a contact at Sandoz.

416.    Following these trade association meetings, there was a sharp uptick in discussions among competitors.  Between June 3, 2014 and June 10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing of at least fosinopril HCTZ.

417.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes.  Again, these discussions

were presumably about the pricing of the generic drugs at issue, including fosinopril HCTZ.

418.    On June 23, the Heritage sales team had a meeting where they discussed the price increases targeted for the identified drugs.  The proposed increase for fosinopril HCTZ was 200%.

419.    Heritage's Lukasiewicz spoke with his contact at Aurobindo for eighteen minutes on June 25, the day before Heritage issued price increase letters for numerous drugs, including fosinopril HCTZ.  They would speak for three and a half minutes again on July 7, 2014.

420.    Also on June 25, a Heritage employee texted a friend at Citron to discuss Citron's entry into the glyburide market and proposed price increases in that market. During this text exchange, Heritage learned for the first time that Citron was planning to enter the market for fosinopril HCTZ as well.  After learning about Citron's proposed entry into the fosinopril HCTZ market, the Heritage employee disclosed Heritage's plan to increase the pricing for fosinopril HCTZ.  She also informed the Citron employee that Aurobindo was a competitor for fosinopril HCTZ.

421.    This exchange between Heritage and Citron provides another example of the overarching conspiracy at work.  Although Heritage contacted Citron to discuss pricing on glyburide, the communications—and anticompetitive agreement—naturally and inevitably expanded to include additional drugs at issue, in this instance, fosinopril HCTZ.

422.    On June 26, 2014, Heritage issued price increases for nine drugs, including fosinopril HCTZ.

423.    On June 27, the day after Heritage began sending out price increase notices for fosinopril HCTZ, an employee of Aurobindo and an employee of Glenmark spoke twice, with one of their calls lasting almost eighteen minutes.  Over the next several months, Glenmark and Aurobindo continued to speak about at least fosinopril HCTZ.

424.    On July 1, 2014, Citron called an employee at Heritage to discuss Citron's agreement to raise prices on certain drugs and to discuss Heritage's price increase plan for fosinopril HCTZ.  They spoke for thirteen minutes.  During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for fosinopril HCTZ or any other drugs.

425.    Employees of Heritage and Citron spoke for nearly twenty-two minutes again on July 2, 2014 about fosinopril HCTZ and other drugs.  These conversations continued throughout July and August 2014.

426.    On July 18, 2014, a Heritage employee—likely Lukasiewicz—spoke directly with a Glenmark employee for twenty-three minutes about at least fosinopril HCTZ.  On July 30, 2014, they spoke for more than five minutes.

427.    By July, Heritage had raised its list (WAC) prices by 100% for fosinopril HCTZ, and prices remained elevated thereafter.

428. The "fair share" agreement among Defendants enabled Heritage to maintain or even increase its market share for fosinopril HCTZ, even though it had raised prices above a competitive level.

429. During this time, Citron also was communicating directly with Aurobindo. On July 28, 2014, an employee of Citron called and texted an employee at Aurobindo several times until the two were finally able to connect by phone.  They spoke later that day for more than twenty-four minutes.  That day, Citron confirmed internally that Heritage had increased its list prices for fosinopril HCTZ, and also had raised prices on two other drugs that Citron was trying to match on price increases (glyburide and glyburide-metformin).

430. Citron spoke with an employee of Glenmark twice on July 14, 2014.  The first call lasted for seven minutes.  The second call, which occurred shortly thereafter, was for more than thirteen minutes.  The next day, Citron increased its fosinopril HCTZ prices to be in line with the price increases adopted by Heritage.

431. Although Heritage significantly raised its prices for fosinopril HCTZ, it did not lose market share until at least 2016 (when it appears to have begun to exit the market).  Maintaining a dominant share of the market was possible because of the "fair share" agreement among Defendants including Heritage, Aurobindo, Citron, Glenmark, and Sandoz.

## O.  **Glipizide-Metformin**

432. The market for glipizide-metformin is mature, as the drug has been available in generic form since 2005.  During the relevant time period, Heritage, Teva,

and Mylan have been the primary sellers of glipizide-metformin sold throughout the United States.

433. Since 2009, numerous Defendants have sold glipizide-metformin, including Mylan, Teva, Sandoz (mostly exited the market by 2010), Actavis (mostly exited the market by 2014), Heritage (entered the market in 2010 and mostly exited the market by July 2017), Sun (sold de minimis amounts up until 2016), and Zydus (entered the market in September 2016).

434. By April 2014, Defendants Heritage, Teva, and Mylan controlled nearly the entire glipizide-metformin market.

435. As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for more than seventeen minutes and discussed various different generic drugs for which Teva was a competitor of Heritage, including glipizide-metformin. During their conversation, Patel agreed that if Heritage increased prices for the drugs they discussed, including glipizide-metformin, Teva would support the price increases.

436. Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including glipizide-metformin.

437. As discussed above, during an April 22, 2014 Heritage sales team teleconference, numerous drugs were slated for a price increase, including glipizide-metformin.

438.    Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements.  For Heritage, O'Mara was responsible for communicating with Mylan (either Aigner or Nesta) about a number of drugs, including glipizide-metformin.  On April 23, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three different drugs, including glipizide-metformin (as well as doxy and verapamil).  O'Mara conveyed this agreement with Mylan to Malek via email the same day.

439.    Teva and Mylan were also in frequent communication with each other about pricing.  On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least glipizide-metformin.  Their conversations included one call that lasted more than seven minutes.  They continued to be in contact throughout 2014.

440.    Also on May 9, 2014, Heritage held an internal call about price increases. Glipizide-metformin was one of the drugs slated for a price increase.

441.    Heritage had a call on June 25 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications.  The next day, Heritage began notifying customers of price increases for nine drugs, including glipizide-metformin.  Glipizide-metformin was slated for a 100% increase effective July 1, 2014. Price increase notices were mailed the same day.

442.    By July 9, 2014, Heritage had increased prices of glipizide-metformin nationwide for at least 27 different customers.

443.    On August 20, 2014, an unidentified individual—likely a Heritage employee—updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of glyburide-metformin and verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by individuals from Heritage, Teva, Mylan, and Sun that are directly implicated in anticompetitive communications: Heritage (Glazer, Malek, O'Mara, and Sather), Mylan (Aigner and Nesta), and Teva (Patel).  Numerous other Defendants attended as well.

444.    Consistent with their agreement, neither Teva nor Mylan challenged Heritage on its price increases.  By November 2014, Teva had increased its bid prices of glipizide-metformin to potential customers.

445.    Although Heritage, Mylan and Teva imposed price increases on their customers, throughout the relevant period, the list (WAC) prices announced for glipizide-metformin by Heritage, Mylan, and Teva, as well as by Defendants Actavis, Sandoz, and Zydus, were virtually identical and unchanged.  Regardless of the number of sellers in the market, and despite multiple entrances and exits from the market, list prices did not change or vary.  This suggests an absence of price competition and is consistent with Defendants' "fair share" agreement.  Rather than compete in the market, Defendants announced identical list prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

P.      **Glyburide**

446.    The market for glyburide is mature, as glyburide has been available in the United States for decades and has been available in generic form in the United States for more than 20 years.

447.    As of April 2014, Defendants Aurobindo, Heritage, and Teva were the dominant sellers of glyburide sold throughout the United States.  Defendant Citron would enter the glyburide market in July of 2014.

448.    As alleged elsewhere in this Complaint, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed various generic drugs, including glyburide. During their conversation, Heritage and Teva agreed not to compete in the glyburide market.  Malek and Patel spoke several more times over the next several months to confirm and finalize their agreements regarding glyburide and numerous other drugs.

449.    On April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including glyburide.  At the time of this call, Aurobindo and Teva were Heritage's only competitors in the glyburide market.

450.    Malek was responsible for communicating with Teva (among other Defendants) and Lukasiewicz was assigned to communicate with Aurobindo.

451.    Malek and Glazer pushed Heritage employees to communicate with their competitors in order to reach agreements to raise prices.  Malek and Glazer sent several emails imploring their sales staff to reach agreements with their competitors in the generic glyburide market, among other generic markets, as soon as possible.   For

example, on April 28, 2014, Malek sent an email to one Heritage employee—likely Lukasiewicz—concerning the status of discussions with Aurobindo.

452.    Glazer followed up the next day (April 29) with an email to Lukasiewicz requesting further information, and Malek sent an additional email on April 30 requesting an update.  Lukasiewicz eventually connected with his Aurobindo contact on May 8, 2014, when the two spoke for sixteen minutes.  During this call, they agreed to raise the price of a number of drugs, including glyburide.

453.    On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss the contemplated price increases for at least nine generic drugs, including glyburide.

454.    The following week, on May 14, Heritage's Sather met in person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minnesota.  During that meeting, Aurobindo and Heritage's Sather agreed to raise the prices of glyburide.  Sather confirmed this agreement in a May 15 email to Malek.  Sather also indicated that she would try to meet with Teva at MMCAP.

455.    On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase glyburide, as well as other generic drugs, and the strategies for doing so.  They reached a consensus that glyburide prices would be increased by 200%.

456.    Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitors—including in the

glyburide market—in order to secure agreements to raise prices for glyburide and other generic drugs.

457.    On June 25, 2014, one Heritage employee texted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling glyburide in the near future.  Once it was determined that Citron would be entering the glyburide market, Citron and Heritage had extensive phone, text message, and in-person conversations concerning Citron's glyburide pricing and bidding strategies.

458.    For example, on July 1, 2014, Citron called an employee at Heritage and they spoke for thirteen minutes, confirming Citron's agreement to raise prices on certain drugs, including glyburide.  During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for glyburide or other drugs.

459.    The two spoke for nearly twenty-two minutes the next day.

460.    As Citron entered the glyburide market in July 2014, it frequently contacted Heritage about glyburide pricing and bidding strategies.  Citron set an initial target of obtaining less than 10% of the glyburide market share.  It was careful, however, to coordinate with Heritage so that it could acquire additional market share without eroding the price increases.

461.    Citron and Heritage's discussions did not occur in isolation.  Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with Defendants about pricing for glyburide and other generic drugs at issue.

462.    By July 9, 2014, Heritage had announced glyburide price increases for at least seventeen customers.  Teva also had increased pricing on glyburide.  Citron, after confirming internally that Heritage had increased its list prices for glyburide, also increased its glyburide pricing in line with the price increases on July 15, 2014.

463.    Consistent with the parties' understanding of their agreements and the principles of "playing fair" within the market, throughout the summer, Teva, Aurobindo, Citron, and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for glyburide.

464.    For example, on July 9, 2014, a large national retail chain asked Teva to bid on both glyburide and nystatin because of Heritage's price increases.  Instead of quoting a price that would win the business, Teva—consistent with Defendants' agreement—raised its own list prices for glyburide to a similar level as Heritage.

465.    Similarly, in response to Heritage's price increase on glyburide and other drugs discussed in this complaint, a large wholesaler separately emailed Teva and Aurobindo on July 25, 2014 and asked for bids.  Aurobindo and Teva immediately contacted Heritage to coordinate their responses and ensure that they were complying with their pricing agreements.

466.    Teva's Patel and Heritage's Malek spoke for fifteen minutes the day the wholesaler's request was received.  After this conversation, Teva declined to provide a bid to the wholesaler.

467.    The same day, Malek sent a text message to an unidentified individual believed to be at Aurobindo.  Malek and this individual then spoke for thirteen minutes

and determined that Aurobindo would not provide a glyburide bid in response to the wholesaler.

468.    Ultimately, neither Teva nor Aurobindo responded to the bid.

469.    While Teva, Aurobindo, and Heritage were trying to maintain their price increases for glyburide, Citron also was communicating directly with Aurobindo presumably to coordinate its entry into at least the glyburide market.

470.    On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to connect by phone.  They spoke later that day for more than twenty-four minutes, including about the pricing of glyburide and other drugs.

471.    Glazer's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that "[i]n furtherance of the conspiracy, [Glazer] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of glyburide sold in the United States."

472.    Similarly, Malek's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that "[i]n furtherance of the conspiracy, [Malek] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of glyburide.  During such discussions

and meetings, agreements were reached to allocate customers and fix and maintain the prices of glyburide sold in the United States."

473.    Through their continued collusion, Citron, Heritage, Aurobindo, and Teva were able to maintain their collusive pricing on glyburide throughout the relevant period. This conspiratorial agreement continues to impact prices that UHS, Pharmacy Assignors, and others in the United States pay for glyburide.

Q.    **Glyburide-Metformin**

474.    The market for glyburide-metformin is mature, as the drug has been available in generic form since 2004.  Glyburide-metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (entered the market in August 2014), Dr. Reddy's (selling only *de minimis* amounts by 2011), Heritage (entered the market in January 2013), Par (selling only *de minimis* amounts by 2010), Sandoz (selling only *de minimis* amounts by 2013), Teva, and Zydus (entered the market in September 2016).

475.    As of April 2014, Teva, Aurobindo, and Actavis were the primary sellers in the market for glyburide-metformin.  Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

476.    As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of generic drugs, including glyburide-metformin. Patel and Malek agreed not to compete on these drugs.  Over the next several months, Malek and Patel spoke several more times to confirm and finalize their agreements.

477.     On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including glyburide-metformin.  After the call, Malek assigned Lukasiewicz to contact Aurobindo about glyburide-metformin (and, as discussed above, fosinopril HCTZ), and Sather was assigned to Actavis to discuss glyburide-metformin.

478.     Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs—including with Actavis about glyburide-metformin.  Sather spoke with Actavis for nine minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price of glyburide-metformin (and, as discussed below, verapamil).  Sather updated Malek on her communications with Actavis on May 8.

479.     Within Actavis, news of its agreement with Heritage spread quickly.  On April 28, 2014, an email to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

480.     In response to that April 28 email, on May 6, an unidentified employee at Actavis called an employee at Mylan, and they spoke for five minutes.  They spoke three more times on May 6, with one call lasting fifteen minutes.  They continued to communicate over the next several months.  It is believed that they discussed pricing for glyburide-metformin.

481.     On April 28, 2014, Heritage CEO Glazer sent an email to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including glyburide-metformin.  Tellingly, Glazer told Lukasiewicz not to put any of his

communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014. Glazer would request status updates from Lukasiewicz several times at the end of April.

482. Heritage's Lukasiewicz and his Aurobindo contact spoke for sixteen minutes on May 8, 2014. During this phone call, they reached an agreement to raise the price of glyburide, glyburide-metformin and fosinopril HCTZ.

483. And on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for at least five different drugs with three different Defendants. Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for glyburide-metformin and two other drugs.

484. Concurrent with these discussions, on May 12, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo, twice about its glyburide-metformin pricing. Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

485. On June 25, 2014, a Heritage employee texted a friend at Citron about Citron's entrance into the glyburide market. As part of this discussion, they also spoke about glyburide-metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

486. In July 2014, both Heritage and Teva increased their WAC prices for glyburide-metformin.

487. Citron took note of these actions. In a July 9, 2014 internal Citron memo, Citron noted that both Heritage and Teva had increased their prices on three different

drugs, including glyburide-metformin. In the same memo, a Citron employee then reiterated Citron's intent to abide by the agreement with Heritage and Teva.

488. On August 20, 2014, an unidentified individual—likely a Heritage employee—exchanged text messages with a Sun employee. The text exchange described the agreements reached with Actavis to increase the price of glyburide-metformin and verapamil. This, again, highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to generic drugs at issue that it did not market or sell.

489. By September 2014, Citron had mobilized to enter the glyburide-metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list (WAC) prices higher than all of them.

### R.     **Leflunomide**

490. The market for leflunomide is mature, as the drug has been available in generic form since 2005. As of April 2014, the main competitors for leflunomide were Defendants Apotex, Teva, and Heritage. Heritage was a dominant player in the market, with a 60% market share.

491. As discussed above, during the week of April 14, 2014, Malek met with two employees and asked them to analyze the impact of price increases for numerous generic drugs, including leflunomide.

492.    Before introducing the market-wide price increases to the rest of his sales team, Malek began communicating with Patel at Teva about numerous generic drugs, including leflunomide.

493.    On April 15, 2014, Malek and Patel spoke on the phone and agreed that if Heritage increased prices for leflunomide, acetazolamide, glipizide-metformin, glyburide, and glyburide-metformin, Teva would support the increases.

494.    Malek and Patel spoke several more times over the next several months to confirm their agreements.  During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

495.    While Malek was speaking with Teva's Patel about increasing prices on leflunomide, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for at least leflunomide.

496.    During the infamous April 22, 2014 Heritage sales call, Malek identified leflunomide as a drug slated for an increase.  In the wake of this call, Malek personally took responsibility for communicating with Teva.  Matt Edelson was assigned to Apotex.

497.    Defendants had numerous opportunities to meet in person at industry events to discuss the pricing of leflunomide.  For example, on April 26-29, Heritage's Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from Teva and Apotex, among others.

498.    On May 2, 2014, Edelson spoke with Apotex's Beth Hamilton for thirteen minutes about at least leflunomide.  Four days later, on May 6, a Heritage employee—

171

likely Edelson—had two more phone calls with Apotex's Hamilton after learning that Teva would be exiting the leflunomide market.

499. After speaking with Hamilton, Edelson emailed Malek to report what they discussed.  Malek replied, confirming the strategy with Edelson.  That same day (May 6), either Malek or Edelson called Apotex.  They had two calls, lasting nine and eight minutes, respectively.

500. The following day—on May 7, 2014—Edelson and Hamilton had two more phone conversations where they agreed to avoid competition and increase prices on leflunomide.  Seven phone calls in five days, and an agreement was reached.

501. On May 8, in response to an email from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

502. On May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for leflunomide.  During the conference call, the Heritage sales team shared the results of their conversations with competitors, including Apotex.

503. On May 27, Heritage learned that Apotex had increased the price on leflunomide to bring it more in line with Heritage's price.

504. On June 26, 2014, Heritage began sending price increase notices to its customers for nine drugs, including leflunomide, and had fully implemented the price increase on all its major leflunomide accounts by early July.

505. Beginning in July 2014, rather than compete for leflunomide sales, Teva ceded the market to Apotex and Heritage and began to exit the market.

S.     **Levothyroxine**

506.    The market for levothyroxine is mature, as levothyroxine has been available in the United States for over 50 years.  Levothyroxine is on the WHO's list of essential medicines.   Levothyroxine is often featured on lists of the top ten most prescribed generic drugs and, as of June 2015, it was the most prescribed generic drug in the United States and constituted 2.7% of the entire generic drug market by number of prescriptions.

507.    During the relevant time period, Defendants Lannett, Mylan, and Sandoz all sold levothyroxine throughout the United States.

508.    At all times relevant to this lawsuit there has been more than one manufacturer of levothyroxine on the market.  Defendants Lannett, Mylan, and Sandoz dominate the market for levothyroxine.

509.    For more than two years prior to the conspiracy period, the prices for levothyroxine remained remarkably stable, with the typical pill costing an average of just a few cents.  However, beginning in or around August 2013, Lannett, Mylan, and Sandoz began to implement a series of price increases across all dosage strengths of levothyroxine, with their average price roughly doubling.  The abrupt price increases were done in lockstep.

510.    The conspirators were able to maintain their collusive price increase into the summer of 2014, but Defendants determined that they could collusively increase prices even further.  Between May and August 2014, Defendants Mylan, Sandoz, and Lannett colluded to increase prices again.

511.   By way of example, with respect to WAC pricing, Defendants set matching WAC prices on their 0.05 mg tablet in quick succession in August and September 2013 and again in April and May 2014, reflecting cumulative increases of more than 125%:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct | Lannett | 00527134201 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1000 ct | Lannett | 00527134210 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 90 ct | Sandoz | 00781518192 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Sandoz | 00781518110 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Mylan | 00378180310 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct | Lannett | 00527134201 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1000 ct | Lannett | 00527134210 | $0.27 | $0.41 | 28-Apr-14 | 54% |
| 90 ct | Sandoz | 00781518192 | $0.27 | $0.41 | 23-May-14 | 54% |
| 1000 ct | Sandoz | 00781518110 | $0.27 | $0.41 | 23-May-14 | 54% |

512.   The following charts of NADAC data further demonstrate Defendants' dramatic, sudden, and sustained price increases across levothyroxine products:











Source: NADAC Price Data

513.   Mylan, Sandoz, and Lannett have maintained their prices at these supracompetitive levels and, as of the filing of this Complaint, UHS and Pharmacy Assignors continue to pay supracompetitive prices for generic levothyroxine.

514.   Upon information and belief, the price increases on levothyroxine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of levothyroxine in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

**T.**     <u>Lidocaine-Prilocaine</u>

515.    The market for lidocaine-prilocaine is mature, as lidocaine-prilocaine has been available in the United States for decades.  It is marketed in the United States under the brand name EMLA.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera have all sold lidocaine-prilocaine throughout the United States.

516.    At all times relevant to this lawsuit there has been more than one manufacturer of lidocaine-prilocaine on the market.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera sold lidocaine-prilocaine throughout the United States.

517.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for lidocaine-prilocaine was remarkably stable.  Until around March of 2014, generic lidocaine-prilocaine pricing was fairly stable.  That stability is reflected in the following chart displaying NADAC data for generic lidocaine-prilocaine covering the years 2012 to 2015:



518.    Beginning on or around March of 2014 however—and without any explanation—the price of Defendants' generic lidocaine-prilocaine began to skyrocket. As shown in the NADAC chart above, the average price per unit of generic lidocaine-prilocaine sold across all Defendants was $0.49 in January of 2014, compared to $1.20 in January of 2015, a 145% increase.

519.    Upon information and belief, the price increases were the result of collusive agreements between and among the Defendants to increase pricing and restrain competition for the sale of lidocaine-prilocaine throughout the United States.

520.    Upon information and belief, this agreement to increase prices on lidocaine-prilocaine was the result of collusive communications between and among Defendants that were initiated by Sandoz and Fougera to increase pricing and restrain competition for the sale of lidocaine-prilocaine in the United States, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry during this time period.  The collusive agreement to increase prices on lidocaine-prilocaine was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

U.    **Meprobamate**

521.    The market for meprobamate is mature, as the drug has been available in the United States since 1955.  During the relevant time period, Heritage and Dr. Reddy's were the primary sellers of meprobamate throughout the United States.

522.   In 2013, Actavis exited the meprobamate market, which left Heritage and Dr. Reddy's as the two remaining suppliers in the market.  Heritage wanted to use Actavis' exit from the market as pretext to increase prices.

523.   While Dr. Reddy's and Heritage were negotiating pricing and market share for zoledronic acid (as discussed above), they also were discussing pricing for meprobamate.

524.   On March 21, 2013, Heritage's Malek emailed O'Mara and Edelson and instructed them to contact Dr. Reddy's—the only competitor remaining in the meprobamate market—to tell Dr. Reddy's that Heritage wanted to increase the price on meprobamate.  Malek's proposed price increase was approximately four times the current price.

525.   On March 22, during the same time they were exchanging price information for zoledronic acid with Dr. Reddy's, Heritage's O'Mara spoke to Dr. Reddy's Adams for nine minutes about at least meprobamate.  During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of meprobamate.  O'Mara confirmed the agreement in an email to Malek that same day, stating, "Dr. Reddy's is on board."

526.   Three days later, on March 25, Malek emailed O'Mara about the agreement, and O'Mara responded again confirming that Dr. Reddy's would "follow suit" if Heritage raised the price on meprobamate.  In a competitive market, a supplier risks losing market share if it raises price, but Dr. Reddy's assurance to Heritage that it

would "follow suit" eliminated that risk—and eliminated price competition in the market for meprobamate.

527.     During this period, Dr. Reddy's was having supply issues with meprobamate, and Heritage's O'Mara reported that this "lack of inventory" kept Dr. Reddy's prices "stationary."  As a result of these supply issues, on March 27, 2013, AmerisourceBergen ("ABC") asked Heritage to give a bid on both formulations of meprobamate.

528.     Malek immediately forwarded the RFP internally and discussed Heritage's proposed response.  Malek's response to the discussion reflected a clear understanding of and an intention to abide by the agreement between Heritage and Dr. Reddy's on pricing for meprobamate.  This agreement was confirmed in a four and a half minute conversation between Heritage and Dr. Reddy's on March 29, 2013.

529.     In April 2013, Dr. Reddy's approached Heritage to discuss obtaining additional meprobamate market share and asked Heritage to give up a specific large pharmacy chain.  Because of their agreement, Heritage gave up some of its market share to Dr. Reddy's.

530.     Heritage sent an email to the large pharmacy chain on April 24, 2013, and on May 17, Heritage's Malek provided Dr. Reddy's with clarifying information about precisely which business Heritage had agreed to give up to Dr. Reddy's.

531.     Heritage's O'Mara called Adams, his counterpart at Dr. Reddy's, on May 17, 2013.  The two subsequently spoke on May 21, 2013 for nearly seven minutes.

532. As a result of Heritage and Dr. Reddy's agreement, both raised meprobamate prices across the board. Their price increases were nearly simultaneous. Heritage's price increase became effective in late April 2013, and Dr. Reddy's price increases became effective in early May. Heritage and Dr. Reddy's imposed identical list prices for 200 mg meprobamate tablets (an increase of nearly 400%) and 400 mg meprobamate tablets (an increase of approximately 350%). AWP prices for both products were elevated as well. List and AWP prices remained elevated above competitive levels thereafter.

533. No product shortages or other market changes can explain Defendants' abrupt, simultaneous and identical price increases.

534. Dr. Reddy's and Heritage's meprobamate pricing discussions happened nearly simultaneously with their pricing and market share discussions about zoledronic acid.

535. Further, as discussed above, Defendants' ability to quickly reach agreement on market share and price increases was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. Heritage, Dr. Reddy's, and representatives of other Defendants attended at least three such meetings when these price increases were being discussed.

536. Heritage and Dr. Reddy's continued to discuss pricing for meprobamate throughout the relevant period. For example, meprobamate was identified during the April 22, 2014 Heritage teleconference as one of the numerous drugs targeted for a price increase.

537.    On April 24, 2014, a Heritage employee—believed to be Matt Edelson—exchanged six text messages with his contact at Dr. Reddy's about pricing for meprobamate (and possibly other drugs as well).  The two spoke briefly on May 6, 2014.

538.    On May 8, 2014, Malek emailed the Heritage sales team requesting an update on the status of agreements with competitors so that Heritage could move forward with the price increases discussed on April 22, 2014.  A Heritage employee (likely Edelson) responded to Malek that he was awaiting feedback from one competitor (believed to be Dr. Reddy's) about the drug meprobamate.

539.    As a result of this anticompetitive conduct, Heritage and Dr. Reddy's increased the prices for meprobamate sold throughout the United States to supracompetitive levels.  This market allocation and price-fixing agreement and the ensuing supracompetitive pricing has continued in either force or effect (or both) throughout the relevant period.

## V.      Nimodipine

540.    The market for nimodipine is mature, as the drug has been available in the United States in generic form for more than 10 years.  During the relevant period, Ascend, Heritage, and Sun (through Caraco) were the primary sellers of nimodipine throughout the United States.

541.   In June 2012, Teva was preparing to exit the market for nimodipine.[30]  This exit would leave Heritage and Sun[31] as the only manufacturers of nimodipine.  Heritage wanted to use Teva's exit as a cover to raise nimodipine prices.

542.   Pricing discussions with competitors were part of Defendants' "toolkit" for achieving and maintaining elevated prices on generic drugs, and Defendants understood that to maintain market share and increase prices they needed to "play fair." With this in mind, Heritage devised a plan to approach Sun.

543.   Heritage's Malek understood that nimodipine price increases would need to be "socialized" with competitors, by which he meant that direct outreach to other manufacturers was important in order to coordinate and implement a market-wide price increase.  To "socialize" a nimodipine price increase, Malek instructed NAM Sather to reach out to Sun to discuss whether it would agree to raise prices.

544.   At Malek's direction, Ann Sather contacted Sun—most likely Knoblauch. Heritage's Sather exchanged numerous text messages and had multiple phone calls with her contact throughout June 2012.  These conversations between Heritage and Sun were successful.  The ostensible competitors reached an agreement ***not*** to compete; their goal was to raise prices.

---

[30] Teva marketed and sold nimodipine during the relevant period at least in part through its subsidiary, Barr.

[31] Sun marketed and sold nimodipine during the relevant period at least in part through its subsidiary, Caraco.

545.   Ultimately, Teva never completely exited the market for nimodipine, yet it did reduce its sales to a very small share, and ceded the market to Sun and Heritage.

546.   Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012 email discussing the status of the agreement on nimodipine between Heritage and Sun.

547.   That same day, Sather sent an analysis of a Cardinal RFP to Malek, Glazer, and other Heritage employees.  Sather noted that Heritage would submit a bid at an artificially high price which would allow Sun to retain Cardinal's business.  Heritage informed Sun about the pricing before submitting to Cardinal.  This information allowed Sun to retain Cardinal's business at a price that was higher than it would have been in a competitive market.

548.   On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal RFP, which, upon information and belief, quoted pricing at a level lower than Sun.  Malek responded the same day and exchanged emails with a Heritage employee (possibly Keith Fleming) about Heritage's pricing on nimodipine and Heritage's agreement on pricing with Sun.  Around the same time, Sather and her contact at Sun were also discussing at least nimodipine.

549.   Heritage's Sather and Sun's Knoblauch communicated by text and phone over the next few weeks.  They also met in person at an industry event.

550.   Through these communications, at the end of July, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for nimodipine.  As

part of this understanding, as it had in June, Heritage again agreed to provide a cover bid to Cardinal.

551.    As a result of Heritage's cover bid, Sun retained its business with Cardinal, and both Heritage and Sun were able to maintain nimodipine prices above the competitive level.

552.    In September 2012, after Cardinal awarded Sun its nimodipine business, Sun began to experience supply issues with its nimodipine.

553.    In October 2012, Cardinal approached Heritage asking for a new bid because it was concerned about Sun's supply chain.  Although Sun never fully exited the market, its sales of nimodipine declined to a small share.

554.    Sather immediately emailed Heritage's Malek, Glazer, and Fleming to apprise them of Cardinal's request.  Given the circumstances, Sather felt that responding to Cardinal's request for an RFP did not violate Heritage's agreement with Sun because Cardinal was coming directly to Heritage.

555.    Sather proposed that Heritage respond to Cardinal's request consistent with a price increase it had recently imposed on a different wholesaler.  Sather believed that Heritage could offer a higher price and still win the business from Cardinal because she had received Sun's Cardinal pricing from her contact at Sun.  Sather also shared information she had learned at the earlier trade conference, which, consistent with industry practice, presumably involved competitive market information.

556.    Heritage's Sather confirmed her understanding that Heritage could submit a bid to Cardinal without violating its agreement with Sun when she spoke with Sun's Knoblauch for thirty-eight minutes the next day.

557.    Heritage continued to monitor when Sun would reenter the nimodipine market.  Malek emailed Sather on December 17, 2012 about Sun's supply issues.  In response to Malek's email, Sather reached out to her contact at Sun and kept Malek informed about her conversations.

558.    On April 16, 2013, Sather reported to Malek that Sun was not pursuing nimodipine customers because it did not know when its product would be available.

559.    Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun reentered the nimodipine market.

560.    Heritage's Sather continued speaking with Sun's Knoblauch to assess when Sun might reenter the nimodipine market.  When they spoke on May 23, 2013, Sather learned that Sun might be returning to the nimodipine market in June or July. Sather immediately reported this development to Malek, and the two exchanged emails about pricing for nimodipine.

561.    Ultimately, Sun decided not to reenter the nimodipine market.  In the spring of 2013, Heritage more than doubled the price of nimodipine capsules and maintained this inflated price for the duration of the relevant period.

562. When Heritage's Malek learned that Ascend was planning to enter the nimodipine market in April 2014, he immediately began the process of trying to contact Ascend and bring them into the "fair share" agreement.

563. On April 8, 2014, Malek informed his staff that Ascend would be entering the nimodipine market and personally took responsibility for coordinating with Ascend. Malek had met John Dillaway, the Executive Vice President of Ascend, in February 2013, and he used that connection as a way to reach out to Dillaway through LinkedIn. The two executives communicated frequently through LinkedIn in the weeks leading up to April 22.

564. As discussed above, during an April 22, 2014 Heritage teleconference, Malek identified numerous drugs that were slated for a price increase, including nimodipine.

565. On April 22, Dillaway and Malek spoke on the phone about Ascend's entry into the nimodipine market for nineteen minutes.

566. Concurrently with Malek's discussions with Ascend, Malek and the rest of Heritage's sales teams were involved in large-scale outreach to Defendants to increase prices for numerous generic drugs.

567. As part of a May 9 internal conference call about industry-wide price increases for various drugs, Heritage discussed allocating customers to co-conspirators as part of the agreements, including, but not limited to, the potential allocation of certain customers to Ascend as part of the efforts to raise or maintain prices on nimodipine.

568.    On June 6, 2014, Heritage's Malek emailed Ascend's Dillaway trying to arrange a phone call to discuss nimodipine.  When they were unable to connect by phone, they planned to meet at the NACDS Total Store Expo in Boston in August to solidify their agreements.

569.    As discussed above, during a conference call on June 23 with the Heritage sales team, the targeted percentage price increases for eight drugs were discussed, including nimodipine, which was slated for a 48% increase.

570.    Three days later, on June 26, Heritage began telling customers that it was increasing prices for nine different drugs, including nimodipine.  Price increase notices were issued on the same date.

571.    Notwithstanding its approval from the FDA and its agreement with Heritage, Ascend did not fully complete its launch of nimodipine until May 1, 2015. However, Ascend discussed its agreement with Heritage repeatedly while it took steps to fully complete its launch of the drug.  This included the in-person meeting in Boston in June 2014, a number of emails with Malek in October and November 2014, and additional contacts in January 2015.

572.    When Ascend finally completed its entry into the nimodipine market in the United States, it announced a WAC price and charged to customers a per-tablet price that were even higher than Heritage's prices.  Despite entering the market with higher pricing than Heritage, Ascend was able to gain substantial market share, because Heritage ceded business to Ascend by submitting sham bids to customers, as the companies had agreed.

573.    These anticompetitive agreements by Heritage, Sun, Caraco, and Ascend resulted in supracompetitive prices for nimodipine in the United States that have persisted as of the filing of this Complaint.

**W.    Nystatin**

574.    The market for nystatin is mature, as the drug has been available in the United States since 1950.  The drug is considered an essential medicine by the World Health Organization.  Defendants Actavis, Par, Perrigo, Sandoz, Taro, Heritage, Sun (through Mutual), and Teva sold nystatin throughout the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

575.    Nystatin is produced in multiple formulations, including an external cream, an external ointment, and a tablet.

576.    During the relevant time frame, Defendants Actavis, Par, Perrigo, Sandoz, and Taro were the primary manufacturers of nystatin external cream, Defendants Actavis, Perrigo, and Sandoz were the primary manufacturers of nystatin external ointment, and the primary manufacturers for nystatin tablets were Teva, Heritage, and Sun (through Mutual).

577.    In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of nystatin external cream.  Taro and Perrigo increased their prices in very close succession in the late spring of 2011.  Par followed the price increase in August, and Actavis joined in November.  Sandoz joined the price increase when it re-entered the market in 2013.

578.    As late as 2009, Sandoz enjoyed approximately a 50% market share for nystatin external cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis had the rest.  Through 2009 and into 2010, Sandoz's market share began to decline.  By the summer of 2010, Sandoz was effectively out of the market.  By this time, Actavis and Par also were effectively out of the market.  Although *de minimis* sales by Sandoz, Actavis, and Par appear to have continued, they each had a market share of less than 1% by the spring of 2011.  By May 2011, Taro had captured as much as 96% of the nystatin cream market, leaving Perrigo approximately a 4% share.

579.    In June, Taro initiated a large price increase of more than 600%.  Rather than compete on price in order to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels.  Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

580.    In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition.  Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

581.    In November, Actavis ramped up production of nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match those of Taro, Perrigo, and Par, also choosing to forgo price competition and the prospect of winning a larger

share of the market.  Even a fourth entrant into the nystatin cream market did not cause prices to erode.  Defendants' agreement was working.

582.    Sandoz's share of the nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Par, and Actavis before it, rather than compete on price in order to regain lost market share, Sandoz priced its nystatin cream at the same inflated level as its co-conspirators.  Prices remained stable and elevated even with a fifth seller in the market.

583.    As depicted in the graph below, Defendants' list price increases for nystatin external cream were almost identical, and once in place the prices remained stable and elevated thereafter.



584.    The graph highlights that after a long period of relatively low and stable pricing for nystatin external cream, Defendants implemented large, abrupt and nearly

uniform price increases.  The AWP prices for Defendants' products also were elevated to nearly identical levels.

585.   No product shortages or other market changes can explain Defendants' price increases.  In a competitive generic pharmaceutical market, prices tend to decline as the number of sellers increases.  Here, the elevated and stable pricing of nystatin cream even as multiple sellers joined the market is more consistent with anticompetitive conduct than with competition.

586.   Throughout this period, Defendants had numerous opportunities to coordinate their pricing for nystatin cream.  For example, Defendants had the opportunity to discuss pricing at the ECRM Retail Pharmacy Conference in March 2011, which was attended by representatives from Actavis, Par, Perrigo, Sandoz, and Taro.

587.   The next month, in April 2011, right before the price increases began, all Defendant manufacturers of nystatin cream again gathered.  Actavis, Par, Perrigo, Sandoz, and Taro attended the NACDS Annual Meeting.

588.   The nystatin cream manufacturers continued to meet at trade conferences thereafter.  For example, leading into and following Sandoz's price increase for nystatin external cream, Sandoz had multiple opportunities to meet with other Defendants.  In April 2013, Sandoz was joined by Actavis, Par, Perrigo, and Taro at the NACDS Annual Meeting.  Then, in June 2013, representatives from these companies attended the GPhA/FDA CMC Workshop in Bethesda, Maryland.  In August, all five nystatin cream manufacturers converged again at the NACDS Total Expo in Las Vegas.  These meetings were also attended by numerous other Defendants.

589.    Nystatin external ointment prices followed a similar pattern to those of nystatin external cream.   In 2009, Sandoz had captured approximately 75% of the market, while Perrigo had 20%, and Actavis 5%.   From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market.   By the summer of 2010, Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued.   By the summer of 2011, Sandoz had approximately a 5% market share.

590.    In June 2011, after Sandoz and Actavis had all but ceded the nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

591.    Five months later, Actavis ramped up production of nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo.  As intended by the overarching "fair share" agreement among Defendants, the list prices and AWP price for nystatin ointment remained virtually unchanged, even with the addition of a new seller in the marketplace.

592.    In the summer of 2012, the pattern repeated itself.  Sandoz ramped up its production of nystatin ointment in June.  Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis.  Even with a third market participant prices remained unchanged, just as devised by Defendants' agreement.

593.    As depicted in the graph below, Defendants' list price increases for nystatin ointment were almost identical, and once in place the prices remained stable and elevated.



594.    The graph highlights that after a long period of relatively low and stable pricing for nystatin ointment, Defendants implemented abrupt and nearly uniform price increases of more than 300%.  The AWP prices for Defendants' products also were elevated to nearly identical levels.

595.    No product shortages or other market changes can explain Defendants' price increases.  The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, economic theory predicts that prices should decline. Yet, nystatin ointment prices remained unchanged, which suggests an anticompetitive agreement among Defendants.

596.    Again, Defendants had the opportunity to discuss pricing of nystatin external ointment at numerous industry events during the relevant period.  For example,

all Defendant manufacturers of nystatin ointment attended the ECRM Retail Pharmacy Conferences and the NACDS Annual Meetings in 2011 and 2012 (in addition to other meetings).

597.    In 2010 and 2011, the nystatin oral tablet market was split between Teva and Sun.[32]  Teva held approximately 60% of the market, while Sun held 40%.  During that time, Teva and Sun had nearly identical list prices for their nystatin tablets.

598.    In the summer of 2012, Heritage entered the market.  Rather than price its nystatin tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva and Sun, consistent with the "fair share" agreement between them.

599.    As Heritage ramped up production, it reached out to Teva and Sun, and in April 2013, Sun, Heritage, and Teva began discussing pricing for nystatin tablets.  By this point in time, Sun had accumulated a larger share of the market.  Defendants therefore devised a plan to reallocate the shares.

600.    Sun would implement a large price increase.  After Teva and Heritage obtained their "fair share" of the market, they would join Sun's price increase.  On April 15, 2013, Sun more than doubled its price for nystatin tablets.  Sun, Teva, and Heritage had ongoing communications both before and after this increase.  The day after Sun increased its nystatin prices, Sun Sr. Sales Manager Knoblauch called Heritage's NAM Sather and they spoke for forty minutes.

---

[32] Sun marketed and sold Nystatin tablets during the relevant period at least in part through its subsidiary, Mutual.

601.   Knoblauch and Sather regularly communicated throughout the summer of 2013.  For example, both Sather and Knoblauch attended the NACDS Total Store Expo in August 2013.  This trade association meeting, which also was attended by representatives from every U.S. Defendant except Mayne, provided an opportunity to meet in person and exchange competitive information.

602.   In June 2013, Teva began internally discussing price increases for nystatin tablets, and contemplating when would be the appropriate time to join Sun's elevated prices.  But Teva needed to coordinate with Heritage.  Accordingly, on July 9, 2013, Teva's Patel called Heritage's Malek and they spoke for twenty-one minutes.  Malek knew Patel from her previous work at AmerisourceBergen.  They spoke throughout July—with a nearly ten-minute call on July 23 and two calls on July 30.  The second call on July 30 lasted more than twelve minutes.

603.   While Heritage's Malek was speaking with Patel at Teva, Heritage remained in contact with Sun.  On July 30—the same day Malek spoke with Teva's Patel twice—Malek also spoke to Sun for nearly eleven minutes.

604.   As these conversations continued, in late July 2013 Teva placed nystatin tablets on its list of potential price increases.

605.   Similarly, throughout August 2013, Malek sent internal Heritage emails discussing drugs targeted for a price increase.  Nystatin tablets were identified as one of those drugs.

606.   Discussions between Heritage and Teva about a nystatin price increase were temporarily tabled while Teva's Patel went on maternity leave on August 12, 2013.

607.   On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since she went on maternity leave in August 2013.   Malek returned her call the next day and the two spoke for more than an hour.   Upon information and belief, they discussed a price increase for at least the drugs nystatin and theophylline.   Teva had been considering price increases for both drugs since early 2014.

608.   Three days after that, on February 7, an unidentified employee of either Heritage or Teva created a spreadsheet identifying nystatin and theophylline as candidates for price increases.   Heritage's Malek and Teva's Patel continued discussing the possibility of such increases.

609.   Throughout February and March 2014, Heritage's Malek and Teva's Patel had a series of phone calls discussing price increases for multiple drugs, including at least the pricing of nystatin and theophylline.

610.   Following these discussions, Teva implemented a price increase for nystatin tablets with an effective date of April 4, 2014.   The increase more than doubled Teva's list price to a price nearly identical to Sun's.

611.   The early success in coordinating with Sun and Teva on nystatin oral tablets emboldened Malek.   During the week of April 14, 2014, he met with two Heritage employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including but not limited to acetazolamide, doxycycline monohydrate, fosinopril HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, and verapamil.

612.    Before introducing the market-wide price increases to the rest of his sales team, Malek continued to communicate with Patel at Teva.  On April 15, 2014, Heritage's Malek had a seventeen-minute phone conversation with Patel, discussing numerous different drugs at issue, including at least acetazolamide, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, nystatin, and theophylline.

613.    As Malek and Patel had already agreed in February, Teva would lead the price increases for nystatin and theophylline.

614.    During their conversation, Malek and Patel agreed that if Heritage increased prices for the other five drugs—acetazolamide, glipizide-metformin, glyburide, glyburide-metformin, and leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not offer lower prices to any of Heritage's customers.

615.    Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on nystatin and other drugs.  Malek also kept Patel updated on the progress of Heritage's proposed price increases.

616.    On April 22, 2014, Heritage's Malek held a teleconference with his sales team.  On the call, Malek dictated a price increase strategy for various generic drugs to Heritage's NAMs.  Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares.

617.    This call set off a chain of pricing and market allocation discussions between Defendants and resulted in numerous drug-specific agreements.  Members of

Heritage's sales team were assigned to specific competitors for whom they had primary, but not exclusive, responsibility for communicating with about pricing and market share. Malek personally took responsibility to communicate with Defendants Teva and Zydus, as well as co-conspirator Ascend.  Anne Sather was assigned to Sun to reaffirm the agreement on nystatin.[33]  She also was assigned Actavis and Lannett.  Her Heritage colleagues Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for pricing discussions with four other Defendants.

618.    Heritage's Sather was responsible for communicating with Sun about the agreed-upon price increase for nystatin tablets.  On April 22, 2014, the same day Heritage held an internal meeting with its sales team to discuss a number of prices increases, Sather and Sun's Knoblauch spoke for more than forty-five minutes and agreed to increase the prices of numerous drugs, including nystatin tablets.  With respect to nystatin, by this time, Sun already had raised its price and Teva had just announced that it was matching that price increase.  Sather and Knoblauch reaffirmed that Heritage, too, would follow the nystatin price increase.

619.    Sather emailed Heritage's Glazer, Malek, Edelson, Rich Smith, and O'Mara immediately after her conversation with Knoblauch to report the agreements

---

[33] Sather also spoke with Sun about Paromomycin and spoke with Actavis to confirm agreements on glyburide-metformin and Verapamil and with Lannett to confirm agreements on doxy mono.

with Sun.  Glazer immediately responded to Sather, instructing her not to put this type of information in writing.  He then contacted her using his cell phone.

620.    During this time frame, Glazer directed Malek to call G.P. Singh, the President of Sun, to get further confirmation of Sun's pricing intentions.  Ultimately, Malek decided not to reach out to Singh, whom he had never met.

621.    Four days later, however, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet in person with G.P. Singh from Sun, as well as with representatives from Teva and nearly every other U.S. Defendant.

622.    On or about May 8, Malek requested an update on the status of Sather's negotiations with competitors.  Sather confirmed her agreement with Sun.

623.    On or about May 9, Heritage had an internal call to discuss the status of the proposed price increases.  Nystatin tablets were slated for a 95% increase.

624.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on certain drugs and their strategy for doing so.  Malek proposed increases of:

    (a)        Acetazolamide—75%.

    (b)        Fosinopril HCTZ—200% effective July 1, 2014.

    (c)        Glipizide-Metformin—100% effective July 1, 2014.

    (d)        Glyburide—200% effective July 1, 2014.

    (e)        Nimodipine—48%.

    (f)        Nystatin—95%.

(g)        Paromomycin—100%.

(h)        Theophylline—150%.

625.    One Heritage employee's notes about the June 23 call indicated that Heritage needed to promptly increase its nystatin WAC price because Teva already had done so.

626.    Heritage had one final internal call to discuss price increases, including the price of nystatin tablets, on June 25, 2014.  While still participating in this internal call about pricing, Heritage's Sather exchanged text messages with Sun's Knoblauch, informing her of the details of Heritage's anticipated price increases.

627.    Similarly, on June 25, Malek had a fourteen-minute call with an individual— likely Teva's Patel—in which he reported that Heritage's price increase notices would be mailed on June 26 for nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

628.    On June 26, 2014, Heritage began telling its customers that it was increasing its prices for nine drugs, including nystatin tablets.  By July, among the other price increases it implemented, Heritage increased its nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun).  This impacted Heritage's customers nationwide.

629.    In accord with their agreement, Teva did not undercut Heritage's prices, even when approached by large potential customers.  For example, on July 8, 2014, a large retail customer emailed a Teva representative asking for a quote for nystatin tablets because it recently was notified of a large price increase from its current supplier.  Teva

either did not provide a bid or provided a cover bid that allowed Teva and Heritage to maintain their anticompetitive agreement.

630.    The price increases of approximately 100% initiated by Sun and joined by Teva and Heritage occurred after a long period of relatively low and stable pricing for nystatin tablets.  The AWP prices for Defendants' products also were elevated to nearly identical levels.  These prices remained stable and elevated above competitive levels thereafter.

## X.    **Paromomycin**

631.    The market for paromomycin is mature, as the drug has been available in the United States since 1960.  Sun and Heritage were the sellers of paromomycin during the relevant time period, with Heritage having approximately a 65% market share.

632.    As discussed above, starting in at least June 2012, Heritage and Sun began discussing price increases and market allocation for at least two drugs—paromomycin and nimodipine.

633.    At Malek's direction, Ann Sather contacted Sun—most likely Knoblauch. Throughout the summer of 2012, Heritage's Sather exchanged numerous text messages and had multiple phone calls with her Sun contact.

634.    Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions at trade meetings throughout this period, including at the October GPhA Fall Technical Conference.

635.    By the end of October 2012, Sun had increased its list (WAC) prices for paromomycin to be identical with Heritage's pricing.  Heritage and Sun kept their list prices at the same level thereafter.

636.    After the April 22, 2014 Heritage teleconference with the sales team in which paromomycin was targeted for a price increase, Malek assigned Anne Sather to communicate with Sun.

637.    Right after the Heritage sales call, Sather communicated with three different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering various different drugs, including paromomycin.

638.    Sather spoke with Susan Knoblauch, her counterpart at Sun, for more than forty-five minutes.  During this conversation, Sather and Knoblauch discussed pricing and agreed to increase the prices of numerous drugs, including paromomycin.  Sather immediately reported her agreement with Sun to Malek.

639.    In response to a May 8 status request from Malek, Sather emailed him to report the agreement she had reached with a number of competitors, including with Sun for paromomycin.

640.    During a May 9 internal Heritage call, paromomycin remained on the list of drugs slated for a price increase.

641.    Heritage and Sun spoke again for more than twelve minutes on May 20.  During the call, Heritage learned that Sun would be making changes to the production of paromomycin.  Malek was immediately informed of this development.

642.    On June 23, Heritage employees discussed the specific percentage increases they would seek for a variety of drugs.  Paromomycin was slated for a 100% increase.

643.    Heritage had a final call confirming that paromomycin would have a price increase on June 25, 2014, and the next day Heritage began sending out price increase notices.

644.    By July 9, 2014, Heritage announced price increases for paromomycin to at least thirteen different customers nationwide.

645.    Over the ensuing months, pursuant to their agreement, Heritage and Sun continued to increase their prices for paromomycin.

646.    Upon information and belief, it was ultimately agreed between the two companies that Sun would exit the market for paromomycin.  Upon information and belief, Heritage agreed to concede market share to Sun on another generic drug in exchange for Sun's agreement to stop manufacturing paromomycin.

## Y.    **Pravastatin**

647.    The market for pravastatin is mature, as generic pravastatin has been available in the United States for over 10 years.  In October 1991, Bristol Meyers Squibb received FDA approval to market Pravachol, which is prescribed to control high cholesterol and triglycerides.  Pravastatin in the generic version of Pravachol.

648.    Upon the expiration of Bristol Meyers Squibb's patent in 2006, a number of generic manufacturers applied for ANDAs to market pravastatin in the United States. By 2010, Actavis, Apotex, Glenmark, Teva, Dr. Reddy's, Lupin, Sandoz, Zydus, and

Mylan had all received ANDAs to manufacture and sell generic pravastatin and each sold pravastatin throughout the United States.  As a result, the average cost of a dose of generic pravastatin sold at a competitive price of less than 10 cents between January 2010 and June 2013.

649.   Beginning in May 2013, Defendants conspired to implement a series of collusive price increases on pravastatin.  Although the price increases were taken in stair-step fashion, they could not have been implemented without collusion between and among each of the eight generic manufacturers of pravastatin.

650.   Between July 2013 and October 2013, Actavis, Apotex, Glenmark, Teva, Dr. Reddy's, Lupin, Sandoz, Zydus, and Mylan each increased their prices for generic pravastatin sold throughout the United States.  The Defendants continued to further raise prices throughout the remainder of 2013.

651.   By way of example, with respect to WAC pricing, Defendants reported nearly identical WACs for their 10 mg products, reflecting increases of more than 100%:

| Product 10 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Apotex | 60505016809 | $0.26 | $0.56 | 28-May-13 | 119% |
| 500 ct | Apotex | 60505016805 | $0.26 | $0.56 | 28-May-13 | 119% |
| 90 ct | Zydus | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 500 ct | Zydus | 68382007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 90 ct | Teva | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |
| 1000 ct | Teva | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 90 ct | Lupin | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 500 ct | Lupin | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

652.   NADAC data for Pravastatin likewise illustrates this drastic increase.  The NADAC data show the average increase in the price of Pravastatin across the major manufacturers and demonstrate that price hikes for Pravastatin were industry-wide:





653.    The increase in average prices was not the result of one dominant manufacturer raising the price while others kept prices in check and sought to capture market share.

654.    Upon information and belief, the price increases on pravastatin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of pravastatin throughout the United States.   These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

655.    Although prices for pravastatin have receded somewhat from the peak in early 2014, Defendants continue to charge supracompetitive prices for pravastatin throughout the United States.   The conspiracy overcharge remains embedded in the price of pravastatin paid by United and others.

**Z.    Propranolol**

656.    The market for propranolol is mature, as propranolol has been available in the United States for decades.   The drug is considered an essential medicine by the World Health Organization, and is used by millions of patients in the United States.   The price for propranolol had fallen steadily since its introduction in the 1960s, and as recently as early 2013, a monthly prescription for propranolol cost as little as $8.00.

657.    Actavis, Breckenridge, and Upsher-Smith each manufacture propranolol in capsule form, while Actavis, Mylan, Teva, PLIVA, UDL, Par, and Heritage

manufacture propranolol in tablet form.  Each sold either propranolol capsules or tablets (or both) throughout the United States.

658.    Actavis, Breckenridge, and Upsher-Smith implemented a collusive price increase beginning in November 2013 on propranolol capsules.  Breckenridge, which had previously had lower prices for propranolol capsules, increased its prices for all dosages by 88% to 140%.  Upsher-Smith followed in December with a corresponding price increase on all dosages of propranolol capsules that ranged from 49% to 79%, depending on the dosage strength.  In February 2014, Actavis increased prices for all dosages of propranolol capsules by 64% to 81%, depending on the dosage strength. Although prices fell slightly from their peak in 2014, Actavis, Breckenridge, and Upsher-Smith continue to price propranolol capsules at supracompetitive levels as of the filing of this Complaint.  The conspiracy continued in either force or effect until the filing of this Complaint.[34]

659.    For the two and a half years before the conspiracy began, transaction prices for propranolol capsules were only 57 cents per capsule on average and were at times as low as 44 cents per capsule.  After Defendants agreed to raise and fix prices, the average price doubled, regularly reaching more than $1 per capsule, and often $1.43 per capsule. The average capsule price charged by certain Defendants reached as high as over $1.70 per capsule, over a 350% increase in price.

---

[34] *See generally In re Propranolol Antitrust Litig*., No. 16-cv-09901 (JSR), 2017 WL 1287515, at *2 & n.1 (S.D.N.Y. Apr. 6, 2017).

660.     Upon information and belief, the price increases on propranolol capsules were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of propranolol capsules throughout the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

661.     Although the conspiring Defendants increased prices on propranolol capsules by early 2014, Defendants' prices for propranolol tablets remained stable throughout 2014.

662.     Beginning in January 2015, however, Actavis, Mylan, Teva, PLIVA, UDL, Par, and Heritage colluded to increase prices on propranolol tablets as well. Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, Teva, PLIVA, and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively.  Mylan and Par began increasing their prices soon after, in April and June 2015, by amounts ranging from 55%-607% and 52%-216%, respectively.  Actavis, Mylan, Teva, PLIVA, Par, and Heritage continued to increase prices throughout 2015, and by January 2016, Defendants had increased their prices for some strengths of propranolol tablets by more than 1,700%.  For example, Actavis raised

its prices of 80 mg propranolol tablets from an average of $0.30 to $0.46 per tablet between December 2014 and November 2015.[35]

663.    In the four years before the tablets conspiracy began, transaction prices for propranolol tablets remained under 4 cents per pill on average, sometimes reaching as low as 3 cents per pill on average. After the conspiracy started, the average price was regularly over 475% higher, reaching 19 cents per pill and even as high as 26 cents per pill, a 650% increase. During the conspiracy period, some Defendants charged almost 30 cents per pill on average across all dosage strengths of their tablet products.

664.    Upon information and belief, the price increases on propranolol tablets were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of propranolol capsules in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

665.    For example, Defendants' propranolol price increases began shortly after the Defendants attended meetings of GPhA, and another association (whose name has been redacted from the public) in February 2013 (for capsules) and after a NACDS meeting in December 2014 (for tablets). At these and similar meetings, senior executives of each Defendant reached agreement and monitored compliance.

---

[35] *See generally In re Propranolol Antitrust Litig.*, No. 16-cv-09901 (JSR), 2017 WL 1287515, at *2 & n.1 (S.D.N.Y. Apr. 6, 2017).

666.    With respect to both the capsule and the tablet price increases, even in those instances in which the Defendants did not increase prices in perfect unison, they still managed to align their pricing on a bi-monthly or quarterly basis, which is consistent with an illegal agreement.

667.    Defendants continue to charge supracompetitive prices for propranolol as of the filing of this Complaint.

**AA.    Theophylline ER**

668.    The market for theophylline ER is mature, as theophylline has been used in various forms to treat various conditions since approximately 1900.   During the relevant period, Heritage and Teva sold theophylline ER throughout the United States.

669.    Prior to Heritage's entry into the market for 300 mg and 450 mg theophylline ER tablets in late 2011, Teva had captured nearly 100% of sales.[36]

670.    Instead of pricing its products below Teva's in order to gain market share, Heritage announced theophylline ER list prices that were identical or even slightly above those of Teva.   Even with Heritage's entry into the market, theophylline ER prices remained relatively stable.   Consistent with their "fair share" agreement, prices did not decline as would be expected in a competitive market.

671.    Teva began considering a price increase for theophylline ER in early 2014. On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since

---

[36] Teva marketed and sold Theophylline during the relevant period at least in part through its subsidiary, PLIVA.

she went on maternity leave in August 2013.  Malek returned her call the next day and the two spoke for more than an hour and discussed a price increase for theophylline ER and at least one other drug (nystatin, as discussed above).

672.    Three days after that, on February 7, a Heritage employee created a spreadsheet that included theophylline ER as a candidate for price increases.

673.    Throughout February and March 2014, Malek and Patel had a series of phone calls discussing price increases for multiple drugs, including theophylline ER.

674.    Shortly thereafter, Teva began implementing across-the-board price increases for theophylline ER.  These price increases also had an effective date of April 4, 2014.

675.    By the time Heritage held its April 22, 2014 meeting with its sales team to discuss a number of price increases, it had already agreed to follow Teva on theophylline ER and nystatin price increases.  As he outlined the proposed price increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on theophylline ER.

676.    On April 24, 2014, Teva received an email from a customer seeking an adjustment to its price increase.  Consistent with its agreement with Heritage, Teva stuck to its price increase for theophylline ER.

677.    On May 9, 2014, Heritage had an internal sales call regarding the drugs subject to price increases, including theophylline ER.  Several weeks later, on June 23, Heritage employees discussed the specific percentage price increases they would seek.  Theophylline ER was slated for a 150% increase.

678.   On June 25, Malek had a nearly fourteen-minute call with a Teva employee—likely Patel.  Malek reported that Heritage would be sending out price increase notices on June 26 for theophylline ER and several other drugs for which Heritage and Teva had agreed to raise prices.

679.   On June 26, 2014, Heritage began telling customers that it would be increasing prices for various drugs, including theophylline ER.  By July 9, 2014, among the other price increases it implemented, Heritage increased its theophylline ER prices to at least twenty different customers nationwide.

680.   Teva and Heritage imposed list price (WAC) increases on both 300 mg tablets and 450 mg tablets pursuant to their agreement.

**BB.**   **Ursodiol**

681.   The market for ursodiol is mature, as generic versions of ursodiol have been available in the United States since 2000.  Defendants Actavis, Lannett, and Epic sold ursodiol throughout the United States.

682.   At all times relevant to this lawsuit there has been more than one manufacturer of ursodiol on the market.  Defendants Actavis, Lannett, and Epic dominate the market for ursodiol.

683.   In the years prior to the conspiracy period, Defendants' average price in the U.S. for ursodiol was remarkably stable.  Beginning in or around May 2014, Defendants increased their prices for ursodiol abruptly and, for the most part, in unison.

684.    By way of example, beginning in May 2014, Defendants selling generic ursodiol set their WACs in near lockstep, reflecting increases from previous WACs on the 300 mg capsule of more than 560%:

| Product cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

685.    Data from NADAC for ursodiol show the low and stable prices of ursodiol characteristic of the market prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in May 2014.  Since that time, Defendants have continued to charge supracompetitive prices.  The NADAC data shows that the average price of ursodiol increased rapidly in a very short period of time:



686.     As the chart illustrates, for more than a year prior to Defendants' price increases, the prices of ursodiol remained flat and at competitive levels.  Then, starting in May of 2014, the average price of ursodiol abruptly increased by more than 1,600%, from an average market price of approximately $0.29 per capsule as of June 4, 2014 to $4.73 per capsule as September 17, 2014.

687.     Upon information and belief, the price increases on ursodiol were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of ursodiol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions

conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications (as identified throughout this Complaint).

**CC.**   **Verapamil**

688.   The market for verapamil is mature, as the drug has been available in the United States since 1981.   The drug is considered an essential medicine by the World Health Organization.   Actavis, Heritage, and Mylan sold verapamil throughout the United States.

689.   From 2009 forward, Actavis and Mylan have dominated the market for verapamil regular release tablets and for certain dosages of verapamil sustained-release capsules.   Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

690.   Heritage entered the verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013.   When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80 mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120 mg tablets.   Heritage did not begin to sell 40 mg verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40 mg tablets at that time.

691.   Instead of entering the market with lower prices of verapamil tablets in order to gain market share—as would be expected in a competitive market—Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan.   This was entirely consistent with Defendants' "fair share" agreement.

692.    Without offering better prices, Heritage was hard pressed to gain market share, and initially was able to capture only a sliver of the market.  In October 2012, however, Mylan increased its tablet prices by approximately 50%, which facilitated Heritage rapidly gaining share.  By January, Heritage had captured more than 25% of the entire tablet market.  As devised by their "fair share" agreement, market shares between Actavis, Heritage, and Mylan quickly stabilized and remained relatively constant thereafter.

693.    In the months prior to Mylan's price increases, Actavis, Heritage, and Mylan had numerous opportunities to meet and discuss verapamil.  For example, all three Defendants attended the HDMA Business Leadership Conference in San Antonio, Texas in early June 2012.  All three also attended the GPhA Fall Technical Conference in Bethesda, Maryland, which took place on October 1 through 3, 2012.

694.    Similarly, on the heels of the 2013 NACDS Total Store Expo—attended by (among others) Actavis, Mylan (Nesta and Aigner), and Heritage (Glazer, Malek, O'Mara, Sather and Edelson)—Mylan raised the list (WAC) prices of its verapamil capsules to identical levels as Actavis.

695.    As market shares for verapamil tablets between Actavis, Heritage, and Mylan stabilized, Heritage aimed to implement a price increase.  Verapamil was on the list of drugs that Heritage's Malek identified on the April 22, 2014 sales team call.

696.    As part of those price increase discussions, Heritage's O'Mara had the primary responsibility for communicating with Mylan about verapamil.  On April 23, O'Mara contacted his counterpart at Mylan (believed to be Aigner).  O'Mara and Aigner

agreed to raise prices on at least three different drugs, including verapamil (and, as discussed above, doxycycline and glipizide-metformin).

697.    Immediately after speaking with Mylan's Aigner, O'Mara emailed Malek providing an update of his discussions with Mylan.

698.    Heritage's Sather was responsible for speaking with Actavis about verapamil, among other drugs.  On April 22, she and an unidentified Actavis employee spoke for nine minutes and reached an agreement to raise the price of verapamil and other drugs slated for an increase.

699.    News of the agreement on verapamil and at least one other drug (as discussed above, glyburide) reached the Actavis sales and pricing team on April 28, 2014, including through an internal email discussing potential price increases for a list of different drugs.

700.    A week after the April 28 email, on May 6, 2014, an Actavis employee called a Mylan employee and left a message seeking to discuss at least pricing for verapamil.  The two spoke for three minutes on May 9 and spoke for almost seven minutes on May 19, presumably about at least verapamil.  Both continued to communicate over the next several months.

701.    On May 8, 2014, Malek emailed the Heritage sales team requesting an update on competition communications.  An employee responded to Malek's email, providing an update on communications with at least Actavis (verapamil and glyburide-metformin), Lannett (doxy mono), and Sun (nystatin and paromomycin).

702.    While Heritage did not increase its verapamil prices market wide in July as it did for other drugs, it announced a price increase for verapamil to at least one customer as the result of Defendants' price increase efforts.

703.    On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun.  The text exchange described the agreement Heritage and Actavis reached to increase the price of verapamil among other drugs.

704.    Throughout this period, Actavis and Mylan coordinated increases on their verapamil sustained-release capsules (120 mg, 180 mg, 240 mg).  The price increases by Actavis and Mylan were staggered, but steady and unexplained, suggesting coordination throughout the relevant period.  From April of 2012 (shortly before Mylan imposed a price increase for its verapamil tablets) through April of 2016, Actavis and Mylan attended at least 25 trade events together.  Over this period, Mylan's verapamil capsule prices nearly tripled, and Actavis's prices doubled.  By the spring of 2016, Actavis and Mylan had imposed virtually identical list (WAC) prices.

705.    The higher prices for 120 mg, 180 mg, and 240 mg capsules enabled Actavis also to raise its prices for 360 mg capsules, for which it was the lone seller in the market.  Between April 2012 and May 2016, Actavis's prices for 360 mg capsules nearly tripled.

706.    During phone calls with senior sales executives from Mylan and Actavis on April 22 and April 23, 2014, Heritage, Mylan, and Actavis agreed to raise prices on verapamil in the United States.

707.    Heritage began announcing the price increase to its customers in late June 2014, and had fully implemented the verapamil price increase by July 9, 2014.

708.    During the summer of 2014, Mylan and Actavis also implemented the collusive price increase on verapamil, as agreed by the three Defendants.  As a result of this agreement, prices for verapamil sold throughout the United States remain at supracompetitive levels as of the filing of this Complaint.

**DD.    Zoledronic Acid**

709.    The market for zoledronic acid is mature, as the drug has been available in generic form since 2013.  The drug is considered an essential medicine by the World Health Organization.  Heritage, Dr. Reddy's, and Par sold zoledronic acid throughout the United States at supracompetitive prices.

710.    In early 2013, Heritage began preparing to launch a generic version of a 5 mg injection formulation of the drug.  It planned to be the first generic entrant in the zoledronic acid market.

711.    Dr. Reddy's was positioned to enter the zoledronic acid market shortly after Heritage.  Par, which did not have an ANDA for zoledronic acid, eventually was able to obtain the rights to market and sell zoledronic acid using an ANDA obtained by Defendant Breckenridge.  Par entered the market approximately eight months after Heritage and Dr. Reddy's.

712.    Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants.  For that reason, on January

21, 2013, Heritage's Malek instructed O'Mara to reach out to his contact at Dr. Reddy's, VP of Sales and Marketing John Adams, to discuss market strategy and to "socialize" the idea of keeping prices elevated above a competitive level.

713.    O'Mara attempted to call Dr. Reddy's Adams the next day, but Adams was on a conference call.  When O'Mara informed Malek that Adams was going to call him back later that morning, Malek outlined exactly what he wanted O'Mara to say when he finally spoke with Adams.

714.    Dr. Reddy's Adams called Heritage's O'Mara after his conference call on January 22, 2013 and they spoke for ten minutes.  After the call, O'Mara reported to Malek.  O'Mara had learned that Dr. Reddy's would launch a 4 mg product on the first day it could produce a generic, but it was not certain if it would launch on the 5 mg formulation.  (Dr. Reddy's ultimately did launch the 5 mg formulation.)

715.    O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market.  As discussed above, "fair shares" were allocated to Defendants across generic drugs and within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market.  If Dr. Reddy's entered the zoledronic acid market first—consistent with fair share agreements that had long existed in the generic pharmaceuticals market—it expected a 60% share of the market.  If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

716.    Less than an hour after they first spoke on January 22, Heritage's O'Mara and Dr. Reddy's Adams spoke again for nearly nine minutes and discussed a plan to keep

the pricing of zoledronic acid elevated above competitive levels.  O'Mara and Adams spoke for nearly twenty-four minutes again on January 24, 2013.

717.     While Heritage had confirmed that Dr. Reddy's was going to enter the market, it would not have been difficult for Heritage to ascertain that Mylan and Actavis also had received ANDA approval for 4 mg zoledronic acid in early March 2013.

718.     Not wanting to take chances, Heritage's Malek set out to confirm that there would be no other entrants to the market.  Malek instructed another Heritage employee (believed to be Sather) to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic zoledronic acid market.  In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's Adams.

719.     Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing.  For example, Heritage's O'Mara called his counterpart at Dr. Reddy's, Adams, on March 3, 2013 and left a message. Adams (or another individual from Dr. Reddy's) returned the call two days later and spoke with Heritage's O'Mara for fifteen minutes.

720.     While these conversations were occurring, Heritage's Malek learned that Dr. Reddy's was quoting low prices on zoledronic acid to customers, including Cardinal, and the pricing was lower than he had hoped.  Malek was upset by Dr. Reddy's pricing because Malek did not view Dr. Reddy's as "playing fair."  He emailed Sather and O'Mara on March 6 to express this concern and to ask about pricing.

721.    Malek also instructed O'Mara to speak with Dr. Reddy's Adams about zoledronic acid when they were both attending the same customer conference in March 2013.  On March 12, 2013, the two spoke by phone twice and exchanged numerous text messages.

722.    Heritage's Malek asked O'Mara for an update on Dr. Reddy's on March 13.  O'Mara responded with information about his conversation with Dr. Reddy's Adams.

723.    On April 3, 2013, Heritage's O'Mara spoke with Dr. Reddy's Adams and confirmed that Dr. Reddy's had just begun shipping the 5 mg product.  Adams also provided information about its pricing.  O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both zoledronic acid and meprobamate.

724.    Consistent with their agreement, in April 2013 both Heritage and Dr. Reddy's entered the zoledronic acid market at a higher price than they otherwise would have absent their collusive pricing agreement.  Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other.  They maintained these list prices through at least early 2016.  These list prices remained stable even when a third manufacturer entered the market.

725.    After zoledronic acid launched, any disagreements about the allocation of customers between Heritage and Dr. Reddy's were resolved through direct communications between the two companies.

726.    Heritage's ability to contact Dr. Reddy's and obtain an agreement on allocation of the market and the price of zoledronic acid would not have been possible absent the existing "fair share" agreement among Defendants.  The discussions between Dr. Reddy's and Heritage make clear that they were not starting from zero in working out the details of their agreement on zoledronic acid, but were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

727.    Defendants were aware that their conversations were anticompetitive and illegal.  For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

728.    Defendants' ability to exchange information and negotiate pricing agreements was aided by the near constant ability of Defendants to meet in person at trade association meetings and conferences.  For example, shortly before Dr. Reddy's and Heritage's March conversations, both Defendants attended two trade association meetings where they also had the opportunity to exchange information.

729.    Similarly, shortly before Par entered the market for zoledronic acid, it attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants (including personnel directly implicated in anticompetitive communications): Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward, and Zydus (Lukasiewicz).

730.    When Par finally entered the market in late 2013, it announced list prices even higher than Heritage and Dr. Reddy's.  List prices for Dr. Reddy's, Heritage, and Par remained elevated thereafter.  As it had done in the doxy mono market discussed above, Par sought to avoid price competition.  Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as economic theory predicts of a competitive market.  Rather, consistent with the "fair share" agreement Par imposed higher list prices and attempted to prevent price erosion in the market for zoledronic acid.

## X.    **THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION**

731.    Defendants' anticompetitive conduct alleged in the Complaint constitutes a conspiracy to fix prices and engage in market customer allocation, which is a *per se* violation of the antitrust laws.  Therefore, Plaintiff need not define a relevant market.  There are, however, features of the industry relevant to this case that show both (i) that the industry is susceptible to collusion, and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

732.    Indeed, the U.S. market for each of the Price-Fixed Generic Drugs has been characterized by numerous factors that facilitated Defendants' conspiracy, including: (i) industry concentration; (ii) sufficient numbers to drive competition; (iii) substantial barriers to entry; (iv) demand inelasticity; (v) lack of substitutes; (vi) interchangeability; (vii) absence of non-conspiring competitors; (viii) opportunities for contact and an

extremely high level of inter-firm communications; (ix) the magnitude of the price increases; and (x) the reimbursement of generic drugs.

733.    Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered the market ripe for collusion.  For example: Teva acquired Ivax Corporation in 2006, Barr Laboratories in 2008 (including Defendant PLIVA), Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016; Watson Pharmaceuticals acquired Andrx Corporation in 2006; Endo acquired Qualitest in 2010; Perrigo acquired Paddock Laboratories, Inc. in 2011; and Sandoz acquired Fougera in 2012.  As a result of the industry-wide consolidation, for each of the Price-Fixed Generic Drugs, there were between three and ten manufacturers in the United States during the time period relevant to claims asserted in this Complaint, thus rendering the market for each drug concentrated.  Each of the drugs at issue in this Complaint also had at least two sellers. While the numbers were small enough to foster collusion, the number of competitors was enough to suggest that, absent collusion, prices would have been much lower.

734.    Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices.  Costs of manufacture, intellectual property, and expenses related to regulatory oversight create substantial barriers to entry in the generic pharmaceutical industry.

735.    Each of the Price-Fixed Generic Drugs is medically appropriate to the health and well-being of the patient for whom it is prescribed.  For that reason, each

demonstrates substantial demand inelasticity.  Indeed, notwithstanding the substantial price increases alleged in this Complaint, demand for each of the Price-Fixed Generic Drugs dropped very little following the increase in price.

736.    Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same dosage strength.  For example, a 40 mg tablet of pravastatin manufactured by Mylan is interchangeable with a 40 mg tablet of pravastatin manufactured by Teva.  Accordingly, each of the Price-Fixed Generic Drugs is highly interchangeable from Defendant to Defendant.  In the absence of collusion, Defendants would compete on price to gain market share.

737.    The Defendants control the markets for each of the Price-Fixed Generic Drugs, which enables them to increase prices without losing market share to non-conspirators.

738.    As alleged above in Section VIII, there was a high level of interfirm communications within the generic pharmaceutical industry, and numerous opportunities for such communications through various trade association and similar meetings.  The magnitude of the price increases involved in this case further differentiates them from parallel price increases.

## XI.    DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING

739.    As a proximate result of this conspiracy, and during the relevant time period, Defendants and their co-conspirators were able to and did maintain

supracompetitive prices (*i.e.*, prices above a competitive level) throughout the United States for each of the Price-Fixed Generic Drugs.  As a further proximate result, UHS and Pharmacy Assignors have been overcharged and continue to incur overcharges for Price-Fixed Generic Drugs.

740.    Each Defendant knew that UHS, Pharmacy Assignors, and other purchasers and/or payors would not be able to obtain a competitive price for each Price-Fixed Generic Drug.  Defendants also knew that any new entrants to the market would also follow the conspiracy pricing (or even seek to increase it further) based on the conspiracy's overarching market allocation and price-fixing agreement.

741.    As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of price increases for each of the Price-Fixed Generic Drugs.  They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on the market.  This was because Defendants knew during the conspiracy that all of them were increasing prices (or offering the same or similar prices) of each Price-Fixed Generic Drug; and the resulting prices were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally set its own prices for each Price-Fixed Generic Drug.  Defendants' coordinated price increases also provided them with a higher, unified starting point in negotiating sales prices to their large direct purchaser customers for each Price-Fixed Generic Drug than would have resulted if each Defendant had independently and unilaterally set its own price increases for each Price-Fixed Generic Drug.

742.    The conspiracy alleged in this Complaint remains in either force or effect (or both) as of the date of this Complaint, and prices at each level of distribution and/or payment (including as paid by UHS and Pharmacy Assignors) continue to remain at supracompetitive levels for each Price-Fixed Generic Drug as a result of Defendants' conduct.

743.    Beyond the fact that Defendants and distributors and/or retailers continue to sell the Price-Fixed Generic Drugs throughout the United States at levels inflated by the conspiracy, Defendants continue to seek to impose additional collusive price increases on other generic drugs.  At an investor conference held on March 14, 2017, in Laguna Niguel, California, Arthur Bedrosian (the CEO of Lannett) boasted behind closed doors that Lannett had just been able to triple the price of a generic drug that day (he did not identify which one) and that Lannett still has the ability to impose additional substantial price increases.  Bedrosian's claim is consistent with a continuing conspiracy.

## XII.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

744.    Discovery is necessary to determine the full scope of the conspiracy, including the exact time frame, products, and participants.  Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, products, or other allegations based upon discovery and further investigation.

## XIII.  ANTITRUST INJURY

745.    Defendants' conspiracy has had the following effects, among others:

      a.    Price competition has been unreasonably restrained or eliminated with respect to the generic drugs at issue and;

      b.    The prices of the generic drugs at issue have been fixed, raised, maintained, or stabilized at artificially inflated levels, including as paid by UHS and Pharmacy Assignors in that, but for Defendants' anticompetitive conduct, lower prices would have been paid for the generic drugs at issue.

746.    During the period alleged in this Complaint, Defendants charged supra-competitive prices for the generic drugs at issue.  By reason of Defendants' alleged violations of the antitrust laws, UHS and Pharmacy Assignors have sustained injury, having paid substantially higher prices for each of the generic drugs at issue than they would have paid absent Defendants' alleged illegal contract or conspiracy, and, as a result, have suffered damages in an amount to be determined.  This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

747.    As to overcharges paid by UHS, inflated prices of the generic drugs at issue resulting from Defendants' price-fixing conspiracy have been passed on to UHS, who paid such overcharges.  General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end payors such as UHS.  The impairment of generic competition at the direct purchaser level similarly injured UHS, who was equally denied the opportunity to pay less for the Price-Fixed Generic Drugs.

748.    The impact of Defendants' conduct on the prices of the generic drugs at issue can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the existence and the amount of the supra-competitive charge paid by UHS and its Pharmacy Assignors.  Thus, the economic harm alleged can be quantified.

749.    Defendants' anticompetitive conduct and/or its effects are ongoing, and, as a result, United continues to pay supra-competitive prices for each of the generic drugs at issue.  UHS seeks damages for all injuries proximately caused by the unlawful conduct.

## XIV.   **TOLLING AND FRAUDULENT CONCEALMENT**

750.    The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations and each of the claims alleged in this Complaint were tolled because of one or more of the following events:

(a)         The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Price-Fixed Generic Drugs tolled the running of the statutes of limitations as of the date the first such Class Action Complaint was filed;

(b)         On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of generic doxycycline and glyburide sold in the United States.  The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation

during the criminal proceedings and for one year thereafter by operation of federal and state statutes, under 15 U.S.C. § 16(i), and under New York General Business Law § 342-c; and/or

(c)      Defendants' affirmative and fraudulent concealment of the conspiracy prevented UHS and Pharmacy Assignors from having notice of these claims more than four years before filing this Complaint, and tolled the running of the statutes of limitations.

751.    Each of the overt acts in furtherance of the conspiracy alleged in this Complaint was done for the purpose of concealing the conspiracy and preventing UHS, Pharmacy Assignors, and other purchasers or payors of generic drugs from learning about the conspiracy's existence.   Defendants concealed, misrepresented and/or materially omitted that the generic drugs at issue were subject to their price-fixing and market allocation scheme, in which the prices for the drugs were artificially and unconscionably inflated, and not subject to unrestrained and lawful competition. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs.   Defendants' false statements and conduct concerning the prices of generic drugs were deceptive as they had the tendency or capacity to mislead UHS, Pharmacy Assignors, and others into believing that they were paying for the Price-Fixed Generic Drugs at prices established by a free and fair market.

752.    Accordingly, UHS and Pharmacy Assignors did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that

would have put them on reasonable notice of their claims.  More than four years before the filing of this Complaint, Defendants and their co-conspirators fraudulently concealed the existence of each and every antitrust claim alleged in this Complaint so that UHS and Pharmacy Assignors, acting reasonably, did not know of the existence of the claims at the time.

753.    During the relevant time period, including the time period more than four years before the filing of this Complaint, Defendants and their co-conspirators concealed the existence of the alleged antitrust claims from UHS and Pharmacy Assignors as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below.  As a result, UHS and Pharmacy Assignors did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing this Complaint.

754.    Among other things, as alleged in the State AG Complaint, Heritage executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012.  These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 454-462 of the State AG Complaint, which are incorporated by reference.  This conduct extended to Heritage's co-conspirators, including Mayne.

755.    Notwithstanding the self-concealing nature of their conspiracy, during the relevant time period, including more than four years before the filing of this Complaint, Defendants and their co-conspirators affirmatively misled UHS and Pharmacy Assignors by wrongfully and affirmatively concealing the existence of their antitrust conduct and the claims alleged in this Complaint.  In addition to the many overt acts alleged above that were undertaken for the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from UHS, Pharmacy Assignors, and others.  For example:

(a)        During the conspiracy alleged in this Complaint, and as alleged above, Defendants and co-conspirators spoke and met in secret to affirmatively conceal the existence of the conspiracy.  For each of the numerous meetings between Defendants alleged in this Complaint, Defendants took steps to either conceal the existence of the meeting, or to create a pretextual explanation for why the meeting occurred.

(b)        During the conspiracy alleged in this Complaint, Defendants made false and pretextual statements about their prices and the bids they provided in response to requests for competitive bids.  For example, upon information and belief, when Cardinal requested that Heritage provide a competitive bid for nimodipine in June 2012, Heritage made representations to Cardinal that the sham bid that Heritage submitted in response (and that Heritage had coordinated with Sun and Caraco in advance) was the lowest price that Heritage could provide.  In reality, Heritage could have manufactured and sold the drug for substantially less than it quoted to Cardinal, but Heritage had agreed in advance with Sun and Caraco that Heritage would not submit a competitive price in

response to Cardinal's request.  Accordingly, Heritage's false statements to Cardinal were intended to conceal from all purchasers and/or payors of nimodipine (and all other generic drugs) the existence of the conspiracy.  As another example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products like . . . Doxycycline . . . where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

(c)      During the conspiracy alleged in this Complaint, Defendants took steps to ensure that their communications in furtherance of the conspiracy were not recorded in writing.  For example, on April 19, 2013, Malek instructed his employees at Heritage not to keep in writing any evidence of the agreements that Heritage was negotiating (and that it would soon reach) with other Defendants relating to the zoledronic acid (and other drugs).  Similarly, during the July 1, 2014 telephone conversation in which a senior sales executive at Heritage discussed the collusive price increases of glyburide and fosinopril HCTZ with a senior sales executive at Citron, the Citron representative told the Heritage representative not to communicate with Citron through email.

(d)      During the conspiracy alleged in this Complaint, Defendants took steps to confine knowledge of the conspiracy to a small group of employees for the purpose (and with the effect) of concealing the conspiracy's existence.  For example, during the same July 1, 2014 telephone conversation between Heritage and Citron, the

Citron representative told the Heritage representative to communicate with a specifically designated employee of Citron that was fully briefed on the conspiracy.

(e)     During the conspiracy alleged in this Complaint, Defendants discussed and coordinated the timing of their price increase announcements for the purpose of making each price increase seem like it was each Defendant's independent decision to raise prices even though, in reality, it was not.  For example, Sandoz and Mylan coordinated their price increases on amitriptyline and levothyroxine.  For levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz issued its matching price increase on May 23, 2014.  Also, on May 23, 2014, Sandoz increased its price for amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering the announcement of these price increases, Sandoz and Mylan intended to convince the public and market participants, including UHS and Pharmacy Assignors, that the latter price increase was the independent response to the initial price increase, and not a result of Defendants' illicit conduct.  As the allegations in this Complaint make clear though, Defendants actively discussed, coordinated, and agreed to these price increases in secret, in order to conceal the existence of the conspiracy.

(f)     Defendants further stated throughout the relevant period, including on their public internet websites, that they do not engage in the type of collusion alleged in this Complaint but instead maintain antitrust/fair competition policies that prohibit the unlawful conduct alleged in this Complaint.  For example:

- Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."

- Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings.  Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share.  Do not conspire with other bidders when competing for contracts."

- Dr. Reddy's' Code of Conduct provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition.  We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."

- Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws.  We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion."

- Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means.  Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."

- Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."

- Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."

- Novartis' (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations."

- Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."

- Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices.  Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."

- Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly.  We seek competitive advantages through superior performance, never through unethical or illegal business practices."  It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."

- Taro's Code of Conduct provides: "We do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."

- Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."

756. During the conspiracy, including more than four years before the filing of this Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from UHS, Pharmacy Assignors, and others; and UHS and Pharmacy Assignors were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of

concealment.  Defendants' misrepresentations, including regarding their price changes and purported competition, were intended to lull UHS, Pharmacy Assignors, and others into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts.  The statements made by Defendants were designed to mislead UHS, Pharmacy Assignors, and others into paying unjustifiably higher prices for Price-Fixed Generic Drugs.

757.    As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, UHS and Pharmacy Assignors did not have actual or constructive knowledge of their claims, or the facts that might reasonably have led them (or a reasonable person or plaintiff in in their position) to discover or suspect that they had the antitrust claims against Defendants and their co-conspirators alleged in this Complaint, more than four years before the filing of this Complaint. Before then, UHS and Pharmacy Assignors were unaware of facts that would have alerted them (or a reasonably diligent person or plaintiff in their position) of the need to investigate whether they had the antitrust claims alleged in this Complaint.

758.    Accordingly,  Defendants   and   their   co-conspirators'   fraudulent concealment of their unlawful conduct tolled the statute of limitations for each of the claims alleged in this Complaint.

759.    The claims alleged in this Complaint have been brought within the applicable statutes of limitations period.

## XV.   ANTITRUST VIOLATIONS, BY CONSPIRACY

### A.   Overarching Conspiracy on All Price-Fixed Generic Drugs (All Defendants)

760.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

761.   By at least March 2011 (and potentially earlier), Defendants had come to a broad "fair share" agreement concerning generic drugs generally.  While the effects of the "fair share" agreement were felt (in the form of higher prices) in more specific markets, the agreement itself was not confined to individual markets or drugs.  The foundation of the overarching agreement was Defendants' understanding that they are current and future competitors across numerous drugs within the broader generic drug industry.  Defendants developed the concept of "fair share," in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition.  Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a "fair share" of the market—became the "rules of the road" that governed their overarching conspiracy.  Defendants' decisions whether and if so when to enter a market, how to price their drugs, and which customers to target were made in accordance with their unlawful "fair share" agreement.

762.   As alleged above, the market for manufacture, pricing and sale of generic drugs had become conducive to cartelization.  The Defendants' efforts to manipulate the pricing and sale of some generic drugs as alleged above infected and over time spread to

the pricing and sale of the Price-Fixed Generic Drugs alleged above.  Beginning at a time yet to be determined, but no later than March 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the manufacture and sale of the Price-Fixed Generic Drugs throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

763.    Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits.  This objective was a common goal among all the Defendants.  In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

764.    Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged above in Section VIII.  Further, this overarching conspiracy contemplated a

continuous result that would not continue without the continuous cooperation of all Defendants.

765.   Every Defendant knowingly joined the overarching, or "all-Price-Fixed Generic Drugs" conspiracy.

766.   The Core Conspirators, consisting of Actavis, Heritage, Mylan/UDL, Par/Endo, Sun, Taro, Teva/PLIVA, and the Sandoz Defendants, engaged in the conduct alleged in this Complaint and directed the implementation of the all-Price-Fixed Generic Drugs conspiracy.  Each of these Core Conspirators played a prominent role in the all-Price-Fixed Generic Drugs conspiracy.  Each of them sold more than five of the Price-Fixed Generic Drugs, and most sold 10 or more.  For example, Heritage sold 15 Price-Fixed Generic Drugs, and Taro and Sun (which are commonly owned) together sold 11 Price-Fixed Generic Drugs.  Collectively, they sold each of the Price-Fixed Generic Drugs.  The Additional Conspirators, consisting of Akorn/Hi-Tech, Apotex, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, Fougera, Glenmark, Impax, Lannett, Lupin, Mayne, Morton Grove/Wockhardt, Perrigo, Teligent, Upsher-Smith, West-Ward, and Zydus also engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy.  But each of the Additional Conspirators sold fewer Price-Fixed Generic Drugs than the Core Conspirators. However, the participation of the Additional Conspirators in the all-Price-Fixed Generic Drugs conspiracy was important to increase the prices of the generic drugs that they manufactured.  Absent the participation of the Additional Conspirators, the Core Conspirators' efforts to increase the prices of the all-Price-Fixed Generic Drugs would

have been thwarted because it would have been in the independent interests of the Additional Conspirators to increase their market share by refusing to follow the price increases of the Core Conspirators. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint. And, this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained throughout this Complaint, there was substantial overlap between all Defendants in the overarching conspiracy.

767. By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the all-Price-Fixed Generic Drugs conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in Section IX, *supra*, were interdependent for at least six reasons.

768. First, every agreement on each of the Price-Fixed Generic Drugs was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price-Fixed Generic Drugs conspiracy. For example, Defendants with a proportionately smaller market shares of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its

market share was safe from competition, market share itself became a fungible commodity that could be traded.

769.   The overarching all-Price-Fixed Generic Drugs conspiracy also benefitted Additional Conspirators that manufactured just one of the Price-Fixed Generic Drugs. For example, Ascend, one of the Additional Conspirators, agreed with Heritage, a Core Conspirator, to increase prices and allocate each company's market share for nimodipine. Such an agreement would be against the self-interest of a company that was not aware of the overarching market allocation agreement, because it resulted in a supracompetitive price, and this supracompetitive price would be expected to attract other generic drug manufacturers to enter the market for nimodipine.  But Ascend agreed to the price increase knowing that even if another Defendant entered the market for nimodipine, that manufacturer would agree to follow the supracompetitive pricing for nimodipine. Accordingly, Ascend's knowledge of the overarching all-Price-Fixed Generic Drugs conspiracy, which it learned through its agreement with Core Conspirator Heritage and its attendance at industry events where other collusive agreements were discussed, allowed it to agree to increase prices on nimodipine, an act that Ascend would not have done in the absence of the overarching all-Price-Fixed Generics conspiracy.  Along these same lines, when Additional Conspirator Mayne entered the doxy DR market that had been cartelized by Core Conspirators Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supracompetitive prices on doxy DR.

770.   In this manner, the existence of the overarching conspiracy permitted the Core Conspirators to induce the collusive agreements of the Additional Conspirators as needed to raise prices on each of the Price-Fixed Generic Drugs.  For example, the existence of the overarching conspiracy allowed Core Conspirator Actavis to persuade Additional Conspirator Breckenridge to lead a series collusive price increases on propranolol capsules and to persuade Additional Conspirator Epic to raise its prices by more than 1,000% on ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion.  Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants, including Core Conspirators Actavis, Mylan, and Teva, to reach an agreement with Additional Conspirator Lupin that would triple its prices on pravastatin.  And, the overarching conspiracy facilitated the collusive agreement of Additional Conspirators Morton Grove and Wockhardt to raise prices on clobetasol, and Additional Conspirator Teligent's collusive agreement to raise prices on econazole.  And although the Core Conspirators were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the Additional Conspirators would participate in the overarching conspiracy as well.  For example, Breckenridge's participation in the conspiracy was dependent on its knowledge—gained in part from attending the many industry events alleged in Section VIII, *supra*—that each of the Additional Conspirators would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for propranolol.

771.    Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented.  For example, as alleged above, Teva declined to offer a competitive bid to a customer that sought glyburide based not only on its agreement with Heritage on glyburide, but also based on its collusion with Heritage on a second drug.  In other words, Teva knew that undercutting the conspiratorial price increase on glyburide would impact not only glyburide, but also the conspiratorial price increases on other drugs.  Because a number of other Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that the cheater manufactured.  Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one.  For example, Mayne (which manufactured only doxycycline) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on doxycycline, which helped to ensure that Mayne also committed to the conspiracy.

772.    Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from the public and market participants, including UHS and Pharmacy

Assignors.  For example, Sandoz and Mylan coordinated their price increases on amitriptyline and levothyroxine.  For levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014.  That same day, Sandoz increased its price for amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time.  And for the same reasons explained in the preceding paragraphs, the ability of Core Conspirators such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that the Additional Conspirators—even if they manufactured just one of the drugs subject to staggered price increases—would also commit to the unlawful agreement.

773.    Fourth, each successful conspiratorial price-fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug.  Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only propranolol, but also each of the other Price-Fixed Generic Drugs, which also used the same binding agents.

774.    Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost.  However, successful price increases also incentivized other manufacturers to substitute

capacity towards the high margin drugs.  Accordingly, it was useful and valuable for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits.  Further, in the instances, if any, that the Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug.  For example, Fougera stopped production of fluocinonide in January 2015, after the collusive price increase had been implemented on the drug.  Similarly, Teva discontinued production of doxy hyclate in May 2013, after the collusive price increase had been implemented on the drug.

775.   Sixth, certain of the Price-Fixed Generic Drugs are subject to varying degrees of long-run demand-side substitution depending on the degree to which they provide the same clinical benefits and same side effects.

776.   The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of federal and state antitrust laws.

777.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

(a)      To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold throughout the United States;

(b)        To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold throughout the United States;

(c)        To control the production and/or sale of the Price-Fixed Generic Drugs throughout the United States; and/or

(d)        To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold throughout the United States that resulted from the collusion alleged in this Complaint.

778.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)        They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold throughout the United States, including the prices quoted or charged for the sale of the Price-Fixed Generic Drugs;

(b)        They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold throughout the United States;

(c)        They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

(d)        They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

779.   Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs.

780.   As a result of this conspiracy in violation of federal and state laws, and during the relevant time period:

(a)      Price competition in the sale of the Price-Fixed Generic Drugs throughout (and in each of) the United States has been restrained, suppressed, and eliminated;

(b)      Prices for the Price-Fixed Generic Drugs have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout (and in each of) the United States, including the prices as paid by UHS and Pharmacy Assignors; and

(c)      UHS, Pharmacy Assignors, and others that paid for and/or purchased Price-Fixed Generic Drugs have been deprived of the benefit of free and open competition.

781.   UHS and Pharmacy Assignors have been injured in their business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.

Having paid anticompetitive overcharges for the Price-Fixed Generic Drugs, their injuries are of the type the antitrust laws were designed to prevent and flow from that which makes the Defendants' conduct unlawful.

### B.     Individual Conspiracies by Drug

#### *Table of Individual Drug Conspiracies*

782.    As alleged above, while drug-specific agreements involve those Defendants that marketed and sold the particular drug during the relevant period, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the Price-Fixed Drugs from at least March 2011 to the present.  From this broad agreement among all Defendants sprang agreements among the manufacturing Defendants relating to each of the Price-Fixed Drugs.  The purpose and effect of all of Defendants' agreements was to lessen competition in the markets for each drug.  UHS alleges individual conspiracies in the alternative to the allegations of a single conspiracy.

783.    For ease of reference, the individual product conspiracies alleged in this Complaint involve anticompetitive prices on the following drugs and the following Defendants, as indicated on the table below.  For the purposes of these individual drug conspiracies, the term "Defendants" refers to only those companies identified in each individual conspiracy.

| Generic Drug | Defendants | Alleged Time Period of Anticompetitive Effects[37] |
|---|---|---|
| Acetazolamide | Heritage, Lannett, Taro, Teva/Barr, Zydus | April 2012 to the present |
| Albuterol | Mylan, Sun | March 2013 to the present |
| Amitriptyline | Mylan, Par, Sandoz | May 2014 to the present |
| Baclofen | Lannett, Par, Teva, Upsher-Smith | February 2014 to the present |
| Benazepril HCTZ | Mylan, Sandoz | August 2013 to the present |
| Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt | June 2014 to the present |
| Clomipramine | Mylan, Sandoz, Taro | May 2013 to the present |
| Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro | May 2013 to the present |
| Digoxin | Impax, Lannett, Mylan, Par, Sun, West-Ward | October 2013 to the present |
| Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to the present |
| Doxycycline | Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, West-Ward | October 2012 to the present |
| Econazole | Fougera, Perrigo, Taro, Teligent | July 2014 to the present |
| Fluocinonide | Actavis, Taro, Teva | June 2014 to the present |

[37] The time periods alleged in this Complaint are based on publicly available information and may be subject to change based on information subsequently learned by UHS.

| Generic Drug | Defendants | Alleged Time Period of Anticompetitive Effects[37] |
|---|---|---|
| Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz | April 2014 to the present |
| Glipizide-metformin | Heritage, Mylan, Teva | April 2014 to the present |
| Glyburide | Aurobindo, Citron, Heritage, Teva | April 2014 to the present |
| Glyburide-metformin | Actavis, Aurobindo, Citron, Heritage, Teva | April 2014 to the present |
| Leflunomide | Apotex, Heritage, Teva | April 2014 to the present |
| Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to the present |
| Lidocaine-prilocaine | Akorn, Fougera, Hi-Tech, Impax, Sandoz | March 2014 to the present |
| Meprobamate | Dr. Reddy's, Heritage | March 2013 to the present |
| Nimodipine | Ascend, Heritage, Sun | June 2012 to the present |
| Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva | June 2011 to the present |
| Paromomycin | Heritage, Sun | October 2012 to the present |
| Pravastatin | Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Sandoz, Teva, Zydus | May 2013 to the present |
| Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, PLIVA, UDL, Teva, Upsher-Smith | November 2013 to the present |

| Generic Drug | Defendants | Alleged Time Period of Anticompetitive Effects[37] |
|---|---|---|
| Theophylline ER | Heritage, Teva | February 2014 to the present |
| Ursodiol | Actavis, Epic Pharma, Lannett | May 2014 to the present |
| Verapamil | Actavis, Heritage, Mylan | October 2012 to the present |
| Zoledronic Acid | Dr. Reddy's, Heritage, Par | January 2013 to the present |

1.     *Acetazolamide Conspiracy (Heritage, Lannett, Taro, Teva, and Zydus)*

784.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

785.    Beginning at a time yet to be determined, but no later than April 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of acetazolamide throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

786.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of acetazolamide in violation of federal and state laws, including those specified below.

787.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)      To fix, stabilize, maintain, and/or raise prices of acetazolamide sold throughout the United States;

(b)      To allocate customers, the volume of sales, and/or market shares of acetazolamide sold throughout the United States;

(c)      To control the production and/or sale of acetazolamide throughout the United States; and/or

(d)      To earn supracompetitive profits on the price of acetazolamide sold throughout the United States that resulted from Defendants' collusion.

788.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about acetazolamide sold throughout the United States, including the prices quoted or charged for the sale of acetazolamide;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of acetazolamide sold throughout the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

789.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of acetazolamide to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of acetazolamide throughout the United States.

790.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, and during the relevant time period:

(a)      Price competition in the sale of acetazolamide in the United States has been restrained, suppressed and eliminated;

(b)      Prices for acetazolamide have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of acetazolamide have been deprived of the benefit of free and open competition.

791.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

2. *Albuterol Conspiracy (Mylan and Sun)*

792.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

793.    Beginning at a time yet to be determined, but no later than March 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of albuterol throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

794.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of albuterol in violation of federal and state laws, including those specified below.

795.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)        To fix, stabilize, maintain, and/or raise prices of albuterol sold throughout the United States;

(b)        To allocate customers, the volume of sales, and/or market shares of albuterol sold throughout the United States;

(c)        To control the production and/or sale of albuterol throughout the United States; and/or

(d)         To earn supracompetitive profits on the price of albuterol sold to throughout the United States that resulted from Defendants' collusion.

796.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)         They agreed to exchange, and did exchange, current and future price information about albuterol sold throughout the United States, including the prices quoted or charged for the sale of albuterol;

(b)         They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of albuterol sold throughout the United States; and/or

(c)         They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

797.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of albuterol to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of albuterol throughout the United States.

798.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, and during the relevant time period:

(a)        Price competition in the sale of albuterol throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for albuterol have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of albuterol have been deprived of the benefit of free and open competition.

799.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 3.    *Amitriptyline Conspiracy (Mylan, Par, and Sandoz)*

800.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

801.    Beginning at a time yet to be determined, but no later than May 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of amitriptyline throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

802.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of amitriptyline in violation of federal and state laws, including those specified below.

803.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)       To fix, stabilize, maintain, and/or raise prices of amitriptyline sold throughout the United States;

(b)       To allocate customers, the volume of sales, and/or market shares of amitriptyline sold throughout the United States;

(c)       To control the production and/or sale of amitriptyline throughout the United States; and/or

(d)       To earn supracompetitive profits on the price of amitriptyline sold throughout the United States that resulted from Defendants' collusion.

804.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)       They agreed to exchange, and did exchange, current and future price information about amitriptyline sold throughout the United States, including the prices quoted or charged for the sale of amitriptyline;

261

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of amitriptyline sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

805.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of amitriptyline to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of amitriptyline throughout the United States.

806.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, and during the relevant time period:

(a)     Price competition in the sale of amitriptyline throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for amitriptyline have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors,); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of amitriptyline have been deprived of the benefit of free and open competition.

807.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

4.   *Baclofen Conspiracy (Lannett, Par, Teva, and Upsher-Smith)*

808.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

809.   Beginning at a time yet to be determined, but no later than February 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of baclofen throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

810.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of baclofen in violation of federal and state laws, including those specified below.

811.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)         To fix, stabilize, maintain, and/or raise prices of baclofen sold throughout the United States;

(b)         To allocate customers, the volume of sales, and/or market shares of baclofen sold throughout the United States;

(c)         To control the production and/or sale of baclofen throughout the United States; and/or

(d)         To earn supracompetitive profits on the price of baclofen sold throughout the United States that resulted from Defendants' collusion.

812.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)         They agreed to exchange, and did exchange, current and future price information about baclofen sold throughout the United States, including the prices quoted or charged for the sale of baclofen;

(b)         They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of baclofen sold throughout the United States; and/or

(c)         They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

813.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the

prices of baclofen to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of baclofen throughout in the United States.

814.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, and during the relevant time period:

(a)        Price competition in the sale of baclofen throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for baclofen have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of baclofen have been deprived of the benefit of free and open competition.

815.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

5.    *Benazepril HCTZ Conspiracy (Mylan and Sandoz)*

816.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

817.    Beginning at a time yet to be determined, but no later than August 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of benazepril HCTZ throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

818.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of benazepril HCTZ in violation of federal and state laws, including those specified below.

819.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)       To fix, stabilize, maintain, and/or raise prices of benazepril HCTZ sold throughout the United States;

(b)       To allocate customers, the volume of sales, and/or market shares of benazepril HCTZ sold throughout the United States;

(c)       To control the production and/or sale of benazepril HCTZ throughout the United States; and/or

(d)       To earn supracompetitive profits on the price of benazepril HCTZ sold throughout the United States that resulted from Defendants' collusion.

266

820.  In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)       They agreed to exchange, and did exchange, current and future price information about benazepril HCTZ sold in the United States, including the prices quoted or charged for the sale of benazepril HCTZ;

(b)       They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of benazepril HCTZ sold throughout the United States; and/or

(c)       They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

821.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of benazepril HCTZ to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of benazepril HCTZ throughout the United States.

822.  As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)       Price competition in the sale of benazepril HCTZ among Defendants and their co-conspirators throughout the United States has been restrained, suppressed and eliminated;

(b)       Prices for benazepril HCTZ have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)       UHS, Pharmacy Assignors, and other payors and/or purchasers of benazepril HCTZ have been deprived of the benefit of free and open competition.

823.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

> 6.     *Clobetasol Conspiracy (Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)*

824.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

825.    Beginning at a time yet to be determined, but no later than June 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of clobetasol throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

826.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of clobetasol in violation of federal and state laws, including those specified below.

827.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)        To fix, stabilize, maintain, and/or raise prices of clobetasol sold throughout the United States;

(b)        To allocate customers, the volume of sales, and/or market shares of clobetasol sold throughout the United States;

(c)        To control the production and/or sale of clobetasol throughout the United States; and/or

(d)        To earn supracompetitive profits on the price of clobetasol sold throughout the United States that resulted from Defendants' collusion.

828.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)        They agreed to exchange, and did exchange, current and future price information about clobetasol sold throughout the United States, including the prices quoted or charged for the sale of clobetasol;

(b)         They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of clobetasol sold throughout the United States; and/or

(c)         They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

829.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of clobetasol to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of clobetasol throughout the United States.

830.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)         Price competition in the sale of clobetasol throughout the United States has been restrained, suppressed and eliminated;

(b)         Prices for clobetasol have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of clobetasol have been deprived of the benefit of free and open competition.

831.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

7.        *Clomipramine Conspiracy (Mylan, Sandoz, and Taro)*

832.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

833.    Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of clomipramine throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

834.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of clomipramine in violation of federal and state laws, including those specified below.

835.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of clomipramine sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of clomipramine sold throughout the United States;

(c)     To control the production and/or sale of clomipramine throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of clomipramine sold throughout the United States that resulted from Defendants' collusion.

836.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about clomipramine sold throughout the United States, including the prices quoted or charged for the sale of clomipramine;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of clomipramine sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

837.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of clomipramine to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of clomipramine throughout the United States.

838.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)         Price competition in the sale of clomipramine among Defendants and their co-conspirators throughout the United States has been restrained, suppressed and eliminated;

(b)         Prices for clomipramine have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)         UHS, Pharmacy Assignors, and other payors and/or purchasers of clomipramine have been deprived of the benefit of free and open competition.

839.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

8.   *Desonide Conspiracy (Actavis, Fougera, Perrigo, Sandoz, and Taro)*

840.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

841.   Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of desonide in the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

842.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of desonide in violation of federal and state laws, including those specified below.

843.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)        To fix, stabilize, maintain, and/or raise prices of desonide sold throughout the United States;

(b)        To allocate customers, the volume of sales, and/or market shares of desonide sold throughout the United States;

(c)        To control the production and/or sale of desonide throughout the United States; and/or

(d)        To earn supracompetitive profits on the price of desonide sold throughout the United States that resulted from Defendants' collusion.

844.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)        They agreed to exchange, and did exchange, current and future price information about desonide sold throughout the United States, including the prices quoted or charged for the sale of desonide;

(b)        They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of desonide sold throughout the United States; and/or

(c)        They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

845.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of desonide to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy;

issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of desonide throughout the United States.

846.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of desonide throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for desonide have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of desonide have been deprived of the benefit of free and open competition.

847.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

9.   _Digoxin Conspiracy (Impax, Lannett, Mylan, Par, Sun, and West-Ward)_

848.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

849. Beginning at a time yet to be determined, but no later than October 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of digoxin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

850. The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of digoxin in violation of federal and state laws, including those specified below.

851. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of digoxin sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of digoxin sold throughout the United States;

(c)     To control the production and/or sale of digoxin throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of digoxin sold throughout the United States that resulted from Defendants' collusion.

852.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about digoxin sold throughout the United States, including the prices quoted or charged for the sale of digoxin;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of digoxin sold throughout the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

853.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of digoxin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of digoxin throughout the United States.

854.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)        Price competition in the sale of digoxin throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for digoxin have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of digoxin have been deprived of the benefit of free and open competition.

855.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

10.    *Divalproex ER Conspiracy (Dr. Reddy's, Mylan, Par, and Zydus)*

856.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

857.    Beginning at a time yet to be determined, but no later than June 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of divalproex ER throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

858.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding

the production, pricing, marketing, and/or sale of divalproex ER in violation of federal and state laws, including those specified below.

859.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)        To fix, stabilize, maintain, and/or raise prices of divalproex ER sold throughout the United States;

(b)        To allocate customers, the volume of sales, and/or market shares of divalproex ER sold throughout in the United States;

(c)        To control the production and/or sale of divalproex ER throughout the United States; and/or

(d)        To earn supracompetitive profits on the price of divalproex ER sold throughout the United States that resulted from Defendants' collusion.

860.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)        They agreed to exchange, and did exchange, current and future price information about divalproex ER sold throughout the United States, including the prices quoted or charged for the sale of divalproex ER;

(b)        They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of divalproex ER sold throughout the United States; and/or

(c)        They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

861.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of divalproex ER to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of divalproex ER throughout the United States.

862.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)        Price competition in the sale of divalproex ER throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for divalproex ER have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of divalproex ER have been deprived of the benefit of free and open competition.

863.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

            *11.*    *Doxycycline Conspiracy (Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)*

864.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

865.    Beginning at a time yet to be determined, but no later than October 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of doxycycline throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

866.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of doxycycline in violation of federal and state laws, including those specified below.

867.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of doxycycline sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of doxycycline sold throughout the United States;

(c)    To control the production and/or sale of doxycycline throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of doxycycline sold throughout the United States that resulted from Defendants' collusion.

868.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about doxycycline sold throughout the United States, including the prices quoted or charged for the sale of doxycycline;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of doxycycline sold throughout the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

869.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of doxycycline to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of doxycycline throughout the United States.

870.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)        Price competition in the sale of doxycycline throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for doxycycline have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by United); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of doxycycline have been deprived of the benefit of free and open competition.

871.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 12. *Econazole Conspiracy (Fougera, Perrigo, Taro, and Teligent)*

872.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

873.    Beginning at a time yet to be determined, but no later than July 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of econazole throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

874.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of econazole in violation of federal and state laws, including those specified below.

875.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of econazole sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of econazole sold throughout the United States;

(c)     To control the production and/or sale of econazole throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of econazole sold throughout the United States that resulted from Defendants' collusion.

876.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about econazole sold throughout the United States, including the prices quoted or charged for the sale of econazole;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of econazole sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

877.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of econazole to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance

286

with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of econazole throughout the United States.

878.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of econazole throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for econazole have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)    UHS, Pharmacy Assignors, and other payors and/or purchasers of econazole have been deprived of the benefit of free and open competition.

879.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 13.    _Fluocinonide Conspiracy (Actavis, Taro, and Teva)_

880.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

881.    Beginning at a time yet to be determined, but no later than June 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding

and conspiracy not to compete on the sale of fluocinonide throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

882.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of fluocinonide in violation of federal and state laws, including those specified below.

883.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of fluocinonide sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of fluocinonide sold throughout the United States;

(c)    To control the production and/or sale of fluocinonide throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of fluocinonide sold throughout the United States that resulted from Defendants' collusion.

884.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about fluocinonide sold throughout the United States, including the prices quoted or charged for the sale of fluocinonide;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of fluocinonide sold throughout the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

885.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of fluocinonide to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of fluocinonide throughout the United States.

886.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)      Price competition in the sale of fluocinonide throughout the United States has been restrained, suppressed and eliminated;

(b)        Prices for fluocinonide have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)        UHS, Pharmacy Assignors, and other payors and/or purchasers of fluocinonide have been deprived of the benefit of free and open competition.

887.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 14.    *Fosinopril HCTZ Conspiracy (Aurobindo, Citron, Glenmark, Heritage, and Sandoz)*

888.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

889.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of fosinopril HCTZ in the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

890.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding

the production, pricing, marketing, and/or sale of fosinopril HCTZ in violation of federal and state laws, including those specified below.

891.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of fosinopril HCTZ sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of fosinopril HCTZ sold throughout the United States;

(c)     To control the production and/or sale of fosinopril HCTZ throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of fosinopril HCTZ sold throughout the United States that resulted from Defendants' collusion.

892.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about fosinopril HCTZ sold throughout the United States, including the prices quoted or charged for the sale of fosinopril HCTZ;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of fosinopril HCTZ sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

893.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of fosinopril HCTZ to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of fosinopril HCTZ throughout the United States.

894.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of fosinopril HCTZ throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for fosinopril HCTZ have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of fosinopril HCTZ have been deprived of the benefit of free and open competition.

895.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 15.     *Glipizide-Metformin Conspiracy (Heritage, Mylan, and Teva)*

896.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

897.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of glipizide-metformin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

898.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of glipizide-metformin in violation of federal and state laws, including those specified below.

899.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)　To fix, stabilize, maintain, and/or raise prices of glipizide-metformin sold throughout the United States;

(b)　To allocate customers, the volume of sales, and/or market shares of glipizide-metformin sold throughout the United States;

(c)　To control the production and/or sale of glipizide-metformin throughout the United States; and/or

(d)　To earn supracompetitive profits on the price of glipizide-metformin sold throughout the United States that resulted from Defendants' collusion.

900.　In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)　They agreed to exchange, and did exchange, current and future price information about glipizide-metformin sold throughout the United States, including the prices quoted or charged for the sale of glipizide-metformin;

(b)　They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of glipizide-metformin sold throughout the United States; and/or

(c)　They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

901.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of glipizide-metformin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of glipizide-metformin throughout the United States.

902.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)   Price competition in the sale of glipizide-metformin throughout the United States has been restrained, suppressed and eliminated;

(b)   Prices for glipizide-metformin have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)   UHS, Pharmacy Assignors, and other payors and/or purchasers of glipizide-metformin have been deprived of the benefit of free and open competition.

903.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 16.   *Glyburide Conspiracy (Aurobindo, Citron, Heritage, and Teva)*

904.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

905.   Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of glyburide throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

906.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of glyburide in violation of federal and state laws, including those specified below.

907.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of glyburide sold throughout the United States;

(d)   To allocate customers, the volume of sales, and/or market shares of glyburide sold throughout the United States;

(e)     To control the production and/or sale of glyburide throughout the United States; and/or

(f)     To earn supracompetitive profits on the price of glyburide sold throughout the United States that resulted from Defendants' collusion.

908.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about glyburide sold throughout the United States, including the prices quoted or charged for the sale of glyburide;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of glyburide sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

909.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of glyburide to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy;

and/or exchanging confidential information on the pricing and/or sale of glyburide throughout the United States.

910.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of glyburide throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for glyburide have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)    UHS, Pharmacy Assignors, and other payors and/or purchasers of glyburide have been deprived of the benefit of free and open competition.

911.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 17.    *Glyburide-Metformin Conspiracy (Actavis, Aurobindo, Citron, Heritage, and Teva)*

912.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

913.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint,

Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of glyburide-metformin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

914.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of glyburide-metformin in violation of federal and state laws, including those specified below.

915.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of glyburide-metformin sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of glyburide-metformin sold throughout the United States;

(c)    To control the production and/or sale of glyburide-metformin throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of glyburide-metformin sold throughout the United States that resulted from Defendants' collusion.

916.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about glyburide-metformin sold throughout the United States, including the prices quoted or charged for the sale of glyburide-metformin;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of glyburide-metformin sold throughout the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

917.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of glyburide-metformin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of glyburide-metformin throughout the United States.

918.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)      Price competition in the sale of glyburide-metformin throughout the United States has been restrained, suppressed and eliminated;

(b)      Prices for glyburide-metformin sold by Defendants and their co-conspirators have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of glyburide-metformin have been deprived of the benefit of free and open competition.

919.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 18.    *Leflunomide Conspiracy (Apotex, Heritage, and Teva)*

920.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

921.    Beginning at a time yet to be determined, but no later than April 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of leflunomide throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

922. The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of leflunomide in violation of federal and state laws, including those specified below.

923. The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a) To fix, stabilize, maintain, and/or raise prices of leflunomide sold throughout the United States;

(b) To allocate customers, the volume of sales, and/or market shares of leflunomide sold throughout the United States;

(c) To control the production and/or sale of leflunomide throughout the United States; and/or

(d) To earn supracompetitive profits on the price of leflunomide sold throughout the United States that resulted from Defendants' collusion.

924. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a) They agreed to exchange, and did exchange, current and future price information about leflunomide sold throughout the United States, including the prices quoted or charged for the sale of leflunomide;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of leflunomide sold throughout the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

925.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of leflunomide to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of leflunomide throughout the United States.

926.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of leflunomide throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for leflunomide have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of leflunomide have been deprived of the benefit of free and open competition.

927.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 19.    *Levothyroxine Conspiracy (Lannett, Mylan, and Sandoz)*

928.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

929.    Beginning at a time yet to be determined, but no later than August 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of levothyroxine throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

930.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of levothyroxine in violation of federal and state laws, including those specified below.

931.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of levothyroxine sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of levothyroxine sold throughout the United States;

(c)     To control the production and/or sale of levothyroxine throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of levothyroxine sold throughout the United States that resulted from Defendants' collusion.

932.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about levothyroxine sold throughout the United States, including the prices quoted or charged for the sale of levothyroxine;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of levothyroxine sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

933. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of levothyroxine to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of levothyroxine throughout the United States.

934. As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a) Price competition in the sale of levothyroxine throughout the United States has been restrained, suppressed and eliminated;

(b) Prices for levothyroxine have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c) UHS, Pharmacy Assignors, and other payors and/or purchasers of levothyroxine have been deprived of the benefit of free and open competition.

935. UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

20.   *Lidocaine-Prilocaine Conspiracy (Akorn, Fougera, Hi-Tech, Impax, and Sandoz)*

936.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

937.   Beginning at a time yet to be determined, but no later than March 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of lidocaine-prilocaine throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

938.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of lidocaine-prilocaine in violation of federal and state laws, including those specified below.

939.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of lidocaine-prilocaine sold throughout the United States;

(b)      To allocate customers, the volume of sales, and/or market shares of lidocaine-prilocaine sold throughout the United States;

(c)      To control the production and/or sale of lidocaine-prilocaine throughout the United States; and/or

(d)      To earn supracompetitive profits on the price of lidocaine-prilocaine sold throughout the United States that resulted from Defendants' collusion.

940.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)      They agreed to exchange, and did exchange, current and future price information about lidocaine-prilocaine sold throughout the United States, including the prices quoted or charged for the sale of lidocaine-prilocaine;

(b)      They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of lidocaine-prilocaine sold throughout the United States; and/or

(c)      They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

941.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of lidocaine-prilocaine to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to

their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of lidocaine-prilocaine throughout the United States.

942.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of lidocaine-prilocaine throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for lidocaine-prilocaine have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)    UHS, Pharmacy Assignors, and other payors and/or purchasers of lidocaine-prilocaine have been deprived of the benefit of free and open competition.

943.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

21.    *Meprobamate Conspiracy (Dr. Reddy's and Heritage)*

944.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

945.    Beginning at a time yet to be determined, but no later than March 2013, and continuing in force or effect, or both, through the date of filing of this Complaint,

Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of meprobamate throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

946.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of meprobamate in violation of federal and state laws, including those specified below.

947.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of meprobamate sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of meprobamate sold throughout the United States;

(c)    To control the production and/or sale of meprobamate throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of meprobamate sold throughout the United States that resulted from Defendants' collusion.

948.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about meprobamate sold throughout the United States, including the prices quoted or charged for the sale of meprobamate;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of meprobamate sold throughout the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

949.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of meprobamate to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of meprobamate throughout the United States.

950.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

311

(a)      Price competition in the sale of meprobamate throughout the United States has been restrained, suppressed and eliminated;

(b)      Prices for meprobamate have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of meprobamate have been deprived of the benefit of free and open competition.

951.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

22.   *Nimodipine Conspiracy (Ascend, Heritage, and Sun)*

952.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

953.   Beginning at a time yet to be determined, but no later than June 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of nimodipine throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

954.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding

the production, pricing, marketing, and/or sale of nimodipine in violation of federal and state laws, including those specified below.

955.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of nimodipine sold throughout the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of nimodipine sold throughout the United States;

(c)   To control the production and/or sale of nimodipine throughout the United States; and/or

(d)   To earn supracompetitive profits on the price of nimodipine sold throughout the United States that resulted from Defendants' collusion.

956.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about nimodipine sold throughout the United States, including the prices quoted or charged for the sale of nimodipine;

313

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of nimodipine sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

957.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of nimodipine to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of nimodipine throughout the United States.

958.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of nimodipine throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for nimodipine have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of nimodipine have been deprived of the benefit of free and open competition.

959.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

23.    *Nystatin Conspiracy (Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)*

960.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

961.    Beginning at a time yet to be determined, but no later than June 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of nystatin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

962.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of nystatin in violation of federal and state laws, including those specified below.

963.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of nystatin sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of nystatin sold throughout the United States;

(c)     To control the production and/or sale of nystatin throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of nystatin sold throughout the United States that resulted from Defendants' collusion.

964.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about nystatin sold throughout the United States, including the prices quoted or charged for the sale of nystatin;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of nystatin sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

965.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of nystatin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of nystatin throughout the United States.

966.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of nystatin throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for nystatin have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)    UHS, Pharmacy Assignors, and other payors and/or purchasers of nystatin have been deprived of the benefit of free and open competition.

967.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.   The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 24.   *Paromomycin Conspiracy (Heritage and Sun)*

968.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

969.   Beginning at a time yet to be determined, but no later than October 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of paromomycin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

970.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of paromomycin in violation of federal and state laws, including those specified below.

971.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of paromomycin sold throughout the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of paromomycin sold throughout the United States;

(c)     To control the production and/or sale of paromomycin throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of paromomycin sold throughout the United States that resulted from Defendants' collusion.

972.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about paromomycin sold throughout the United States, including the prices quoted or charged for the sale of paromomycin;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of paromomycin sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

973.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of paromomycin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance

with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of paromomycin throughout the United States.

974.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)    Price competition in the sale of paromomycin throughout the United States has been restrained, suppressed and eliminated;

(b)    Prices for paromomycin have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)    UHS, Pharmacy Assignors, and other payors and/or purchasers of paromomycin have been deprived of the benefit of free and open competition.

975.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.   The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

25.    *Pravastatin Conspiracy (Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Sandoz, Teva, and Zydus)*

976.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

977.    Beginning at a time yet to be determined, but no later than May 2013, and continuing in force or effect, or both, through the date of filing of this Complaint,

Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of pravastatin throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

978.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of pravastatin in violation of federal and state laws, including those specified below.

979.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of pravastatin sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of pravastatin sold throughout the United States;

(c)    To control the production and/or sale of pravastatin throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of pravastatin sold throughout the United States that resulted from Defendants' collusion.

980.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about pravastatin sold throughout the United States, including the prices quoted or charged for the sale of pravastatin;

(b)    They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of pravastatin sold throughout the United States; and/or

(c)    They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

981.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of pravastatin to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of pravastatin throughout the United States.

982.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of pravastatin throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for pravastatin have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of pravastatin have been deprived of the benefit of free and open competition.

983.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

26.   *Propranolol Conspiracy (Actavis, Breckenridge, Heritage, Mylan, Par, PLIVA, Teva, UDL, and Upsher-Smith)*

984.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

985.   Beginning at a time yet to be determined, but no later than November 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of propranolol throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

986.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of propranolol in violation of federal and state laws, including those specified below.

987.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of propranolol sold throughout the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of propranolol sold throughout the United States;

(c)    To control the production and/or sale of propranolol throughout the United States; and/or

(d)    To earn supracompetitive profits on the price of propranolol sold throughout the United States that resulted from Defendants' collusion.

988.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)    They agreed to exchange, and did exchange, current and future price information about propranolol sold throughout the United States, including the prices quoted or charged for the sale of propranolol;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of propranolol sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

989.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of propranolol to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of propranolol throughout the United States.

990.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of propranolol throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for propranolol have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of propranolol have been deprived of the benefit of free and open competition.

991.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 27.    *Theophylline ER Conspiracy (Heritage and Teva)*

992.    Plaintiff incorporates by reference ¶¶ 1 through 759 above.

993.    Beginning at a time yet to be determined, but no later than February 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of theophylline ER throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

994.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of theophylline ER in violation of federal and state laws, including those specified below.

995.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among

Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of theophylline ER sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of theophylline ER sold throughout the United States;

(c)     To control the production and/or sale of theophylline ER throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of theophylline ER sold throughout the United States that resulted from Defendants' collusion.

996.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about theophylline ER sold throughout the United States, including the prices quoted or charged for the sale of theophylline ER;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of theophylline ER sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

997.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of theophylline ER to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of theophylline ER throughout the United States.

998.    As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of theophylline ER throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for theophylline ER have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of theophylline ER have been deprived of the benefit of free and open competition.

999.    UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the

type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

28. *Ursodiol Conspiracy (Actavis, Epic Pharma, and Lanett)*

1000.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

1001.   Beginning at a time yet to be determined, but no later than May 2014, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of ursodiol throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

1002.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of ursodiol in violation of federal and state laws, including those specified below.

1003.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of ursodiol sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of ursodiol sold throughout the United States;

(c)     To control the production and/or sale of ursodiol throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of ursodiol sold throughout the United States that resulted from Defendants' collusion.

1004.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about ursodiol sold throughout the United States, including the prices quoted or charged for the sale of ursodiol;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of ursodiol sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

1005.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of ursodiol to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy;

and/or exchanging confidential information on the pricing and/or sale of ursodiol throughout the United States.

1006.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)      Price competition in the sale of ursodiol throughout the United States has been restrained, suppressed and eliminated;

(b)      Prices for ursodiol have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of ursodiol have been deprived of the benefit of free and open competition.

1007.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.   The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

29.   *Verapamil Conspiracy (Actavis, Heritage, and Mylan)*

1008.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

1009.   Beginning at a time yet to be determined, but no later than October 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding

and conspiracy not to compete on the sale of verapamil throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

1010.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of verapamil in violation of federal and state laws, including those specified below.

1011.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)      To fix, stabilize, maintain, and/or raise prices of verapamil sold throughout the United States;

(b)      To allocate customers, the volume of sales, and/or market shares of verapamil sold throughout the United States;

(c)      To control the production and/or sale of verapamil throughout the United States; and/or

(d)      To earn supracompetitive profits on the price of verapamil sold throughout the United States that resulted from Defendants' collusion.

1012.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about verapamil sold throughout the United States, including the prices quoted or charged for the sale of verapamil;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of verapamil sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

1013.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of verapamil to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of verapamil throughout the United States.

1014.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of verapamil throughout the United States has been restrained, suppressed and eliminated;

(b)      Prices for verapamil have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)      UHS, Pharmacy Assignors, and other payors and/or purchasers of verapamil have been deprived of the benefit of free and open competition.

1015.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

### 30.      *Zoledronic Acid Conspiracy (Dr. Reddy's, Heritage, and Par)*

1016.   Plaintiff incorporates by reference ¶¶ 1 through 759 above.

1017.   Beginning at a time yet to be determined, but no later than January 2013, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of zoledronic acid throughout the United States in unreasonable restraint of trade and commerce in violation of federal and state laws, including those specified below.

1018.   The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of zoledronic acid in violation of federal and state laws, including those specified below.

1019.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of zoledronic acid sold throughout the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of zoledronic acid sold throughout the United States;

(c)     To control the production and/or sale of zoledronic acid throughout the United States; and/or

(d)     To earn supracompetitive profits on the price of zoledronic acid sold throughout the United States that resulted from Defendants' collusion.

1020.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about zoledronic acid sold throughout the United States, including the prices quoted or charged for the sale of zoledronic acid;

(b)     They agreed to coordinate or set prices, price levels, price terms, price movements, and/or production levels of zoledronic acid sold throughout the United States; and/or

(c)     They agreed not to compete for certain customers or sales on certain products sold throughout the United States.

1021.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of zoledronic acid to be sold throughout the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of zoledronic acid throughout the United States.

1022.   As a result of Defendants and their co-conspirators' conspiracy in violation of federal and state laws, including those specified below, and during the relevant time period:

(a)     Price competition in the sale of zoledronic acid throughout the United States has been restrained, suppressed and eliminated;

(b)     Prices for zoledronic acid have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States (including the prices as paid by UHS and Pharmacy Assignors); and

(c)     UHS, Pharmacy Assignors, and other payors and/or purchasers of zoledronic acid have been deprived of the benefit of free and open competition.

1023.   UHS and Pharmacy Assignors have been injured in their business or property by reason of Defendants and their co-conspirators' antitrust violations in

amounts not yet ascertained.  The injuries of UHS and Pharmacy Assignors are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants and their co-conspirators' conduct unlawful.

## XVI.   <u>LEGAL CLAIMS FOR RELIEF AND CAUSES OF ACTION</u>

### FIRST CLAIM FOR RELIEF

**Violation of Federal Antitrust Law**
**(Damages, Pharmacy Assignor Direct Purchases; Injunctive Relief)**

1024.  Plaintiff incorporates by reference the allegations in all preceding paragraphs.

1025.  As set forth above, each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs sold throughout the United States.

1026.  Each Defendant's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Section 3, 15 U.S.C. § 3, as an unreasonable restraint of trade.  Defendants' conduct is *per re* unlawful under antitrust law.

1027.  Each of the Defendants has committed at least one overt act in furtherance of one or more of the conspiracies alleged in this Complaint.

1028.  The acts done by each of the Defendants as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1029.   The anticompetitive acts by Defendants and their co-conspirators had, and continues to have, a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the generic drugs at issue throughout the United States.

1030.   As a proximate result of Defendants' unlawful conduct, UHS and Pharmacy Assignors have been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs in the United States.

1031.   UHS and Pharmacy Assignors have been injured and will continue to be injured in their business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct.

1032.   UHS, by virtue of its assignments from Pharmacy Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.   Such damages have been suffered in an amount to be proven at trial.

1033.   UHS is separately and further entitled, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to an injunction against Defendants, restraining and preventing the violations alleged in this Complaint, as well as attorneys' fees and costs, and all other forms of relief available under federal law.

## SECOND CLAIM FOR RELIEF

### Violation of Minnesota Antitrust Law
### (Damages, All UHS Payments)

1034.   Plaintiff incorporates by reference the allegations in all preceding

paragraphs.

1035.  As set forth above, each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs throughout the United States, including as paid in Minnesota.

1036.  Each Defendant's conduct violated, and continues to violate, Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, *et seq*., as an unreasonable restraint of trade. Defendants' conduct is *per re* unlawful under the Minnesota Antitrust Law.

1037.  As set forth above, as well as in the State AG Complaint, a substantial number of significant events including meetings and other acts establishing and furthering the Defendants' unlawful agreements took place and were performed in the State of Minnesota.  Numerous such events and acts were further organized and participated in by Defendants' employees and representatives who reside in the State of Minnesota, and numerous communications central to and effectuating and/or furthering the conspiracies alleged in this Complaint were sent from and/or received in Minnesota. *See, e.g., supra* §§ VIII, IX.

1038.  In addition, at all relevant times, UHS,[38] a Minnesota corporation headquartered in Minnesota, was contractually responsible for the payments for the Price-Fixed Generic Drugs dispensed to UnitedHealthcare Insureds.  UHS entered agreements with PBMs, pursuant to which UHS was, and is, responsible for paying PBMs for pharmaceutical drugs, including the Price-Fixed Generic Drugs prescribed and

---

[38] As used in this paragraph, UHS refers to the entity United HealthCare Services, Inc.

dispensed to UnitedHealthcare Insureds throughout the United States.  UHS entered these contracts, received invoices, and ensured and administered for payment pursuant thereto in amounts totaling several billion dollars for the Price-Fixed Generic Drugs at its headquarters in Hennepin County, Minnesota.  Employees involved with making, processing, and managing payments to the PBMs for UnitedHealthcare Insured's claims for the Price-Fixed Generic Drugs work and reside in Minnesota.  Likewise, employees with knowledge of UHS's agreements and payment relationships work and reside in Minnesota.

1039.   The distribution scheme employed by Defendants involves contracting with distributors and/or retailers.  Through their relationship with the distributors and/or retailers who sold the Price-Fixed Generic Drugs, Defendants were able to ensure sales of the Price-Fixed Generic Drugs to UnitedHealthcare Insureds nationwide, paid for by UHS.

1040.   During the relevant period, through either Defendants themselves or the regional and national distributors and retailers that Defendants have engaged for the sale of the Price-Fixed Generic Drugs, many millions of dollars' worth of the Price-Fixed Generic Drugs have been, and continue to be, sold and/or paid for in Minnesota each year.

1041.   The anticompetitive acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on Minnesota commerce by artificially raising and fixing prices for the generic drugs at issue, as were paid in, and/or

out from, Minnesota, and otherwise injuring corporations and persons located in Minnesota.

1042.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce in Minnesota and interstate commerce flowing in to or out from Minnesota, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in Minnesota.

1043.   As a proximate result of Defendants' violation of Minnesota Antitrust Law, UHS has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs dispensed to insureds throughout the United States, and UHS has suffered damages in an amount to be proven at trial.

1044.   UHS has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct in violation of Minnesota Antitrust Law.

1045.   In light of the foregoing, and other facts to be learned and developed through discovery and/or proved at trial, Plaintiff seeks treble damages under Minnesota law for all overcharges incurred and paid by UHS as a result of Defendants' conduct, as well as attorneys' fees and costs, and all other forms of relief available under Minn. Stat. § 325D.49, *et seq*.

## THIRD CLAIM FOR RELIEF

### Violation of Various State Antitrust and Consumer Protection Statutes
### (Damages/Monetary Relief for UHS Payments, In the Alternative)

1046.   Plaintiff incorporates by reference the allegations in ¶¶ 1 through 1033.

1047.   This claim for relief is pleaded in the alternative to the Second Claim for Relief, in the event that the Court disagrees that UHS's statutory claims for damages and/or monetary relief for all payments made for drugs dispensed to UnitedHealthcare Insureds are governed by Minnesota.

1048.   By engaging in the conduct alleged above, each of the Defendants has entered into one or more contracts, combinations, or conspiracies in restraint of trade violating the antitrust and competition statutes of each the following States and territories:

    (a)   **Alabama:** Ala. Code §§ 6-5-60, *et seq.*; §§ 8-10-1, *et seq.*

    (b)   **Arizona**:  Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

    (c)   **California**:  Cal. Bus. Code §§ 16700, *et seq.*

    (d)   **Connecticut**:  Conn. Gen. Stat. Ann. § 35-24, *et seq.*

    (e)   **District of Columbia**:  D.C. Code Ann. §§ 28-4501, *et seq.*

    (f)   **Hawaii**:  Haw. Rev. Stat. §§ 480-1, *et seq.*

    (g)   **Illinois**:  740 Ill. Comp. Stat. 10/1, *et seq.*

    (h)   **Iowa**:  Iowa Code §§ 553.1, *et seq.*

    (i)   **Kansas**:  Kan. Stat. Ann. §§ 50-101, *et seq.*

    (j)   **Maine**:  Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

    (k)   **Michigan**:  Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

    (l)   **Minnesota**:  Minn. Stat. §§ 325D.49, *et seq.*

    (m)   **Mississippi**:  Miss. Code Ann. §§ 75-21-1, *et seq.*

    (n)   **Nebraska**:  Neb. Code Ann. §§ 59-801, *et seq.*

(o) **Nevada**:  Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

(p) **New Hampshire**:  N.H. Rev. Stat. §§ 356:1, *et seq.*

(q) **New Mexico**:  N.M. Stat. Ann. §§ 57-1-1, *et seq.*

(r) **New York**:  New York Gen. Bus. Law §§ 340, *et seq.*

(s) **North Carolina**:  N.C. Gen. Stat. §§ 75-1, *et seq.*

(t) **North Dakota**:  N.D. Century Code §§51-08.1-01, *et seq.*

(u) **Oregon:**  Or. Rev. Stat. §§ 646.705, *et seq.*

(v) **Puerto Rico**:  10 L.P.R.A. §§ 257, *et seq.*

(w) **Rhode Island**:  R.I. Gen. Laws §§ 6-36-1, *et seq.*

(x) **South Dakota**:  S.D. Codified Laws §§ 37-1-3.1, *et seq.*

(y) **Tennessee**:  Tenn. Code Ann. §§ 47-25-101, *et seq.*

(z) **Utah**:  Utah Code §§ 76-10-3101, *et seq.*

(aa) **Vermont**:  Vt. Stat. Ann. 9, §§ 2453, *et seq.*

(bb) **West Virginia**:  W. Va. Code §§ 47-18-1, *et seq.*

(cc) **Wisconsin**:  Wis. Stat. §§ 133.03, *et seq.*

1049.  The conduct of each of the Defendants further constitutes unfair competition or unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the consumer protection statutes of each the following States and territories:

(a) **Arkansas**:  Ark. Code §§ 4-88-101, *et seq.*

(b) **California**:  Cal. Bus. & Prof. Code §§ 17200, *et seq.*

(c) **District of Columbia**:  D.C. Code §§ 28-3901, *et seq.*

(d)    **Florida**:  Fla. Stat. §§ 501.201, *et seq.*

(e)    **Massachusetts**:   Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq.*

(f)    **Nebraska**:  Neb. Code Ann. §§ 59-1601, *et seq.*

(g)    **Nevada**:  Nev. Rev. Stat. § 598.0903, *et seq.*

(h)    **New Hampshire**:  N.H. Rev. Stat. §§ 358-A, *et seq.*

(i)    **New Mexico**:  N.M. Stat. Ann. §§ 57-12-1, *et seq.*

(j)    **New York**:  New York Gen. Bus. Law §§ 349, *et seq.*

(k)    **North Carolina**:  N.C. Gen. Stat. §§ 75-1.1, *et seq.*

(l)    **South Dakota**:  S.D. Codified Laws §§ 37-24-1, *et seq.*

(m)   **Utah**:  Utah Code §§ 13-5-1, *et seq.*

(n)    **Vermont**:  Vt. Stat. Ann. 9, §§ 2451, *et seq.*

(o)    **Virginia**:  Va. Code Ann. § 59.1-196, *et seq.*

(p)    **West Virginia**:  W. Va. Code §§ 46A-6-101, *et seq.*

(q)    **Wisconsin**:  Wis. Stat. §§ 100.18, *et seq.*

1050.   The unlawful acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the generic drugs at issue as sold, paid for, and/or dispensed in each State or territory.

1051.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

1052.   During the relevant period, through either Defendants themselves or the regional and national distributors and retailers that Defendants have engaged for the sale of the Price-Fixed Generic Drugs, many millions of dollars' worth of the Price-Fixed Generic Drugs have been, and continue to be, sold in each of the above States and territories every year.

1053.   As a direct and proximate result of Defendants' violation of each of the foregoing laws, UHS has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs dispensed to insureds throughout the United States, and UHS has suffered damages in an amount to be proven at trial.

1054.   There was and is a gross and unconscionable disparity between the price that UHS paid and continues to pay for the generic drugs at issue, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1055.   UHS has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

1056.   Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

1057.   In light of the foregoing, and other facts to be learned and developed through discovery and/or proved at trial, Plaintiff seeks damages, trebled or multiplied to the full extent permitted by each of the foregoing States and territories, for all

overcharges incurred and paid by UHS as a result of Defendants' conduct, restitution, as well as attorneys' fees and costs, and all other forms of relief available.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (UHS and Pharmacy Assignor Payments)

1058.   Plaintiff incorporates by reference the allegations in ¶¶ 1 through 1023.

1059.   To the extent required, this claim is pleaded in the alternative to the other claims and/or causes of action in this Complaint.

1060.   Defendants have unlawfully benefited from their sales because of the unlawful and inequitable acts alleged in this Complaint.   Defendants unlawfully overcharged UHS and Pharmacy Assignors, who paid for the Price-Fixed Generic Drugs at prices that were more than they would have been but for Defendants' unlawful actions.

1061.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by UHS and Pharmacy Assignors.

1062.   To their economic detriment, UHS and Pharmacy Assignors have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges.

1063.   Defendants have been enriched by revenue resulting from unlawful overcharges for the Price-Fixed Generic Drugs while UHS and Pharmacy Assignors have suffered an impoverishment by the overcharges they paid for the Price-Fixed Generic Drugs imposed through Defendants' unlawful conduct.   Defendants' enrichment and the impoverishment to UHS and Pharmacy Assignors are connected.

1064.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused an impoverishment to UHS and Pharmacy Assignors, having paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1065.   UHS and Pharmacy Assignors did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1066.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of the Price-Fixed Generic Drugs.

1067.   The benefits conferred upon Defendants are measurable, in that the revenues Defendants have earned due to their unlawful overcharges of the Price-Fixed Generic Drugs are ascertainable by review of sales and/or payment records.

1068.   As to payments by UHS, it would be futile for UHS to seek a remedy from any party with whom they have privity of contract.   Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from UHS with respect to Defendants' sales of the Price-Fixed Generic Drugs.

1069.   As to payments by UHS, it would be futile for UHS to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased or paid for the Price-Fixed Drugs, as the intermediaries are not liable and cannot reasonably be expected to compensate UHS for Defendants' unlawful conduct.

1070.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for the Price-Fixed Generic Drugs is a direct and proximate result of Defendants' unlawful practices.

1071.   The financial benefits derived by Defendants rightfully belong to UHS, because UHS and its Pharmacy Assignors paid supracompetitive prices during the relevant period, inuring to the benefit of Defendants.

1072.   It would be inequitable under unjust enrichment principles of Minnesota, or alternatively, all States and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Price-Fixed Generic Drugs derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1073.   Defendants are aware of and appreciate the benefits bestowed upon them by UHS and its Pharmacy Assignors.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

1074.   Defendants should be compelled to disgorge in a common fund for the benefit of UHS all unlawful or inequitable proceeds they received from their sales of the Price-Fixed Generic Drugs.

1075.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to the payments made by UHS and Pharmacy Assignors for the Price-Fixed Generic Drugs.

1076.   UHS has no adequate remedy at law.

1077.   By engaging in the foregoing unlawful or inequitable conduct depriving UHS of lower prices for the Price-Fixed Generic Drugs and forcing them to pay higher prices for the Price-Fixed Generic Drugs, Defendants have been unjustly enriched in violation of the common law of Minnesota, or alternatively, all States and territories in the United States, except Ohio and Indiana.

## XVII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following relief:

A.      A jury verdict in the amount of all compensatory damages sustained as a result of Defendants' conduct.

B.      A judgment against Defendants, jointly and severally, by the Court, in treble the amount of the jury verdict, and for attorneys' fees, costs, and interest.

C.      A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

D.      Restitution and disgorgement.

E.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: January 16, 2019

BOIES SCHILLER FLEXNER LLP
Hamish P.M. Hume
Abby L. Dennis
Kyle Smith
1401 New York Ave, NW
Washington, D.C. 20005
Telephone:  (202) 895-7580
hhume@bsfllp.com
adennis@bsfllp.com
ksmith@bsfllp.com

Duane L. Loft
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
dloft@bsfllp.com

ZELLE LLP
By:  */s/ Rory D. Zamansky*
Rory D. Zamansky (MN Bar #0330620)
500 Washington Avenue South,
Suite 4000
Minneapolis, MN 55415
Telephone:  (612) 339-2020
rzamansky@zelle.com

Judith A. Zahid
Eric W. Buetzow
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 693-0700
jzahid@zelle.com
ebuetzow@zelle.com

James R. Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Avenue, NW,
Suite 375
Washington, D.C. 20006
Telephone:  (202) 899-4100
jmartin@zelle.com
jhackett@zelle.com

***ATTORNEYS FOR PLAINTIFF***
***UNITED HEALTHCARE SERVICES,***
***INC.***

4818-8679-2068